UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

EDEN ALPHA CI LLP, individually and on
behalf of all others similarly situated,

**MEMORANDUM & ORDER
22-CV-6606 (NGG) (VMS)**

Plaintiff,

-against-

POLISHED.COM INC. F/K/A 1847 GOEDEKER
INC., DOUGLAS T. MOORE, ALBERT
FOUERTI, MARIA JOHNSON,

Defendants.

NICHOLAS G. GARAUFIS, United States District Judge.

Lead Plaintiff Eden Alpha CI LLP ("Plaintiff") brings this putative
class action against Polished.com Inc. ("Polished"), Douglas
Moore, Albert Fouerti, and Maria Johnson (collectively, "Defend-
ants"), alleging violations of the federal securities laws. (Am.
Compl. (Dkt. 34).) Pending before the court are Defendants
Moore, Fouerti, and Johnson's (the "Individual Defendants") mo-
tion for consideration and/or judicial notice of certain documents
and motion to dismiss the Amended Complaint. (Individual De-
fendants' Motion for Judicial Notice ("Defs.' Mot. for Not.") (Dkt.
48-2); Individual Defendants' Motion to Dismiss ("Defs.' MTD")
(Dkt. 48-1).) For the reasons that follow, the motion for consid-
eration and/or judicial notice is GRANTED in part and DENIED
in part, the motion to dismiss is GRANTED, and Plaintiff's request
for leave to file a second amended complaint is GRANTED.

1

# I.   BACKGROUND

## A.   General Background[1]

Plaintiff represents a putative class of investors who acquired publicly traded Polished common stock between August 12, 2021 and July 31, 2023 (the "Class Period"). (Am. Compl. ¶ 3.) Defendants are Polished, a Delaware corporation that sold, among other things, fitness equipment, furniture, and commercial appliances to consumers and businesses; Douglas Moore, Polished's CEO from August 2019 to August 31, 2021; Albert Fouerti, Polished's CEO from September 1, 2021 to October 14, 2022; and Maria Johnson, Polished's CFO from July 2021 to October 14, 2022. (*Id.* ¶¶ 14-18.)

Founded in 1951 as Goedeker Television Co., Polished expanded from a brick-and-mortar appliance store to a large, nationwide appliance retailer that conducted the majority of its business online. (*Id.* ¶¶ 28-29.) In January 2019, 1847 Goedeker Inc. was incorporated in the State of Delaware as a Special Purpose Acquisition Company with "the sole purpose of acquiring substantially all of the assets of Goedeker Television Co." (*Id.* ¶¶ 4, 30.) 1847 Goedeker completed the acquisition of Goedeker Television in April 2019 and thereafter traded on the New York Stock Exchange under the ticker symbol "GOED." (*Id.*) 1847 Goedeker eventually changed its name to "Polished.com Inc.," and its ticker symbol to "POL." (*Id.* ¶ 37.)

Brothers Albert and Elie Fouerti founded Appliances Connection ("AC"), an online appliance retailer, in 2015. (*Id.* ¶ 31.) The company was "one of the leading retailers of household appliances in the U.S.," with a showroom in Brooklyn and multiple warehouses

---

[1] The following facts are drawn from the Amended Complaint and, for purposes of this motion to dismiss, are assumed to be true. *See Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 349 (2d Cir. 2022).

on the east coast, including a warehouse in Hamilton, New Jersey called YF Logistics LLC ("YF Logistics"). (*Id.* ¶¶ 31, 45; Pl.'s MTD Opp. (Dkt. 48-20) at 2.) Albert Fouerti served as AC's CEO from 2015 through June 1, 2021. (Am. Compl. ¶ 17.)

In August 2020, Polished executives began negotiating with the Fouerti brothers a potential merger of AC into Polished. (*Id.* ¶ 32.) As part of its due diligence, then-CEO of Polished Douglas Moore visited YF Logistics in Hamilton, New Jersey, and AC's headquarters in Brooklyn, New York. (*Id.* ¶ 33.) Additionally, in anticipation of the acquisition, Polished formed a wholly owned subsidiary—Appliances Connection, Inc. ("ACI")—to purchase AC's assets. (*Id.* ¶ 34.) Polished's Board of Directors approved the acquisition of AC in October 2020, and the acquisition closed on June 2, 2021. (*Id.* ¶¶ 32, 36.) Upon closing, AC's assets became part of ACI, and Albert Fouerti became President of ACI. (*Id.* ¶ 34.) A few months later, in September 2021, Fouerti replaced Moore as Polished's CEO. (*Id.* ¶ 17.)

## B. Alleged Improper Business Practices

Plaintiff alleges that Albert Fouerti—first at AC and then at Polished alongside Moore and Johnson—engaged in several fraudulent, illegal, or otherwise improper business practices. (Am. Compl. ¶¶ 38-84.) Through the reports of eleven anonymous former employees ("FEs") at Polished and YF Logistics, Plaintiff claims that Polished: (1) committed fraud with respect to inventory numbers, (2) forged and falsified documents as a routine business practice, (3) employed undocumented workers who lacked work permits or social security numbers, and (4) fired its former Vice President of Logistics after he disclosed the improper practices to Moore and attempted to discuss the practices with Fouerti and Johnson. (*Id.* ¶¶ 52-72, 75-84.)

Several FEs report deficiencies in YF Logistics' inventory practices. (*Id.* ¶¶ 52-65.) FE5, a "Manifest Manager" at YF Logistics from June 2022 to August 2023, and FE7, an "Inventory Control

Manager" at YF Logistics from January 2021 to December 2022—both of whom reported to Danny Jean, the warehouse manager—report that YF Logistics "never had an accurate count of its inventory" and that "there would always be material inconsistencies between the inventory listed on paper, and the much smaller actual count." (*Id.* ¶¶ 42, 44, 52-53.) FE6, an IT support specialist at YF Logistics from February 2022 to December 2022, also claims that "the physical count was never correct." (*Id.* ¶¶ 43, 52.) FE7 further reports that a manager named "Luigi" would "let employees buy appliances from the 'scrap' pile for cash, for enormous discounts, and then pocket the cash." (*Id.* ¶ 53.) FE6 claims that "employees stole many appliances from YF Logistics' warehouse." (*Id.*) Moreover, when FE11, an "Inventory Control Manager" at YF Logistics from October 2020 to March 2021, made multiple suggestions to Elie Fouerti on ways to improve inventory practices, Fouerti reportedly rejected those suggestions. (*Id.* ¶¶ 48, 54.) FE2, a "Reverse Logistics Manager" at Polished from October 2015 to December 2021 who reported to Polished's VP of Logistics, claims to have been similarly rebuffed after raising inventory concerns with "management." (*Id.* ¶¶ 39, 57.)

FE3, a "Dispute Analyst" at AC and Polished from September 2019 to July 2023, reported to a manager that in turn reported to Albert Fouerti. (*Id.* ¶ 40.) FE3 reportedly sat two desks away from Albert Fouerti in Polished's Brooklyn office. (*Id.*) At an unspecified time and date, FE3 claims to have heard Albert Fouerti state during a meeting that "every piece of inventory must be carried as available for sale, even if it was damaged." (*Id.* ¶ 55.) FE3 reportedly received numerous complaints a day from unhappy customers and personally observed that "many of the warehoused items available for sale were actually damaged." (*Id.*) Also at an unspecified time and date, FE3 allegedly heard Albert Fouerti state that, "even if an item was not in stock, [] AC would sell it, charge the customers the second the order was

placed, and then keep the money." (*Id.* ¶ 56.) FE3 also claims to "know[] that Albert Fouerti forged AC's, and then later ACI's, inventory numbers," although FE3 provides no basis for that knowledge. (*Id.*) Likewise, although they provide no basis for this knowledge, FE3, FE5, FE6, and FE7 all claim that "Polished's publicly reported inventory numbers were materially false." (*Id.* ¶ 58.)

Next, according to the Amended Complaint, multiple FEs "observed that Albert and Elie Fouerti repeatedly ordered [] documents [] forged, and mandated that employees perform unethical and illegal business practices." (*Id.* ¶ 59.) FE2 reports that Albert and Elie Fouerti ordered an employee in Brooklyn named Ketevan Talakvadze to repeatedly forge documents. For example, "if a product was returned after 35 days, outside the window to return it to a manufacturer, the Fouertis ordered Talakvadze to alter the document so that it appeared the appliance had been returned within the time limit." (*Id.* ¶ 60.) FE2 further claims that YF Logistics would ship damaged products, charge the customer for the cost of the return, and then collect a refund from the shipper for the damages, thus allowing YF Logistics to "recoup[] even more money." (*Id.* ¶ 61.) FE8, who worked in the customer service department at a YF Logistics warehouse in Somerset, New Jersey from November 2021 to October 2022, reports similar conduct. (*Id.* ¶¶ 45, 64.)

According to FE3 and FE10, a Customer Service Supervisor at Polished from September 2020 to March 2022, AC and later ACI "forged customer signatures, delivery signatures, and lied to convince credit card companies that products had been delivered with no damage when they were actually damaged when delivered, gaining a material advantage with respect to chargeback resolutions." (*Id.* ¶¶ 47, 62-63.) FE4, who handled credit card disputes at Polished from 2018 to 2022, reports similar conduct. (*Id.* ¶¶ 41, 65.) FE9, a customer service supervisor at Polished

from March 2018 to March 2022, likewise reports that "ACI employees routinely changed dates on invoices so that valid warranty claims would be outside the warranty period," and claims to have personally observed forged signatures on delivery orders, falsely indicating that lost appliances were delivered. (*Id.* ¶¶ 46, 63.)

The Amended Complaint also alleges that Polished and/or YF Logistics employed undocumented workers. (*Id.* ¶¶ 66-72.) For example, FE6 claims that "numerous workers at YF Logistics openly told FE6 that they were undocumented, were hired under an alias, with no supporting paperwork, and were paid in cash." (*Id.* ¶ 68.) FE3 states that Sam Bazzi, head of Human Resources at Polished from January 2021 to July 2021, "found that 60% of the workers at YF Logistics had no social security numbers and were not authorized to work in the U.S." (*Id.* ¶ 69.) When FE3 brought these statistics to Albert Fouerti's attention at some unspecified time, FE3 was fired. (*Id.* ¶ 69.)

The Amended Complaint further contends that Albert Fouerti fired FE1—Polished's VP of Logistics from October 2020 to November 2021—after FE1 attempted to bring the above issues to management's attention. (*Id.* ¶¶ 75-84.) After the AC acquisition, FE1 visited ACI's facilities "to see how ACI was run in order to successfully merge its systems and practices with Polished's systems and practices." (*Id.* ¶ 75.) From these visits, FE1 reportedly concluded that "Albert Fouerti was requiring illegal and unethical fraudulent practices, resulting in serious systemic and operational issues at ACI." (*Id.* ¶ 76.) On September 9, 2021, FE1 reported these issues via email to Robert Barry, a Polished executive, and several other individuals in Polished's management. (*Id.* ¶¶ 76-80.) Barry reportedly told FE1 that he should discuss these issues with Albert Fouerti and Maria Johnson. (*Id.* ¶ 82.) According to the Amended Complaint, "[a] series of emails were

exchanged between FE1, Fouerti, and others," and Fouerti eventually "asked FE1 to meet with him and Johnson at 2:30 p.m. on September 21, 2021." (*Id.*) During the September 21 meeting, FE1 "attempted to discuss the concerns and fraudulent practices he had raised in his September 9, 2021 email," but as the meeting went on, Fouerti became "openly hostile . . . interrupting FE1 constantly . . . bec[oming] louder [and] attacking FE1 on a personal level." (*Id.* ¶ 83.) Fouerti eventually told FE1 that he was "finished" with FE1, and Johnson later confirmed that FE1 was fired. (*Id.* ¶¶ 83, 84.)

Finally, FE3 claims that, at an unspecified time and date, Albert Fouerti created a fake salesperson profile, assigned "about half of all online orders" to that fake salesperson, and reaped the commissions on those orders. (*Id.* ¶ 74.) Plaintiff also notes, and the Individual Defendants do not dispute, that Albert Fouerti charged Polished approximated $800,000 for expenses unrelated to the company and its operations. (*Id.* ¶¶ 73, 154; Defs.' MTD at 5.)

### C.   Financial Disclosures and Polished's Decline

Plaintiff claims that Polished, Moore, Fouerti, and Johnson made several material misrepresentations and omissions during the Class Period, across five financial disclosures. (Am. Compl. ¶¶ 167-173 (citing the Q2 2021 Form 10-Q filed on August 12, 2021; the Q3 2021 Form 10-Q filed on November 15, 2021; the Q3 2021 earnings call held on November 15, 2021; the 2021 Form 10-K filed on March 31, 2022; and the Q1 2022 Form 10-Q filed on May 16, 2022).)[2] The challenged statements generally fall into four categories: (1) financial metrics and opinions regarding Polished's future prospects (*id.* ¶¶ 116, 118, 126, 128);

---

[2] Form 10–K (or "10-K") is an annual financial report filed with the SEC. Likewise, Form 10-Q (or "10-Q") is a quarterly financial report filed with the SEC.

(2) restated financial metrics (*id.* ¶¶ 134, 138, 144); (3) statements and certifications regarding Polished's internal controls (*id.* ¶¶ 120, 130, 132, 136, 146); and (4) statements concerning Polished's fulfilment, logistics, and returns processes (*id.* ¶¶ 122, 124, 140, 142). In general, these disclosures represented that Polished was profitable and opined that the company would continue operating as a going concern in the months or year to come.

Following the last of the challenged disclosures in May 2022, Polished's affairs took a turn for the worse. On August 15, 2022, Polished announced that it would delay its Q2 2022 Form 10-Q filing because of an ongoing internal investigation, stating:

> The Audit Committee of [Polished's] Board of Directors ("Audit Committee") ***recently began an independent investigation regarding certain allegations made by certain former employees related to the Company's business operations***. The investigation is ongoing, and the Audit Committee continues to work diligently with independent counsel and consultants to complete the investigation as soon as possible. The Company cannot predict the duration of the investigation, [its] eventual scope, its outcome, or its impact on the Company's financial results. As a result of the additional time required to complete the investigation, the Company has not finalized its financial statements for the period ended June 30, 2022. The Company expects that it will finalize its financial statements and file the related Second Quarter 10-Q as soon as practicable after the conclusion of the investigation, but does not anticipate that it will be in a position to file the Second Quarter 10-Q on or before [the deadline].

(*Id.* ¶ 148 (emphasis in original).) According to Plaintiff, "[o]n this news, Polished's stock price fell 35.7%, from $75.50 at the

close on August 15, 2022, to $48.50 at the close on August 16, 2022." (*Id.* ¶ 149.)

On August 25, 2022, Polished announced that it had engaged an independent consulting firm "to augment its existing management, identify opportunities to accelerate long-term profitable growth and, separately, to potentially expedite the Audit Committee of the Board of Directors' ongoing investigation." (*Id.* ¶ 150.) A few months later, on October 14, 2022, Albert Fouerti, Maria Johnson, and Elie Fouerti resigned from the company. (*Id.* ¶ 151.) Polished then issued several additional statements detailing its ongoing internal investigation and announcing a delay in the filing of its Q3 2022 Form 10-Q. (*Id.* ¶¶ 152-53.)

On December 22, 2022, Polished disclosed the results of the Audit Committee's internal investigation, listing the key findings as follows:

> The Company was charged by its former Chief Executive Officer [Albert Fouerti] approximately $800,000 for expenses unrelated to the Company and its operations.

> The Company appears to not have had in place all the necessary documentation for all of its employees and, in turn, may have failed to comply with certain legal requirements. As elaborated on below, the Company has subsequently put in place enhanced controls to remedy any labor issues and believes it is now in full compliance with legal requirements.

> The Company's controls, software and procedures for managing and tracking inventory, including damaged inventory, were insufficient. As elaborated on below, the Company has subsequently put in place enhanced controls to remedy such issues.

(*Id.* ¶ 154.) A few days later, Polished announced that its independent registered public accounting firm, Friedman LLP

("Friedman"), had resigned, withdrawn its audit for fiscal year 2021, and declined to be associated with the quarterly financial statements for Q2 2021, Q3 2021, or Q1 2022. (*Id.* ¶ 155.)

Finally, on July 31, 2023, Polished filed its delayed 2022 Form 10-K (the "July Restatement") with the Securities and Exchange Commission (the "SEC"), in which it restated its financial results for fiscal year 2021 and Q1 of 2022. (*Id.* ¶ 156.) As to fiscal year 2021, the company restated its previously issued 2021 Form 10-K to reflect the following adjustments:

*Consolidated Statement of Operations*

1. Reduction in revenue of $16.6 million, which comprised the following: (1) an increase in the allowance for sales returns of $7.4 million, (2) revenue of $8.1 million that should be recognized in 2022, and (3) sales tax collections of $1.1 million improperly recognized as revenue.

2. Net reduction in cost of goods of $6.7 million, which comprised of the following: (1) reduction in product cost of sales due to an increase in the allowance for sales returns of $4.0 million, (2) reduction in product cost of sales of $6.0 million relating to revenue cutoff that should be recognized in 2022, and (3) an offsetting increase in cost of goods sold from an over accrual of vendor rebates ($0.4 million), under accrual of vendor purchases ($1.5 million), and an error in inventory cutoff ($1.4 million).

3. Increase in general and administrative expenses of $0.9 million, resulting from an increase in bad debt expense of $0.6 million in accordance with the Company's policy for allowance for doubtful accounts, and an over accrual of sales tax receivable of $0.3 million.

4. As a result of the changes above, income tax changed from a tax benefit of $4.4 million to a tax expense of $0.1 million.

*Consolidated Balance Sheet*

5. Net increase in current assets of $6.6 million, which comprised the following: (1) increase in inventory of $7.7 million, resulting from the reduction in cost of goods sold attributable to the allowance for sales returns, revenue cutoff, and inventory cutoff, offset by a reduction in showroom inventory of $1.0 million that was reclassified as property and equipment, (2) reduction in receivables of $1.1 million, resulting from an increase to the allowance for doubtful accounts of $0.6 million, and an over accrual of vendor rebates (as detailed in Nos. 1-4 above).

6. Net increase in current liabilities of $18.3 million, which comprised the following: (1) increase in accounts payable of $10.3 million, as a result of the increase in the allowance for sales returns, and an under accrual of sales tax refund receivable (netted with the sales tax liability), and (2) increase in customer deposits related to revenue cutoff (as detailed in Nos. 1-4 above).

7. Increase in long-term liabilities of $4.5 million, relating to an increase to the deferred tax liability as a result of the changes described above.

(July Restatement (Dkt. 48-10) at ECF pp. 162-63 (emphasis in original).) As to Q1 2022, Polished restated its previously issued Q1 2022 Form 10-Q to reflect the following adjustments:

*Consolidated Statements of Operations*

1. Revenue declined by $4.1 million because of an understatement of a returns allowance and revenue cutoff issues.

11

2. Cost of goods sold increased $1.0 million, net by reclassification of expenses from operating expenses to cost of goods sold offset by the reduction in product cost associated with the reduction in revenue.

3. Operating expense declined by $1.9 million primarily by reclassification of operating expense to cost of goods sold.

4. Other income (expense) various miscellaneous adjustments totaling $0.2 million.

5. Income tax expense declined by $3.3 million.

6. As a result of the above adjustments, net income declined by $0.1 million.

*Consolidated Balance Sheet*

7. Current assets declined by $13.2 million from a $3.8 million reduction in vendor rebate accrual, inventory declined by $6.7 million, net from changes to sales returns allowance and revenue cutoff adjustments, and prepaid expenses declined by $2.7 million by to adjust for charging some items to expense, rather than prepaid expense.

8. Reclassification of showroom inventory to property and equipment.

9. Eliminate a right-of-use asset on a property that was not occupied.

10. Reflect the issuance of shares granted to two directors.

11. Reflect adjustments made to 2021 accumulated deficit and adjustment to net income for the three months ended March 31, 2022.

(*Id.* at ECF p. 206 (emphasis in original).) According to Plaintiff, following the July Restatement, "Polished's stock price fell 68%, from $31.55 at the close on July 31, 2023, to $10.00 at the close on August 1, 2023." (Am. Compl. ¶ 157.)

### D. Procedural History

On October 21, 2022, Plaintiff filed suit against Polished, the Individual Defendants, and several others, alleging violations of the Securities Exchange Act of 1934 (the "Exchange Act"). (Compl. (Dkt. 1).) Over the next few months, three different plaintiffs moved for appointment of lead plaintiff and lead counsel, with some submitting memoranda in opposition to the other's motions. (*See* Dkts. 6-15.) The court referred these motions to Magistrate Judge Vera M. Scanlon for decision pursuant to 28 U.S.C. § 636(b)(1)(A) and Federal Rule of Civil Procedure 72(a). (Order Dated 1/11/2023.) In September 2023, Judge Scanlon appointed Eden Alpha CI LLP as lead plaintiff and The Rosen Law Firm, P.A. as lead counsel. (Mem. and Order Appointing Lead Plaintiff (Dkt. 30) at 2.)

On October 31, 2023, on consent of the parties and by order of the court, Plaintiff filed the operative Amended Complaint, alleging: (Count I) violations of Section 10(b) of the Exchange Act and the SEC Rule 10b-5(b) against Polished, Fouerti,[3] and Johnson; (Count II) violations of Section 10(b) and Rule 10b-5(a) and (c) against Polished and Fouerti; and (Count III) violations of Section 20(a) against the Individual Defendants. (Stipulation and Order (Dkt. 33); Am. Compl. ¶¶ 167-190.) Count I alleges that several statements in Polished's Q2 2021 Form 10-Q, Q3 2021 Form 10-Q, Q3 2021 earnings call, 2021 Form 10-K, and Q1 2022 Form 10-Q were false or materially misleading, as evidenced by the allegations of the FEs and the July Restatement. (Am. Compl. ¶¶ 167-173.) Building upon these alleged misrepresentations, Count II claims scheme liability as to Polished and Fouerti, and Count III claims control person liability as to the Individual Defendants. (*Id.* ¶¶ 180-190.)

---

[3] From this point forward, unless otherwise noted, references to "Fouerti" are to Albert Fouerti.

13

Although Counts I, II, and III refer only to Polished, Moore, Fouerti, and Johnson, the Amended Complaint's caption listed numerous other individuals and entities as Defendants. (*See* Am. Compl.) Consequently, when those individuals and entities moved to delete their names from the caption, the court granted their motions, leaving Polished, Moore, Fouerti, and Johnson as the remaining Defendants in this case. (*See, e.g.*, Letter Mot. to Amend Caption (Dkt. 35); Order Granting Mot. to Amend (Dkt. 37).)

On February 27, 2024, the court held a pre-motion conference at which it granted Defendants' request to file a motion to dismiss the Amended Complaint. (Minute Entry Dated 2/27/2024.) Soon thereafter, on March 7, 2024, Polished filed for Chapter 7 bankruptcy in the United States Bankruptcy Court for the District of Delaware, triggering an automatic stay of the proceedings pursuant to 11 U.S.C. § 362(a). (Notice of Bankruptcy (Dkt. 42).) *See In re Polished.com Inc., et al.*, No. 24-BK-10353 (Bankr. D. Del.) However, as automatic stays generally do not apply to non-bankrupt codefendants, the proceedings continued against the Individual Defendants.[4] (*See* Pl.'s Letter Dated 3/11/2024 (Dkt. 43).)

---

[4] "It is well-established that stays pursuant to § 362(a) are limited to debtors and do not encompass non-bankrupt co-defendants." *Tchrs. Ins. And Annuity Ass'n of Am. v. Butler*, 803 F.2d 61, 65 (2d Cir. 1986). As such, courts in this circuit regularly decline to extend a debtor corporation's automatic stay to its non-debtor officers and principals. *See Gray v. Hirsch*, 230 B.R. 239, 242 (Bankr. S.D.N.Y. 1999) (collecting cases). While an automatic stay *can* apply to non-debtors, it does so only in unusual circumstances, "when a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate." *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287 (2d Cir. 2003). "The question is whether the action against the non-debtor is sufficiently likely to have a material effect upon reorganization efforts, [such] that debtor protection requires

On June 21, 2024, the Individual Defendants filed their fully briefed motion to dismiss the Amended Complaint under Federal Rules of Civil Procedure 12(b)(6) and 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4. (Defs.' MTD; Pl.'s MTD Opp.; Defs.' Reply in Supp. of MTD ("Defs.' Reply") (Dkt. 48-22).) At the same time, the Individual Defendants filed a fully briefed motion requesting that the court consider and/or take judicial notice of certain documents. (*See* Defs.' Mot. for Not.; Pl.'s Opp. to Mot. for Not. (Dkt. 48-21); Defs.' Reply in Supp. of Mot. for Not. (Dkt. 48-23).)

---

an exception to the usual limited scope of the stay." *Plaintiff Funding Holding, LLC v. Blue Ocean Partners LLC,* No. 22-CV-4094 (KPF), 2023 WL 3506142, at *1 (S.D.N.Y. Apr. 18, 2023) (internal quotation marks and citation omitted). Moreover, "[a] court should not extend the automatic stay where the non-debtor is independently liable as, for example, where the debtor and another are joint tortfeasors or where the nondebtor's liability rests upon his own breach of duty." *Franco v. Ideal Mortg. Bankers, Ltd.,* No. 7-CV-3956 (JS) (AKT), 2017 WL 5195223, at *2 (E.D.N.Y. Nov. 9, 2017) (internal quotation marks and citation omitted).

After Polished filed for bankruptcy, Plaintiff informed the court that it intended to dismiss Polished from the case without prejudice and pursue its claims solely against the Individual Defendants. (Pl.'s Letter Dated 3/11/2024 at 1.) It has not done so, and Polished remains a named Defendant in this action. *See* John M. Wunderlich, *Bankruptcy's Protection For Non-Debtors From Securities Fraud Litigation,* 16 FORDHAM J. CORP. & FIN. L. 375, 395 n.115 (2011) (noting that, generally, "a securities fraud case against non-debtors goes forward without the debtor-company named in the suit [such that,] in practice, whether the court should extend the automatic stay usually is not an issue"). Neither party has raised the issue of whether the automatic stay should extend to the Individual Defendants. Nor has the Bankruptcy Court taken any action to enjoin the proceedings as to the Individual Defendants. *See generally In re Polished.com Inc., et al.,* No. 24-BK-10353 (Bankr. D. Del.). Thus, because neither party has raised it, the court need not and does not decide whether an extension of the automatic stay to the Individual Defendants would be appropriate in these circumstances.

## II.  LEGAL STANDARD

In considering a motion to dismiss, the court accepts as true all factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor. *See Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008). In addition, the court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Comms., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) ("*ATSI*").[5] To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Complaints alleging securities fraud are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA. *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 166 (2d Cir. 2021) ("*Synchrony*"). Rule 9(b) requires that "a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To satisfy this standard, a plaintiff must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Synchrony*, 988 F.3d at 167. "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI*, 493 F.3d at 99.

The PSLRA expands on the Rule 9(b) standard, requiring securities fraud complaints to "specify each misleading statement; . . .

---

[5] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

set forth the facts on which a belief that a statement is misleading was formed; and . . . state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012); *see also* 15 U.S.C. § 78u–4(b)(1), (2). "The requisite state of mind in a Rule 10b-5 action is an intent to deceive, manipulate or defraud." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168 (2d Cir. 2000). Such an intent may be established "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99.

### III. MOTION FOR CONSIDERATION AND/OR JUDICIAL NOTICE

As previously noted, in ruling on a motion to dismiss, the court may consider the complaint, "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI*, 493 F.3d at 98. "A document is incorporated by reference if the complaint makes[] a clear, definite and substantial reference to the document." *Stinnett v. Delta Air Lines, Inc.*, 278 F. Supp. 3d 599, 608 (E.D.N.Y. 2017). Where a document is not incorporated by reference, the court may nevertheless consider it if "the complaint relies heavily upon [the document's] terms and effect, thereby rendering the document integral to the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

The court "may also consider matters of which judicial notice may be taken under Fed. R. Evid. 201." *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991). A court may take judicial notice of a fact that is "not subject to reasonable dispute" either

because it is "generally known within the trial court's territorial jurisdiction" or because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). It is well-established that courts may take judicial notice of "public disclosure documents required by law to be filed, and actually filed, with the SEC." *Kramer*, 937 F.2d at 774.

Here, the Individual Defendants request that the court "consider and take judicial notice of" sixteen documents and four Financial Accounting Standards Board ("FASB") standards. (Defs.' Mot. for Not. at 3-4, 6-8.) The documents include financial forms filed by Polished with the SEC, press releases, and a transcript of the November 15, 2021 earnings call. (*Id.* at 3-4.) The Individual Defendants argue that these documents are "incorporated by reference into the Amended Complaint and/or [are] a proper subject of judicial notice." (*Id.* at 1.) Plaintiff opposes this request. (Pl.'s Opp. to Mot. for Not. at 1.)

The court agrees with the Individual Defendants that it may consider Exhibits 1-12 because they are incorporated by reference in the Amended Complaint. However, Exhibits 13-16 are not incorporated by reference in the Amended Complaint, and the court concludes that it would be inappropriate to consider those documents at this time. Lastly, the court will consider the FASB standards just as it would any other source of regulatory authority.

### A. Exhibits 1-12

Exhibits 1-12 include four press releases (contained within Exhibits 8, 9, 10, and 11), a transcript of Polished's Q3 2021 earnings call held on November 15, 2021 (Exhibit 3), and eleven documents filed by Polished with the SEC (Exhibits 1, 2, 4-12). (Defs.' Mot. for Not. at 3-4.) Exhibit 1 is Polished's Q2 2021 Form 10-Q, Exhibit 2 is its Q3 2021 Form 10-Q, Exhibit 3 is a transcript of the Q3 2021 earnings call, Exhibit 4 is its 2021 Form 10-K,

Exhibit 5 is its Q1 2022 Form 10-Q, and Exhibit 7[6] is the July Restatement. (Q2 2021 Form 10-Q (Dkt. 48-4); Q3 2021 Form 10-Q (Dkt. 48-5); Q3 Call Tr. (Dkt. 48-6); 2021 Form 10-K (Dkt. 48-7); Q1 2022 Form 10-Q (Dkt. 48-8); July Restatement.) The Amended Complaint quotes from and makes substantial reference to each of these documents. (Defs.' Mot. for Not. at 3-4. (citing the Amended Complaint).) In fact, the statements contained within Exhibits 1-5 and 7 form the backbone of Plaintiff's Section 10(b) claims. (Am. Compl. ¶¶ 167-179.) Thus, because the Amended Complaint "makes[] a clear, definite and substantial reference" to each of these documents, Exhibits 1-12 are incorporated by reference and deemed part of the Amended Complaint. *Stinnett*, 278 F. Supp. 3d at 608; *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) ("Documents that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered.").

### B.  Exhibits 13-16

Exhibits 13-16 are documents filed with the SEC but not referenced in the Amended Complaint. (Defs.' Mot. for Not. at 7.) They include Polished's 2020 Form 10-K (Exhibit 13) and three Form 4s (Exhibits 14-16). (*Id.*)

As noted above, "[e]ven where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." *Chambers v. Time*

---

[6] Polished filed the July Restatement with the SEC on July 31, 2023, and subsequently amended and refiled the restatement on August 8, 2023. Exhibit 7 is a copy of the amended restatement filed in August 2023. The Individual Defendants represent that Exhibit 7 is "substantially similar to the version filed on July 31, 2023." (Notice Req. at 4 n.2.) Plaintiff does not dispute that assertion. (*See generally* Pl.'s Opp. to Not.) As such, the court accepts that Exhibit 7 is substantially similar to the restatement filed on July 31, 2023.

*Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). "[M]ere notice or possession [of the document in question] is not enough." *Id.* The Amended Complaint does not reference these SEC filings at any point, so they are not incorporated by reference. Nor do the Individual Defendants argue that these filings are "integral" to the Amended Complaint. (*See* Defs.' Mot. for Not.) And even if the filings were integral to the Amended Complaint, the court cannot consider them for the truth of the matters asserted. *Roth*, 489 F.3d at 509. Similarly, while the court may take judicial notice of the SEC filings, it cannot do so to establish the truth of the matters asserted therein. *Id.* ("If the court takes judicial notice, it does so in order to determine what statements [the documents] contained—but. . . *not for the truth of the matters asserted.*" (emphasis in original)). As such, the court declines to consider at this stage the documents contained within Exhibits 13-16.

## C.  FASB Standards

Finally, the Individual Defendants request that the court consider four FASB standards (also referred to as Accounting Standards Codification or "ASC") cited in the Amended Complaint. (Defs.' Mot. for Not. at 4; Am. Compl. ¶¶ 85-86.)

Plaintiff alleges that the Individual Defendants, in making certain financial disclosures, violated Generally Accepted Accounting Principles ("GAAP"). (Am. Compl. ¶¶ 85-115.) "The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the [FASB] and the American Institute of Certified Public Accountants." *In re Bear Stearns Cos., Inc. Sec., Derivative, and ERISA Litig.*, 763 F. Supp. 2d 423, 467 (S.D.N.Y. 2011). The FASB is "the designated organization in the private sector for establishing standards of financial accounting and reporting." *In re WorldCom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 478 n.3 (S.D.N.Y. 2005). These standards "have been recognized by the SEC as authoritative." *Id.* SEC Regulation S–X provides that financial statements filed with the SEC that are

not presented in conformity with GAAP will be presumed to be misleading. 17 C.F.R. § 210.4–01(a)(1). Ultimately, however, "[a]llegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim." *Stevelman v. Alias Rsch. Inc.*, 174 F.3d 79, 84 (2d Cir. 1999).

Plaintiff alleges that the Individual Defendants violated four FASB standards: ASC 606, ASC 330, ASC 705, and ASC 310. (Am. Compl. ¶¶ 85-86, 99, 135.) Although Plaintiffs generally oppose the Individual Defendants' motion, they do not specifically object to the court's consideration of these standards. (*See* Pl.'s Opp. to Mot. for Not.) Logically so: the Amended Complaint relies significantly on alleged violations of FASB standards in attempting to state a securities fraud claim, and Plaintiff presumably wants the court to refer to those standards in adjudicating the motion to dismiss. As such, the court will consider the FASB standards, particularly the standards cited in the Amended Complaint, just as it would any other source of regulatory authority.

In sum, the Individual Defendants' request that the court consider Exhibits 1-12 and the FASB standards is GRANTED, their request that the court consider Exhibits 13-16 is DENIED, and their request that the court take judicial notice of any of these Exhibits is DENIED.

## IV. MOTION TO DISMISS

Plaintiff asserts claims under Sections 10(b) and 20(a) of the Exchange Act. *See* 15 U.S.C. §§ 78j, 78t. Count I of the Amended Complaint alleges violations of Section 10(b) and SEC Rule 10b-5(b) against Polished, Fouerti, and Johnson; Count II alleges violations of Section 10(b) and Rule 10b-5(a) and (c) against Polished and Fouerti; and Count III alleges violations of Section

20(a) against the Individual Defendants.[7] (Am. Compl. ¶¶ 167-190.)

Plaintiff's claims under Section 10(b) and Rule 10b-5(b) require a material misrepresentation or omission and scienter. The Amended Complaint fails to establish these elements; as such, Plaintiff fails to state a claim under Section 10(b). Plaintiff likewise fails to state a claim for scheme liability under Section 10(b) and Rule 10b-5(a) and (c) because the Amended Complaint does not actually describe a scheme in connection with the purchase or sale of securities. Finally, since liability under Section 20(a) is dependent on a primary violation of the Exchange Act, Plaintiff's Section 20(a) claim fails as well.

### A. Primary Liability: Section 10(b) of the Exchange Act and Rule 10b-5(b)

Count I of the Amended Complaint alleges violations of Section 10(b) and Rule 10b-5(b) against Polished, Fouerti, and Johnson. To state a claim under Section 10(b) and Rule 10b-5(b), Plaintiff must plausibly allege: "(1) a material misrepresentation (or omission); (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Singh v. Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019). At issue in this motion to dismiss are elements one, two, and six: material misrepresentation (or omission), scienter, and loss causation. (*See generally* Defs.' MTD.)

### 1. Anonymous Employee Accounts

Before turning to the disputed elements of Plaintiff's Section 10(b) and Rule 10b-5(b) claims, the court addresses the accounts of the eleven anonymous FEs. The Amended Complaint relies on

---

[7] In accordance with the automatic stay, in adjudicating this motion to dismiss the court considers only those allegations against the Individual Defendants, and does not consider nor render a decision on the allegations as to Polished.

the FEs—and the improper business practices they allege—to establish (1) the false or misleading nature of the alleged misrepresentations or omissions and (2) scienter. (Pl.'s MTD Opp. at 10-26.) However, for the reasons that follow, the court concludes that it cannot credit the FE accounts, as currently pleaded, for purposes of establishing either of these elements.

As a general matter, "if personal sources must be identified, there is no requirement that they be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000). "Following *Novak*, district courts in the Second Circuit generally credit anonymous witnesses in two situations." *In re NIO, Inc. Sec. Litig.*, No. 19-CV-1424 (NGG) (JRC), 2021 WL 3566300, at *7 (E.D.N.Y. Aug. 12, 2021). First, courts will credit anonymous witnesses whose "positions and/or job responsibilities are described sufficiently to indicate a high likelihood that they actually knew facts underlying their allegations." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 590 (S.D.N.Y. 2011). Second, where "independent adequately pled factual allegations corroborate a confidential source's statements, the requirement of a description of the source's job is loosened." *Id.* However, anonymous witnesses "cannot be used to merely parrot conclusory allegations contained in the complaint." *Id.* Rather, such sources "must show that individual defendants actually possessed the knowledge highlighting the falsity of public statements; conclusory statements that defendants were aware of certain information, and mere allegations that defendants would have or should have had such knowledge is insufficient." *Id.* at 591 (collecting cases).

As relevant here, courts routinely decline to credit anonymous witness accounts in at least four circumstances. *See Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 798-99 (S.D.N.Y. 2020). First,

courts generally do not credit the statements of anonymous witnesses "who are insufficiently described or whose descriptions do not suggest that they [were] in [a] position to know the facts attributed to them." *Id.* at 799 (collecting cases). Second, statements "that cannot situate in time relevant occurrences are sometimes disregarded because they cannot establish that the challenged statements were knowingly false when made." *Id.* (collecting cases). Third, allegations by anonymous witnesses that are insufficiently particular are often discounted or disregarded. *Id.* at 800 (collecting cases). Fourth, courts tend not to credit uncorroborated statements of anonymous witnesses that are sourced secondhand from individuals "with whom plaintiffs' counsel have not themselves interacted." *Id.* (collecting cases).

Here, each of the FE accounts suffers from one or all of the above deficiencies.

First, the descriptions of many of the FEs do not suggest that they were in a position to know the facts attributed to them. For example, FEs 5, 6, 7, and 8 worked at YF Logistics warehouses in New Jersey, in roles ranging from inventory control manager, to IT support specialist, to customer service representative. (Am. Compl. ¶¶ 42-45.) Nevertheless, FEs 5, 6, and 7 assert that "Polished's publicly reported inventory numbers were materially false," and FE8—a customer service representative—claims that Albert Fouerti ordered employees to engage in fraudulent business practices at ACI. (*Id.* ¶¶ 58, 64.) But these FEs' respective positions at *YF Logistics* do not suggest that they would be in a position to know about *Polished's* or *ACI's* practices more broadly. *See, e.g., Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 223 (S.D.N.Y. 2018) (disregarding statements of five former employees because they "worked mainly within a single [company] unit, so they had no insight on how other [company] units, let alone other [company] divisions, projected aftermarket sales"); *In re China Mobile Games & Ent. Grp.*,

*Ltd Sec. Litig.*, No. 14-CV-4471 (KMW), 2016 WL 922711, at *4 (S.D.N.Y. Mar. 7, 2016) (disregarding allegations of confidential witness ("CW") who worked at a subsidiary, not the parent company, as such testimony "could describe the anomalies of a rogue fiefdom rather than company-wide practices"); *In re Lehman Bros. Sec. & Erisa Litig.*, No. 10-CV-6637 (LAK), 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013) (disregarding CWs who "were loan level underwriters, not managers or corporate officers who could have spoken to the company's practices broadly"); *Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010) (discounting allegations of "low-level" or "rank-and-file" employees" or "outside contractors" whom the complaint did not indicate had any "access to aggregated data regarding [the company's] credit risk"), *aff'd*, 430 F. App'x 63 (2d Cir. 2011).

More importantly, with the exception of FE1 and FE3, none of the FEs are alleged to have "met the Individual Defendants, reported any concerns, received any instructions, or made any personal contact with them during the Class Period." *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 352 (S.D.N.Y. 2011). At best, the FEs claim that they reported to a manager who—sometimes through multiple other persons—ultimately reported to Albert Fouerti. (*See, e.g.*, Am. Compl. ¶¶ 39, 43, 65.) While FE2 and FE8 claim that Albert Fouerti gave certain orders, missing from the Amended Complaint is any indication of "what kind of access [FE2 and FE8] had to [Fouerti], in what form and context [Fouerti] made [these] alleged statement[s], or how [FE2 and FE8 were] privy to [those] statements." *Glaser*, 772 F. Supp. 2d at 595. The absence of any communication between the FEs and the Individual Defendants is fatal to Plaintiff's theory of scienter. Even accepting the FE accounts as true, they do not "show that [the] individual defendants actually possessed the knowledge highlighting the falsity of public statements; [and]

conclusory statements that defendants were aware of certain information, [or] that defendants would have or should have had such knowledge[,] is insufficient." *Patel v. Koninklijke Philips N.V.*, No. 21-CV-4606 (ERK) (MMH), 2024 WL 4265758, at *7 n.4 (E.D.N.Y. Sept. 23, 2024); *see also Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010) (remarking that "Plaintiffs should, but do not, provide specific instances in which Defendants received information that was contrary to their public declarations"); *Glaser*, 772 F. Supp. 2d at 595 (failure to describe how CW was privy to individual defendant's alleged contradictory statement was fatal to the CW's allegations); *Loc. No. 38*, 724 F. Supp. 2d at 460 (discounting CW allegations where there was no indication that the sources had any contact with the individual defendants). This lack of description "is, alone, fatal to [the FEs'] allegations." *Glaser*, 772 F. Supp. 2d at 595; *see also In re Wachovia*, 753 F. Supp. 2d at 352 (refusing to credit CW allegations despite "colorful" accusations of improper business practices because there was "no allegation that any CW met the Individual Defendants, reported any concerns, received any instructions, or made any personal contact with them during the Class Period").

Second, with the exception of FE1, each of the FE accounts are "unmoored in time." *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 408-09 (S.D.N.Y. 2018) (characterizing factual allegations as "problematic" where the complaint "does not attempt to pinpoint when" the relevant issues "became apparent"). While the Amended Complaint provides the start and end date of each FE's employment with Polished or YF Logistics, it does not situate in time any alleged improper business practice or statement by the Individual Defendants. (*See* Am. Compl. ¶¶ 38-84.) "This omission renders the task of matching [FE] allegations to contrary public statements all but impossible, since

allegations about an unspecified time period cannot supply specific contradictory facts available to Defendants *at the time* of an alleged misstatement." *In re Wachovia*, 753 F. Supp. 2d at 352 (emphasis in original). For example, FEs 2, 3, 4, 9, and 10 all began working at ACI or YF Logistics *before* the start of the Class Period in August 2021. (Am. Compl. ¶¶ 39-41, 46-47.) Without any allegation as to when FEs 2, 3, 4, 9, or 10 observed the alleged improper business practices, it is all but impossible to discern when those incidents occurred in relation to the alleged misstatements and omissions, or whether they occurred during the Class Period at all. *See Gregory*, 297 F. Supp. 3d at 409 (disregarding CW accounts where the complaint "alleges that CW–2 worked at [the defendant-company] from May 2015 to July 2016 but otherwise is imprecise as to dates"); *see also In re Wachovia*, 753 F. Supp. 2d at 352 (same). FE11's account is likewise unhelpful, as FE11 left YF Logistics in March 2021, months before the start of the class period. (Am. Compl. ¶ 48) *Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 208 (S.D.N.Y. 2020) (noting that "courts have rejected confidential witness allegations where the confidential witnesses left the company before the class period"). While FEs 5-8 began working at YF Logistics after the start of the Class Period, their accounts are also unspecific as to time, making it impossible to match their allegations to any contrary contemporaneous public statements by the Individual Defendants. *See Gregory*, 297 F. Supp. 3d at 381, 409 (disregarding account of CW who started working at the defendant-company after the start of the class period but whose account was "otherwise is imprecise as to dates").

Next, many of the FE allegations are insufficiently particular. For example, the Amended Complaint claims that "FE8 was instructed to lie and tell customers that the order was backlogged . . . when in fact ACI did not have the product in stock," but does not state who told FE8 to lie or when. (Am. Compl. ¶ 64.) FE3 claims to "know[]" that Albert Fouerti forged AC's, and then later

ACI's, inventory numbers, but provides no explanation as to the basis for their knowledge. (*Id.* ¶ 56.) FE2 asserts that they raised certain issues with "management" at ACI, but does not specify with whom they spoke or when. (*Id.* ¶ 57.) Additionally, FEs 3, 5, 6, and 7 claim that "Polished's publicly reported inventory numbers were materially false," (Am. Compl. ¶ 58.), but this "merely parrot[s the] conclusory allegations contained in the complaint." *Glaser*, 772 F. Supp. at 590; *see also In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d, 365, 376 (S.D.N.Y. 2007) ("[P]laintiffs have not satisfied the heightened pleading requirements [because the CW on whom they rely] merely parrots the conclusory allegations contained in the complaint."). Lastly, while FE1 claims to have reported the improper business practices to certain Polished executives in a September 9, 2021 email, the Amended Complaint does not actually state whether FE1 successfully brought those practices to the attention of Johnson or Albert Fouerti at the September 21, 2021 meeting. (Am. Compl. ¶¶ 76-83.) FE1 claims that he "attempted to discuss the concerns and fraudulent practices" with Fouerti, but states that Fouerti "constantly" interrupted, became loud and hostile, and attacked FE1 on a personal level before firing him. (*Id.* ¶ 83.) FE1 does not detail what information, if any, he shared with Fouerti and Johnson. (*Id.*) Plaintiff effectively asks the court to assume that, after this meeting, Fouerti and Johnson knew about the alleged improper business practices. Such logical leaps will not satisfy the heightened pleading requirements for Plaintiff's securities fraud claim. *See Miao*, 442 F. Supp. 3d at 800 n.21 (collecting cases in which courts disregarded insufficiently particular CW allegations).

Fourth and finally, several of the FE accounts are sourced secondhand from individuals with whom Plaintiff's counsel have not themselves interacted. For example, FE2 claims that Ketevan Talakvadze "told FE2 . . . that she did not want to forge [] documents, but that Albert and Elie Fouerti ordered her to do it." (Am.

Compl. ¶ 60.) Similarly, FE3 alleges that Sam Bazzi told FE3 that "60% of the workers at YF Logistics had no social security numbers and were not authorized to work in the U.S." (*Id.* ¶ 69; *see also id.* ¶ 63 (according to FE9, "[w]hen the customer complained, ACI employees would tell them that the item was delivered, and that ACI had a document proving it"); *id.* ¶ 68 ("FE6 stated that numerous workers at YF Logistics openly told FE6 that they were undocumented, were hired under an alias, with no supporting paperwork, and were paid in cash.").) The foregoing allegations are "particularly uninformative" because they suggest that the FEs obtained their information "through intermediaries, thus undermining the likelihood that [they have] personal knowledge of [their] allegations." *Glaser*, 772 F. Supp. 2d at 595.

In sum, the court concludes that the FE accounts are not "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314. As such, the court will not credit their accounts in assessing the sufficiency of the allegations in the Amended Complaint.

## 2. Alleged Material Misrepresentations and Omissions

"A material misrepresentation or omission must be both (1) false or misleading, and (2) material." *Leadersel Innotech ESG v. Teladoc Health, Inc.*, No. 23-CV-1112, 2024 WL 4274362, at *2 (2d Cir. Sept. 24, 2024) (citing *Singh*, 918 F.3d at 62-63). To adequately allege a material misrepresentation, "a plaintiff must plead facts that show that the defendant made a statement of material fact that was untrue at the time it was made." *In re Liberty Tax, Inc. Sec. Litig.*, 435 F. Supp. 3d 457, 465 (E.D.N.Y. 2020). A misrepresentation or omission is material if there is a "substantial likelihood that a reasonable investor would find the misrepresentation important in making an investment decision."

*United States v. Gramins*, 939 F.3d 429, 445 (2d Cir. 2019); *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (applying same standard to omissions). A misrepresentation or omission is important to a reasonable investor "if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Gramins*, 939 F.3d at 445; *Basic Inc.*, 485 U.S. at 231-32.

Plaintiff alleges that Fouerti and Johnson made numerous material misrepresentations and omissions across four SEC filings and one earnings call. As noted above, the challenged statements generally fall into four categories: (1) financial metrics and opinions regarding Polished's future prospects (Am. Compl. ¶¶ 116, 118, 126, 128); (2) restated financial metrics (*id.* ¶¶ 134, 138, 144); (3) statements and certifications regarding Polished's internal controls (*id.* ¶¶ 120, 130, 132, 136, 146); and (4) statements concerning Polished's fulfilment, logistics, and returns processes (*id.* ¶¶ 122, 124, 140, 142). The court discusses each in turn.

> a.   *Financial metrics and opinions regarding Polished's future prospects*

The first group of challenged statements are financial metrics and opinions contained within Polished's Q2 and Q3 2021 Forms 10-Q. These disclosures were *not* subject to the July Restatement.

Johnson[8] endorsed the following statements in Polished's Q2 2021 Form 10-Q:

---

[8] While Count I alleges primary liability against Fouerti and Johnson, *Moore* and Johnson signed the Q2 2021 Form 10-Q filed on August 12, 2021. (*See* Q2 2021 Form 10-Q at ECF pp. 53-54.) Although the AC merger was complete by August 2021, Fouerti had yet to join Polished as its CEO, and, as such, he did not sign the Q2 2021 Form 10-Q. (Am. Compl. ¶ 17.) Thus, to the extent Plaintiff contends that Fouerti made any misstatements

- For the six months ended June 30, 2021, the Company incurred operating losses of approximately $4,543,516 and negative cash flow from operations of $6,985,302, but had working capital of $15,530,879. Additionally, the Company had over $45 million of unrestricted cash at June 30, 2021. On June 2, 2021, the Company closed on the acquisition of Appliances Connection. Appliances Connection has historically been profitable, however, only 29 days of their operations are included in results for the three and six months of 2021.

- We had an income tax net benefit of $8,048,478 for the three months ended June 30, 2021, as compared to an income tax benefit of $688,953 for the three months ended June 30, 2020. The tax benefit arose from the elimination of the allowance for the deferred tax asset. The acquisition of Appliances Connection on June 2, 2021 makes it more likely than not that the Company will be profitable, and will be able to utilize previously derived net operating losses.

(Q2 2021 Form 10-Q at ECF pp. 15, 37.) Similarly, Fouerti and Johnson endorsed the following statement in Polished's Q3 2021 Form 10-Q:

---

or omissions in the Q2 2021 Form 10-Q, that claim is meritless. *See In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 165 (S.D.N.Y. 2012) (holding that defendant was not primarily liable for misleading statements in SEC filings that he did not sign because he did not "make" the statements they contained).

- For the nine months ended September 30, 2021, the Company had operating profit of $2.0 million, $18.3 million of cash flow used in operations, and working capital of $20.0 million. Additionally, the Company had $27.2 million of unrestricted cash at September 30, 2021. On June 2, 2021, the Company completed the acquisition of Appliances Connection. Appliances Connection has historically been profitable; however, less than 4 months of their operations are included in results for the nine months ended September 30, 2021.

(Q3 2021 Form 10-Q at ECF p. 16.)

Plaintiff claims that the foregoing statements were materially false or misleading for several reasons. (Am. Compl. ¶¶ 117, 119, 127, 129.) First, Plaintiff asserts that the statements about Polished's ability to operate as a going concern were false because, "but for the fraud, as Polished admitted at the end of the Class Period, Polished was not profitable." (*Id.*) Plaintiff contends that Polished and Fouerti "knew or recklessly disregarded that at no point in 2021 was the consolidated entity Polished profitable," citing the July Restatement as evidence of that alleged fact. (*Id.*) Second, Plaintiff asserts that AC was not profitable, and, as a result, "Defendants' stated opinion that Polished would be able to continue as a going concern" based on AC's profitability was false. (*Id.*) Third, Plaintiff claims that, "in the context of praising AC and discussing profitability and going concern, Defendants were duty-bound to disclose that Albert Fouerti was and continued to be a thief and mandated fraudulent business practices." (*Id.*)

Plaintiff has not met its burden of showing that the above statements were materially false or misleading. Plaintiff contends that the statements about Polished's financial metrics for Q2 and Q3 2021 were false because (1) the July Restatement revealed that

Polished was not profitable at any point in 2021 and (2) the financial metrics were based on "the false supporting fact of AC's profitability." (*Id.*) While the July Restatement did restate Polished's financials for fiscal year 2021 and Q1 of 2022, it did *not* restate the company's financials for Q2 or Q3 of 2021. (July Restatement at ECF 163-64, 206-09.) That Polished restated its consolidated financials for fiscal year 2021 to reveal net losses instead of net profits for that year does not prove or indicate that the company was unprofitable during Q2 or Q3 of that year. Nor does it render false Polished's statements that it realized certain income tax benefits in Q2 and Q3 of 2021. In other words, the July Restatement does not show that the financial metrics disclosed in Polished's Q2 or Q3 Forms 10-Q were "untrue at the time [they were] made." *In re Liberty Tax*, 435 F. Supp. 3d at 465. Furthermore, even accepting Plaintiff's argument that the Q2 and Q3 2021 financial metrics were premised on AC's profitability, Plaintiff does not plead *any* facts demonstrating that AC was unprofitable. Such conclusory allegations are plainly insufficient to prove the falsity of the Q2 or Q3 2021 financial metrics. *See ATSI*, 493 F.3d at 99 ("Allegations that are conclusory or unsupported by factual assertions are insufficient.").

Next, Plaintiff contends that certain opinions rendered in Polished's Q2 and Q3 2021 Forms 10-Q were materially false or misleading. (Am. Compl. ¶¶ 117, 119, 127, 129.) Johnson endorsed the following opinions in Polished's Q2 2021 Form 10-Q:

- In the second quarter of 2021, the Company acquired Appliances Connection. Appliances Connection has a history of profitable operations. As such, the Company determined that it was more likely than not that it would have profitable operations in the future and therefore be able to realize the deferred tax assets and accordingly reversed the allowance for deferred tax assets at June 30, 2021.

- Management has prepared estimates of operations for fiscal years 2021 and 2022 and believes that sufficient funds will be generated from operations to fund its operations, and to service its debt obligations for one year from the date of the filing of these unaudited condensed consolidated financial statements. Additionally, only one month of operations for Appliances Connection, which has operated profitably, are included in the results of operations for the six months ended June 30, 2021.

- Management believes that based on relevant conditions and events that are known and reasonably knowable that its forecasts, for one year from the date of the filing of these unaudited condensed consolidated financial statements, indicate improved operations and the Company's ability to continue operations as a going concern.

(Q2 2021 Form 10-Q at ECF pp. 14, 16.) Likewise, Fouerti and Johnson endorsed the following opinions in Polished's Q3 2021 Form 10-Q:

- In the second quarter of 2021, the Company acquired Appliances Connection. Appliances Connection has a history of profitable operations. As such, the Company determined that it was more likely than not that it would have profitable operations in the future and therefore be able to realize the deferred tax assets and accordingly reversed the allowance for deferred tax assets at June 30, 2021.

- Management believes that based on relevant conditions and events that are known and reasonably knowable that its forecasts, for one year from the date of the filing of these unaudited condensed consolidated financial statements, indicate improved operations and the Company's ability to continue operations as a going concern.

(Q3 2021 Form 10-Q at ECF pp. 15, 17.)

Opinions may be actionable under Rule 10b-5 if (1) the speaker disbelieved the opinion at the time it was made, (2) the opinion "contained one or more embedded factual statements that can be proven false," or (3) the opinion, "without providing critical context, implied facts that can be proven false." *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 174-75 (2d Cir. 2020). As the Second Circuit has explained:

> A statement structured, "I believe that x is so because y has occurred," contains the factual and falsifiable statement, "y has occurred." If y has in fact not occurred, the statement of opinion is actionable because an embedded but complete "statement of a material fact" under the first part of Rule 10b-5 can be proven false.
>
> . . . [Additionally,] when a statement of opinion implies facts or the absence of contrary facts, and the speaker knows or reasonably should know of different material

35

facts that were omitted, liability under Rule 10b-5 may follow.

*Id.* at 175.

Here, Plaintiff does not claim that Fouerti or Johnson disbelieved these opinions at the time they were made. (Am. Compl. ¶¶ 117, 119, 127, 129.) Instead, Plaintiff apparently contends that the opinions "contained one or more embedded factual statements that can be proven false," or "without providing critical context, implied facts that can be proven false." *Abramson*, 965 F.3d at 175. (*See* Am. Compl. ¶¶ 117, 119, 127, 129.) Specifically, Plaintiff argues that Fouerti and Johnson's opinion that Polished would "more likely than not . . . have profitable operations in the future" was false or materially misleading because it was premised on the false supporting fact of AC's profitability. (Am. Compl. ¶¶ 117, 119, 127, 129.) Plaintiff further contends that the opinions were false or materially misleading because, "but for the fraud, as Polished admitted at the end of the Class Period [when it filed the July Restatement], Polished was not profitable." (*Id.*)

As discussed above, Plaintiff does not plead *any* facts demonstrating that AC was unprofitable. Moreover, Plaintiff does not explain how "the fraud"—*i.e.*, the alleged improper business practices—rendered the above opinions false or misleading. That Polished had inaccurate counts of its inventory, forged and falsified documents as a routine business practice, and employed undocumented workers does not necessarily render false Polished's opinions that it would be profitable in the future and continue operations as a going concern. In other words, Plaintiff fails to allege any facts demonstrating that these opinions, "without providing critical context, implied facts that can be proven false." *Abramson*, 965 F.3d at 175. As such, Fouerti and Johnson

were not required to paint an overly gloomy picture of future prospects.[9]

Finally, the court rejects Plaintiff's argument that, in the context of rendering the above statements and opinions, the Individual Defendants were "duty-bound to disclose that Albert Fouerti was and continued to be a thief and mandated fraudulent business practices." (Am. Compl. ¶¶ 117, 119, 127, 129.) With respect to alleged omissions, it bears emphasis that Section 10(b) and Rule 10b–5(b) "do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011). A company "is not required to disclose a fact merely because a reasonable investor would very much like to know that fact." *In re Time Warner Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993). Rather, "an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts." *Id.* Such a duty may arise "when a corporate insider trades on confidential information, a statute or

---

[9] The Individual Defendants contend that these opinions are also forward-looking statements protected by the PSLRA's safe harbor. (Defs.' MTD at 19-20.) The court agrees that these opinions contain certain forward-looking aspects, namely, Polished's projections for the future. However, when an allegedly false statement has both a forward-looking aspect and an aspect that encompasses a representation of present fact, the statement is not protected by the PSLRA. *Manavazian v. Atec Grp.*, 160 F. Supp. 2d 468, 481 (E.D.N.Y. 2001) (statements not subject to PSLRA safe harbor provision or bespeaks caution doctrine where plaintiffs alleged that defendants "knowingly misrepresented present material facts as part of forward-looking statements"); *see also In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 566 n.17 (S.D.N.Y. 2011) (same). Here, Polished's opinions that it would be profitable in the future and continue operations as a going concern were based on a representation of present facts, including AC's historic profitability, "estimates of operations for fiscal years 2021 and 2022," and "relevant conditions and events that are known and reasonably knowable." (Q2 2021 Form 10-Q at ECF p. 16; Q3 2021 Form 10-Q at ECF pp. 16-17.) As such, the opinions are not protected by the PSLRA's safe harbor or the bespeaks caution doctrine, discussed in more detail *infra*.

regulation requires disclosure, or a statement is made that would be inaccurate, incomplete, or misleading without further context." *Synchrony*, 988 F.3d at 167.

Plaintiff fails to adequately allege that Fouerti or Johnson had a duty to disclose the alleged improper business practices. Plaintiff does not claim that Fouerti or Johnson "trad[ed] on confidential information" or that "a statute or regulation require[d] disclosure" of the improper practices. *Id.* at 167. Rather, Plaintiff argues that the above statements and opinions were misleading without the further context of the alleged improper practices. (Am. Compl. ¶¶ 117, 119, 127, 129.) But Plaintiff does not explain how the alleged practices rendered Polished's statements about its current or future profitability false or misleading. Instead, Plaintiff simply asserts that Fouerti and Johnson were "duty-bound" to disclose the alleged improper business practices, without explaining why. But Section 10(b) and Rule 10b–5(b) do not create a duty to disclose any and all material information, and a corporation "is not required to disclose a fact merely because a reasonable investor would very much like to know that fact." *In re Time Warner*, 9 F.3d at 267. The "mere existence of reports of adverse events" is not sufficient to create a duty to disclose; "Something more is needed." *Dalberth v. Xerox Corp.*, 766 F.3d 172, 183 (2d Cir. 2014). As such, Plaintiff fails to allege an actionable omission in the above statements and opinions.

### b.    Restated financial metrics

The second group of challenged statements are Polished's financial metrics for fiscal year 2021 and Q1 of 2022. (Am. Compl. ¶¶ 96, 135, 139, 145.) These statements *were* subject to the July Restatement.

Fouerti and Johnson endorsed the following statement in Polished's 2021 Form 10-K:

As of December 31, 2021, we had cash and cash equiv-
alents of $25.7 million and restricted cash of $8.1
million. For the year ended December 31, 2021, the
Company incurred operating income of approximately
$8.3 million, cash flows used in operations of $18.3 mil-
lion, and working capital of $16.0 million. On June 2,
2021, the Company completed the acquisition of Appli-
ances   Connection.   Appliances   Connection   has
historically been profitable; however, less than 7 months
of their operations are included in results for the year
ended December 31, 2021.

(2021 Form 10-K at ECF p. 80.) Fouerti and Johnson also en-
dorsed several other financial metrics for fiscal year 2021,
including: Product sales = $362.3 million; Gross profit = $79.7
million; Operating income = $8.3 million; Net income = $7.7
million; Net income per share = $0.12. (*Id.* at ECF pp. 69-70.)
Likewise, Fouerti and Johnson endorsed the following financial
metrics for Q1 of 2022: Product sales = $152.8 million; Gross
profit = $35.9 million; Operating income = $10.1 million; Net
income = $5.9 million; Net income per share = $0.06. (Q1 2022
Form 10-Q at ECF pp. 6-7.) Finally, Fouerti and Johnson en-
dorsed the following opinion in the 2021 Form 10-K:

The accompanying consolidated financial statements
have been prepared on a going concern basis under
which the Company is expected to be able to realize its
assets and satisfy its liabilities in the normal course of
business. Management believes that based on relevant
conditions and events that are known and reasonably
knowable that its forecasts, for one year from the date
of the filing of these consolidated financial statements,
indicate improved operations and the Company's ability
to continue operations as a going concern.

(2021 Form 10-K at ECF p. 80.)

Plaintiff claims that the foregoing statements and opinion were materially false or misleading for several reasons. (Am. Compl. ¶¶ 96, 135, 139, 145.) Plaintiff repeats its claim that "Defendants' stated opinion that Polished would be able to continue as a going concern" based on AC's profitability was false. (*Id.* ¶ 139.) It also reiterates that, "in the context of praising AC and discussing profitability and going concern, Defendants were duty-bound to disclose that Albert Fouerti . . . was and continued to be a thief and mandated fraudulent business practices." (*Id.*) Plaintiff additionally alleges that the above-listed financial metrics were false, as evidenced by the July Restatement in which Polished restated its financials for fiscal year 2021 and Q1 2022. (*Id.*) Finally, Plaintiff contends that Polished calculated these statistics in violation of GAAP, thus rendering the metrics false and misleading. (*Id.* ¶¶ 85-115, 135, 145.)

In light of the July Restatement, there can be no dispute that the Amended Complaint pleads numerous false and misleading misstatements with respect to Polished's 2021 Form 10-K and Q1 2022 Form 10-Q. *See Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 606 (S.D.N.Y. 2009) ("Misreported financial information clearly amounts to a false statement of fact."). Pursuant to GAAP, "previously issued financial statements should be restated only to correct material accounting errors that existed at the time the statements were originally issued." *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 486 (S.D.N.Y. 2004). "Although a restatement is not an admission of wrongdoing, the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made." *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 544 (S.D.N.Y. 2017). As such, the Amended Complaint adequately alleges that the fiscal year 2021 and Q1 2022 financial metrics were false when stated.

Likewise, the Amended Complaint sufficiently alleges that the above-quoted opinion was false or misleading when made. In its 2021 Form 10-K, Fouerti and Johnson opined as followed: "Management believes that based on relevant conditions and events that are known and reasonably knowable that its forecasts . . . indicate improved operations and the Company's ability to continue operations as a going concern." (2021 Form 10-K at ECF p. 80.) The court presumes that Fouerti and Johnson premised this rosy outlook, at least in part, on Polished's positive financial results for fiscal year 2021. Because those financial results were incorrect, the opinion either "contained one or more embedded factual statements that can be proven false," or "implied facts that can be proven false." *Abramson*, 965 F.3d at 175. Thus, Plaintiff adequately alleges that this opinion was materially false or misleading.

### c.  *Statements and certifications regarding Polished's internal controls*

The third group of challenged statements are statements and certifications regarding Polished's internal controls. (Am. Compl. ¶¶ 121, 131, 133, 137, 147.)

Internal controls are "a process, effected by an entity's board of directors, management and other personnel, designed to provide reasonable assurance regarding the achievement of objectives in the following categories: (i) Effectiveness and efficiency of operations; (ii) Reliability of financial reporting; [and] (iii) Compliance with applicable laws and regulations." *In re Bear Stearns*, 763 F. Supp. 2d at 471.[10] The Sarbanes-Oxley Act ("SOX") requires management to report assessments of internal

---

[10] Polished's 2021 Form 10–K adopts the "Internal Control–Integrated Framework" promulgated by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). (2021 Form 10-K at ECF p. 59.) The above definition of internal controls comes from Chapter 1 of the COSO Framework. *In re Bear Stearns*, 763 F. Supp. 2d at 471.

controls annually. 15 U.S.C. § 7262(a). It also requires management to make certain certifications ("SOX certifications") in each annual or quarterly report. 15 U.S.C. § 7241(a).

Moore and Johnson, and then Fouerti and Johnson, made the following SOX certifications in Polished's Q2 2021 Form 10-Q, Q3 2021 Form 10-Q, and 2021 Form 10-K:

> The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
> b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

(Q2 2021 Form 10-Q at ECF pp. 49, 51; Q3 2021 Form 10-Q at ECF pp. 62, 64; 2021 Form 10-K at ECF pp. 141, 143.) These SOX certifications largely mirror the statutory language. *See* 15 U.S.C. § 7241(a)(5).

Additionally, in its Q2 2021 Form 10-Q, Polished stated:

> There were no changes in the Company's internal control over financial reporting or in any other factors that could significantly affect these controls during the three

> months ended June 30, 2021 that have materially af-
> fected, or are reasonably likely to materially affect, the
> Company's internal control over financial reporting.

(Q2 2021 Form 10-Q at ECF p. 45.) Likewise, in its Q3 2021 Form 10-Q, Polished stated:

> During the three months ended September 30, 2021, the Company hired a new Chief Executive Officer and a new Chief Financial Officer.
>
> There were no other changes in the Company's internal control over financial reporting or in any other factors that could significantly affect these controls during the three months ended September 30, 2021 that have ma-terially affected, or are reasonably likely to materially affect, the Company's internal control over financial re-porting.

(Q3 2021 Form 10-Q at ECF p. 47.)

Plaintiff contends that the foregoing statements and certifications were materially false and misleading "because they rendered Pol-ished duty-bound to disclose then-existing material weaknesses, of which Polished and Albert Fouerti knew of or recklessly disre-garded." (Am. Compl. ¶¶ 121, 131.) Plaintiff points to the following disclosure from Polished's 2021 Form 10-K as proof that material weaknesses existed in Polished's internal controls during Q2 and Q3 of 2021:

> The following material weaknesses, which were discov-ered to be material during 2021, were present at December 31, 2021: lack of structure and responsibility, insufficient number of qualified resources and inade-quate oversight and accountability over the performance of controls; ineffective assessment and identification of changes in risk impacting internal con-trol over financial reporting; inadequate selection and

> development of effective control activities, general con-
> trols over technology and effective policies and
> procedures; and ineffective evaluation and determina-
> tion as to whether the components of internal control
> were present and functioning.

(2021 Form 10-K at ECF p. 28.) Plaintiff further contends that
the Fouerti certifications in the Q3 2021 Form 10-Q and 2021
Form 10-K were particularly false and misleading because
Fouerti was "duty-bound to disclose" the alleged improper busi-
ness practices discussed in detail above. (Am. Compl. ¶¶ 133,
137, 147.)

The Individual Defendants contend that Plaintiff's argument is
"classic impermissible fraud by hindsight, and it conveniently ig-
nores the fact that [SOX] only requires a company to report its
assessments of internal controls annually." (Defs.' MTD at 26.)
They argue that "the fact that management assessed the Com-
pany's internal controls as of year-end 2021 and promptly
disclosed the material weakness negates any inference that De-
fendants were disingenuous about their earlier certifications."
(*Id.*) The Individual Defendants also point out that the company
"only identified material weaknesses in [its] internal controls in
2021 *as of* December 31, 2021." (*Id.* (emphasis in original).)

The Second Circuit encountered a similar challenge to SOX cer-
tifications in *New England Carpenters Guaranteed Annuity and
Pension Funds v. DeCarlo*, 122 F.4th 28 (2d Cir. 2023). There,
plaintiffs argued that defendants' restatement, in which it
"acknowledged a failure of internal controls," rendered its exec-
utives' prior SOX certifications regarding internal controls false
or misleading. *Id.* at 47. The Second Circuit characterized the
SOX certifications as opinions because they "contain[ed] lan-
guage that convey[ed] management's subjective judgments
about the company's internal controls." *Id.* The Court then re-
jected plaintiffs' challenge to the certifications, reasoning that the

44

company's "change of opinion, standing alone, does not mean that the original certified opinions were disingenuous. Nor is a genuinely held opinion that turned out to be wrong necessarily actionable." *Id.* (footnote omitted). Instead, in that case, plaintiffs "fail[ed] to adequately allege that the [] executives who signed the certifications did not believe what they certified." *Id.*

For the reasons articulated by the Second Circuit in *DeCarlo*, the court concludes that the challenged statements and SOX certifications regarding internal controls are inactionable statements of opinion. The challenged statements and certifications are opinions because they "contain language that conveys management's subjective judgments about the company's internal controls." *Id.* Moreover, Plaintiff does not contend that Fouerti or Johnson disbelieved these opinions at the time they were made. (Am. Compl. ¶¶ 121, 131, 133, 137, 147.) Instead, Plaintiff claims that the statements and certifications were false based on the 2021 Form 10-K's disclosure of material weaknesses in internal controls. (*Id.* ¶¶ 121, 131.) But Polished's "change of opinion, standing alone, does not mean that the original certified opinions were disingenuous. Nor is a genuinely held opinion that turned out to be wrong necessarily actionable." *DeCarlo*, 122 F.4th at 47. In other words, Polished's conclusion that material weaknesses "were present at December 31, 2021," does not necessarily prove or indicate that Fouerti and Johnson's prior opinions were false when made. (2021 Form 10-K at ECF p. 28.) Other than the Form 10-K itself, Plaintiff cites no fact indicating that material weaknesses in internal controls existed in Q2 or Q3 of 2021, or that Fouerti or Johnson knew of those weaknesses. (Am. Compl. ¶¶ 121, 131.) Thus, Plaintiff fails to adequately allege that the statements and SOX certifications were false or materially misleading.

Plaintiff also fails to adequately allege that the statements or SOX certifications rendered Fouerti and Johnson "duty-bound" to disclose the alleged improper business practices discussed above.

(*Id.* ¶¶ 133, 137, 147.) Recall that "an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts," *In re Time Warner Sec. Litig.*, 9 F.3d at 267, and that such a duty may arise when "when a corporate insider trades on confidential information, a statute or regulation requires disclosure, or a statement is made that would be inaccurate, incomplete, or misleading without further context," *Synchrony*, 988 F.3d at 167. Plaintiff does not allege that Fouerti or Johnson "trad[ed] on confidential information" or that "a statute or regulation require[d] disclosure" of the improper practices. *Id.* Though Plaintiff apparently contends that the statements and certifications were misleading without the context of the improper business practices, it does not explain *how* the alleged practices affected Polished's internal controls, let alone how they rendered the above statements false or misleading. As with other alleged misstatements, Plaintiff simply asserts that Fouerti and Johnson were "duty-bound" to disclose the alleged improper business practices, without explaining why. Such conclusory allegations fail to state a claim for actionable omissions. *In re Time Warner*, 9 F.3d at 267.

For these reasons, Plaintiff has not met its burden of showing that the above statements and certifications were materially false or misleading.

> ### d.   *Statements concerning Polished's fulfilment, logistics, and returns processes*

The fourth and final group of challenged statements are statements concerning Polished's fulfilment, logistics, and returns processes. (Am. Compl. ¶¶ 123, 125, 141, 143.) These statements are contained within the Q3 2021 earnings call held on November 15, 2021 and the 2021 Form 10-K.

In the Q3 earnings call, Fouerti stated:

We built a stand-alone business that has superior value proposition relative to the competition. With respect to our go-forward strategy, I have been working with the Board and the rest of the management team to put in place a new plan to solidify our foundation for long-term growth. We are an e-commerce company that specializes in home appliances and providing great content, not a hardline merchant and not an omnichannel retailer.

Our priorities must reflect this reality. In the quarters to come, we are going to be focused on initiatives that include building a best-in-class tech stack and digital marketing presence. *The backbone of our success will be our fulfillment and logistics systems as well as the other technologies in our supply chain.* This is why we are investing in our tech stack, while also constantly optimizing our consumer-facing digital platforms.

(Q3 Call Tr. at ECF pp. 5-6 (challenged portion in italics).)

Plaintiff alleges that the italicized statement was materially false and misleading because, "[b]y mentioning fulfillment and logistics, Defendants were duty bound to disclose, but omitted," the alleged improper business practices, including the inventory issues, the sale of damaged items, and Fouerti's theft of the business. (Am. Compl. ¶ 123.) Individual Defendants argue that this statement is an opinion and/or a forward-looking statement protected by the PSLRA safe harbor provision. (Defs.' MTD at 21.)

"Two doctrines—one statutory, the other judge-made—protect certain forward-looking statements from serving as the basis for claims of securities fraud." *City of Omaha Police and Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 396 (S.D.N.Y. 2020). Forward-looking statements are "statements whose truth

cannot be ascertained until some time after they are made." *Saskatchewan Healthcare Emp.'s Pension Plan v. KE Holdings Inc.*, 718 F. Supp. 3d 344, 386 (S.D.N.Y. 2024). By contrast, "statements about present or historical facts, whose accuracy can be determined at the time they were made, are not forward-looking statements." *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 569 (S.D.N.Y. 2011); *see also Saskatchewan Healthcare*, 718 F. Supp. 3d at 386 (explaining that the "Second Circuit has contrasted forward-looking statements with statements of present or historical facts, in other words, statements regarding facts that exist and are known"). When an allegedly false statement has both a forward-looking aspect and an aspect that encompasses a representation of present fact, however, the statement is not protected. *Manavazian*, 160 F. Supp. 2d at 481 (statements not subject to safe harbor provision or bespeaks caution doctrine where plaintiffs alleged that defendants "knowingly misrepresented present material facts as part of forward-looking statements").

The PSLRA creates a statutory safe harbor for forward-looking statements. 15 U.S.C. § 78u-5(c); *Slayton v. Am. Express Co.*, 604 F.3d 758, 765 (2d Cir. 2010). Under that provision, "a defendant is not liable if (1) the forward-looking statement is identified and accompanied by meaningful cautionary language, (2) the forward-looking statement is immaterial, or (3) the plaintiff fails to prove that the forward-looking statement was made with actual knowledge that it was false or misleading." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 245 (2d Cir. 2016). "[A] forward-looking statement is protected . . . if any of the three prongs applies." *Id.* at 245-46. However, the PSLRA excludes from the safe harbor provision forward-looking statements "included in a financial statement prepared in accordance with [GAAP]." *Slayton*, 604 F.3d at 767 (citing 15 U.S.C. § 78u–5(b)(2)(A)).

Additionally, the "bespeaks caution" doctrine "limits fraud liability for forward-looking statements that . . . are coupled with sufficient cautionary language or risk disclosures that, taken in context, bespeak caution to the reader." *In re Salomon Analyst AT&T Litig.*, 350 F. Supp. 2d 455, 467-68 (S.D.N.Y. 2004). Put another way, "a forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading." *Gregory*, 297 F. Supp. 3d at 398. When there is cautionary language, the court analyzes "the allegedly fraudulent materials in their entirety to determine whether a reasonable investor would have been misled." *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004). Importantly, "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Id.*; *see also In re Prudential Sec. Inc. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.").

The court concludes that the challenged statement is protected by the PSLRA safe harbor provision or the bespeaks caution doctrine. The statement is forward looking because its truth—that the backbone of Polished's success *will* be its fulfilment and logistics systems—"[could not] be ascertained until some time after [it was] made." *Saskatchewan Healthcare*, 718 F. Supp. 3d at 386. Moreover, the Q3 call began with the following cautionary language:

> Please note that various remarks about future expectations, plans and prospects constitute forward-looking statements for the purposes of the safe harbor provisions under the Private Securities Litigation Reform Act of 1995. The company cautions that these forward-looking

> statements are subject to risks and uncertainties that
> may cause actual results to differ materially from those
> indicated, including risks described in the company's fil-
> ings with the SEC.

(Q3 Call Tr. at ECF p. 5.) Thus, Fouerti identified the statement as forward-looking by making a "remark[] about future expecta-tions," and the statement was accompanied by sufficient cautionary language. (*Id.*) As such, the PSLRA safe harbor provi-sion and the bespeaks caution doctrine shield this statement from liability.

Even if the statement were not protected by the PSLRA safe har-bor or the bespeaks caution doctrine, the statement is also inactionable puffery. "Statements containing simple economic projections, expressions of optimism, and other puffery" do not give rise to securities violations. *Novak*, 216 F.3d at 315. Such statements are inactionable as a matter of law because they are "too general to cause a reasonable investor to rely upon them." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014). "People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be ex-pected to be confident about their stewardship and the prospects of the business that they manage." *Rombach*, 355 F.3d at 174. Thus, "[t]o succeed on this claim, plaintiffs must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." *Id.*

Here, Fouerti's statement that the backbone of Polished's success will be its fulfilment and logistics systems is "quite general, deliv-ered in corporate jargon, and relate[d] to future expectations." *City of Omaha*, 450 F. Supp. 3d at 400. A reasonable investor would not rely on it. Accordingly, it is non-actionable puffery.

Next, Fouerti engaged in the following colloquy in the Q3 earn-ings call:

> UNKNOWN ANALYST: Okay. And your return policies, how does that work if the -- unfortunately, product is damaged in the shipping and handling, how does that flow back to your balance sheet?
>
> ALBERT FOUERTI: *So right now, we take it back. It's just a regular process return. If you take the product, it gets returned back to us. We process it exchange or we process a refund to the consumer. And it depends if their manufacturer take it back and our factories just gets allowance -- each manufacturer has a different process in place to take back and address these type of returns.*

(Q3 Call Tr. at ECF p. 14 (challenged portion in italics).)

Plaintiff alleges that the italicized statement was materially false and misleading because it omitted the fact that "Polished's return process involved fraud as a business practice, . . . including forging documents, shipping damaged products . . . , forging invoices and bills of lading, refusing to accept returns from customers based on forged paperwork, and lying to credit card companies and producing forged documents." (Am. Compl. ¶ 125.) Individual Defendants argue that the FE allegations are insufficiently pleaded and, even if the allegations were sufficiently pleaded, they do not render this statement false or misleading because it is a "generic statement[] that [is] undeniably true on [its] face." (Defs.' MTD at 21-22.)

The FE accounts, accepted on their face, indicate that Fouerti's statement was "inaccurate, incomplete, or misleading," because it omitted the fact that the company's returns process actually involved shipping damaged products, charging consumers for the return freight, and forging documents to indicate that a product was returned within the time limit set by the manufacturer. *Synchrony*, 988 F.3d at 167. (*See* Am. Compl. ¶¶ 52-65.) However, as discussed above, the FE accounts suffer from several critical deficiencies which prevent the court from crediting their

51

allegations. As such, the Amended Complaint fails to adequately allege a material misrepresentation or omission in this statement.

In its 2021 Form 10-K Polished stated:

> In our fulfillment of large durable goods, we have created an infrastructure that allows us to deliver products in most states. We want to scale this infrastructure by continuing to improve execution, fulfillment center locations, and delivery timing. *This proprietary logistic process enables us to provide our customers' products quickly and to provide a better shipping and delivery experience than they might otherwise experience. Additionally, we believe this logistics network will help us reduce expenses, touchpoints, damages and returns.*

(2021 Form 10-K at ECF p. 11 (challenged portion in italics).)

Plaintiff asserts that the alleged improper business practices at Polished rendered the above italicized statement false or materially misleading. (Am. Compl. ¶ 141.) However, as noted above, the FE allegations suffer from several critical deficiencies which prevent the court from crediting their accounts. As such, the Amended Complaint fails to adequately allege a material misrepresentation or omission in this statement.

Finally, Polished made the following risk disclosure in its 2021 Form 10-K:

> **Risks Related to our Business and Industry**
>
> . . .
>
> **Our continued revenue growth will depend upon, among other factors, our ability to acquire more customers, build our brands and launch new brands, introduce new products or offerings and improve existing product.**

> Maintaining and enhancing our brands is critical to acquiring and expanding our base of customers and suppliers. Our ability to maintain and enhance our brands *depends largely on our ability to maintain customer confidence in our product and customer service offerings, including by delivering products on time and without damage*. If customers do not have a satisfactory shopping experience, they may seek out alternative offerings from our competitors and may not return to our sites as often in the future, or at all. . . .
>
> *Customer complaints* or negative publicity about our sites, products, delivery times, customer data handling and security practices or customer support, especially on blogs, social media websites and our sites, could rapidly and severely diminish consumer use of our sites and consumer and supplier confidence in us and result in harm to our brands.

(2021 Form 10-K at ECF pp. 17-19 (bold in original) (challenged portions in italics).)

Plaintiff repeats its claim that the alleged improper business practices at Polished rendered the above italicized statements false or materially misleading. (Am. Compl. ¶ 143.) Additionally, Plaintiff claims that the risk warning was false or materially misleading "because the risk warned of as hypothetical had materialized": Polished "was shipping damaged goods or shipping appliances to the wrong addresses, or not shipping appliances to customers at all, but charging customers in every such case[,] and then denying the aggrieved customers satisfaction, refusing to refund money as a course of practice." (*Id.* ¶ 143.)

Courts in this Circuit have held that a risk disclosure "can itself constitute a material misrepresentation when it presents as a risk an event that has already transpired." *Chapman v. Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 405 (S.D.N.Y. 2020) (collecting

cases). The FE accounts, accepted on their face, indicate that this risk disclosure may have warned of a risk that had already transpired, *i.e.*, that Polished was losing customer confidence in its products, delivering damaged goods, and receiving complaints. (*See* Am. Compl. ¶¶ 55, 61-64.) However, because the court does not credit the FE accounts, the Amended Complaint fails to adequately allege a material misrepresentation or omission in this statement.

In sum, the court concludes that the Amended Complaint fails to allege a material misrepresentation or omission as to the: financial metrics and opinions regarding Polished's future prospects (Am. Compl. ¶¶ 116, 118, 126, 128); statements and certifications regarding Polished's internal controls (*id.* ¶¶ 120, 130, 132, 136, 146); and statements concerning Polished's fulfilment, logistics, and returns processes (*id.* ¶¶ 122, 124, 140, 142). However, the court concludes that the Amended Complaint sufficiently alleges material misrepresentations or omissions in the restated financial metrics. (*Id.* ¶¶ 134, 138, 144).

### 3. Scienter

Under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." *Anschutz Corp.*, 690 F.3d at 108. "The requisite state of mind in a Rule 10b-5 action is an intent to deceive, manipulate or defraud." *Ganino*, 228 F.3d at 168. Such an intent may be established "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99. Motive and opportunity may be established by demonstrating that defendants benefitted "in a concrete and personal way" from the alleged fraud. *Novak*, 216 F.3d at 311. Conscious misbehavior means "deliberate[ly] illegal behavior, a standard met when it is

clear that a scheme, viewed broadly, is necessarily going to in-jure." *Gould v. Winstar Comms., Inc.*, 692 F.3d 148, 158 (2d Cir. 2012). Recklessness may be established "where a defendant has engaged in conduct that was highly unreasonable, representing an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* at 158-59. This standard is met "where a defendant failed to review or check information that it had a duty to monitor, or ignored obvious signs of fraud." *Id.* at 159.

Importantly, there are "several important limitations on the scope of liability for securities fraud based on reckless conduct." *Novak*, 216 F.3d at 309. First, the Second Circuit "refuse[s] to allow plaintiffs to proceed with allegations of fraud by hind-sight." *Id.* "Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them." *Id.* As such, "allegations that defendants should have anticipated future events and made certain disclo-sures earlier than they actually did do not suffice to make out a claim of securities fraud." *Id.* Second, "as long as the public state-ments are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects." *Id.* And where a plaintiff claims that defendants had access to contrary facts, the plaintiff "must specifically identify the reports or statements con-taining this information." *Id.* Finally, "[a]llegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim." *Stevelman*, 174 F.3d at 84; *see also Novak*, 216 F.3d at 309.

"[I]n determining whether the pleaded facts give rise to a strong inference of scienter, the court must take into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551

55

U.S. 308, 323 (2007). A complaint will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. In making this determination, the court must review "all the allegations holistically." *Id.* at 326.

The Amended Complaint relies on circumstantial evidence of conscious misbehavior or recklessness to establish scienter.[11] *ATSI*, 493 F.3d at 99. Specifically, Plaintiff relies on four sets of facts to establish circumstantial evidence of conscious misbehavior or recklessness as to Fouerti and Johnson: (1) the FE accounts; (2) the resignations of Fouerti and Johnson; (3) the resignation of Polished's independent accounting firm, Friedman; and (4) alleged GAAP violations. (Am. Compl. ¶¶ 38-115, 151, 155; Pl.'s MTD Opp. at 10-17.) The Individual Defendants argue that the FE accounts are "insufficiently pleaded, irrelevant, and should be disregarded." (Defs.' MTD at 7.) They further contend that the resignations and alleged GAAP violations do not support a strong inference of scienter. (Defs.' Reply at 9 n.14;

---

[11] In its memorandum in opposition, Plaintiff argues that Fouerti had both the motive and opportunity to fraudulently inflate AC's numbers via the alleged fraudulent business practices so that he could induce Goedeker to complete the acquisition. (Pl.'s MTD Opp. at 14.) The Individual Defendants correctly point out that this theory of motive was not alleged in the Amended Complaint. (Defs.' Reply in Supp. of MTD at 7-8.) Because these allegations are raised for the first time in Plaintiff's opposition brief, the court does not consider them in deciding this motion to dismiss. *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998); *LaFlamme v. Société Air France*, 702 F. Supp. 2d 136, 148 n.18 (E.D.N.Y. 2010) ("[T]he court disregards these allegations which are first raised in plaintiffs' motion papers because it is well-settled that a claim for relief may not be amended by the briefs in opposition to a motion to dismiss.").

Defs.' MTD at 29.) For the reasons that follow, the court con-
cludes that the Amended Complaint fails to sufficiently allege
scienter as to Fouerti or Johnson.[12]

As discussed above, the FE accounts are not "described in the
complaint with sufficient particularity to support the probability
that a person in the position occupied by the source would pos-
sess the information alleged." *Novak*, 216 F.3d at 314. With the
exception of FE1 and FE3, none of the FEs are alleged to have
"met the Individual Defendants, reported any concerns, received
any instructions, or made any personal contact with them during
the Class Period." *In re Wachovia*, 753 F. Supp. 2d at 352. Even
accepting the FE accounts as true, they do not "show that [the]
individual defendants actually possessed the knowledge high-
lighting the falsity of public statements; [and] conclusory
statements that defendants were aware of certain information,
[or] that defendants would have or should have had such
knowledge[,] is insufficient." *Patel*, 2024 WL 4265758, at *7 n.4.
This lack of detail "is, alone, fatal to [the FEs'] allegations." *Gla-
ser*, 772 F. Supp. 2d at 595. Moreover, the court cannot credit
FE3's allegations because they are unmoored in time, insuffi-
ciently particular, and come from secondhand sources with
whom Plaintiff's counsel have not personally interacted. *Miao*,
442 F. Supp. 3d at 799. Finally, though FE1 provides exact dates
and times of interactions with Fouerti and Johnson, the actual
content of those interactions is unclear. (*See* Am. Compl. ¶¶ 82-
83.) While Plaintiff's memorandum in opposition claims that FE1
was in "regular contact" with Fouerti and Johnson regarding the
alleged improper practices, the Amended Complaint does not
contain that allegation. (Pl.'s MTD Opp. at 3, 14, 22-23)

---

[12] Plaintiff asserts that the Amended Complaint pleads "a strong inference
of scienter for Albert [Fouerti], Moore, and Johnson." (Pl.'s MTD Opp. at
17.) However, as Count I alleges primary liability against Fouerti and John-
son, Moore's alleged scienter is irrelevant to the court's analysis of Count I.
(Am. Compl. ¶¶ 167-179.)

*LaFlamme*, 702 F. Supp. 2d at 148 n.18 ("[I]t is well-settled that a claim for relief may not be amended by the briefs in opposition to a motion to dismiss."). As currently pleaded, the Amended Complaint is silent as to whether FE1 actually brought to Fouerti and Johnson's attention the alleged improper business practices. (*See* Am. Compl. ¶¶ 82-83.) FE1's account is therefore insufficiently particular to create a strong inference of scienter. *Miao*, 442 F. Supp. 3d at 799.

This leaves the court with the resignations of Fouerti, Johnson, and Friedman, and the alleged GAAP violations. None of these occurrences, standing alone, would raise a strong inference of scienter. *Novak*, 216 F.3d at 309 ("[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim."); *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. 2007) ("[A]lthough not sufficient in and of themselves, [resignations] add to the overall pleading of circumstantial evidence of fraud."). Thus, the question is whether these allegations, considered "holistically," constitute strong circumstantial evidence of conscious misbehavior or recklessness. *Tellabs*, 551 U.S. at 326. The court concludes that they do not.

"For executive resignations to raise a strong inference of scienter, they must be highly unusual and suspicious." *Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp.*, 902 F. Supp. 2d 329, 343 (S.D.N.Y. 2012), *aff'd sub nom. IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp.*, 783 F.3d 383 (2d Cir. 2015). Resignations are highly unusual and suspicious "when independent facts indicate that the resignation was somehow tied to the fraud alleged, that the resignation somehow alerted defendants to the fraud, or that defendants' scienter was otherwise evident." *See Glaser*, 772 F. Supp. 2d at 598.

The Amended Complaint does not sufficiently allege that the resignations of Fouerti and Johnson were "highly unusual and

suspicious." *Lighthouse*, 902 F. Supp. 2d at 343. Fouerti and Johnson resigned in October 2022—three months after Polished's announcement of the internal investigation, two months before Friedman's resignation, and nine months before Polished filed the July Restatement. (Am. Compl. ¶¶ 148-156.) "When corporate misconduct is disclosed, members of management resign for all sorts of reasons, including that they were negligent in overseeing the responsible employees or simply because the optics of changing management are better for investors and regulators." *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 303 (S.D.N.Y. 2019). In this case, the resignations of Fouerti and Johnson "are at least as consistent with punishing those at the helm for their poor judgment and leadership, than resignations relating to concocting a scheme to defraud shareholders." *Lighthouse*, 902 F. Supp. 2d at 343; *see also Jun v. 500.com Ltd.*, No. 20-CV-806 (GRB) (AKT), 2021 WL 4260644, at *2 (E.D.N.Y. Sept. 20, 2021) ("That a corporate executive would resign from a company under investigation for an international bribery scheme hardly seems suspect—there are many plausible economic, cultural and practical reasons for such a departure that do not involve knowledge of the scheme."). "The amended complaint simply contains no allegations supporting an inference of fraud that is at least as compelling as an inference of mismanagement or one of the myriad other reasons an executive might resign." *N. Collier Fire Control and Rescue Dist. Firefighter Pension Plan and Plymouth Cnty. Ret. Ass'n v. MDC Partners, Inc.*, No. 15-CV-6034 (RJS), 2016 WL 5794774, at *21 (S.D.N.Y. Sept. 30, 2016). As such, the court concludes that the resignations of Fouerti and Johnson do not support a strong inference of scienter.

The resignation of Friedman presents a closer call. Polished summarized Friedman's resignation as follows:

> In the [resignation] Letter, Friedman advised the Company that based on the results of the Company's Board of Directors (the "Board") internal investigation as reported to Friedman, it appears there may be material adjustments and/or disclosures necessary to previously reported financial information. Additionally, the Board's internal investigation has identified facts, that if further investigated by Friedman, might cause Friedman to no longer to be able to rely on the representations of (i) management that was in place at the time Friedman issued its audit report for the year ended December 31, 2021, or (ii) management that was in place at the time of Friedman's association with the quarterly financial statements for the periods ended June 30, 2021, September 30, 2021 and March 31, 2022. Prior to the Letter, in the past two years, the Company had not received from Friedman an adverse opinion or a disclaimer of opinion, and their opinion was not qualified or modified as to uncertainty, audit scope, or accounting principles. . . .

(Am. Compl. ¶ 155.) For purposes of adjudicating this motion to dismiss, the court assumes without deciding that the above statement, coupled with Polished's eventual restatement of its 2021 Form 10-K and Q1 2022 Form 10-Q, indicate that Friedman's resignation was tied to the alleged misstatements of Polished's financials for fiscal year 2021 and Q1 of 2022. *Glaser*, 772 F. Supp. 2d at 598.

However, even assuming that Friedman's resignation was unusual or suspicious, the Amended Complaint does not allege a strong inference of scienter. While the Second Circuit has "suggested that employees' 'suspicious' resignations may be suggestive of scienter, [it has] done so only in the context of other compelling circumstantial allegations supporting scienter." *KBC*

*Asset Mgmt. NV v. MetLife, Inc.*, No. 21-CV-291, 2022 WL 480213, at \*3 (2d Cir. Feb. 17, 2022). Here, Plaintiff's only remaining allegation supporting scienter is the GAAP violations. But "[a]llegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim." *Stevelman*, 174 F.3d at 84. And the mere fact that Polished restated its financials for fiscal year 2021 and Q1 of 2022 does not mean that Fouerti or Johnson engaged in conscious misbehavior or recklessness. As noted above, Plaintiff cannot "proceed with allegations of fraud by hindsight," and "allegations that defendants should have anticipated future events [or] made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Novak*, 216 F.3d at 309. Thus, the court concludes that Friedman's resignation and the alleged GAAP violations, standing alone, fall short of sustaining Plaintiff's burden to allege a strong inference of scienter. *See Varghese*, 672 F. Supp. 2d at 608 (strong inference of scienter where, in addition to resignations and GAAP violations, plaintiffs alleged that defendants received "repeated disclosures" of weak internal controls and an email from an independent member of the Board of Directors and Audit Committee in which he alerted the company to internal control deficiencies and then resigned); *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 117 (S.D.N.Y. 2013) (strong inference of scienter where, in addition to resignations and GAAP violations, plaintiffs alleged that defendant contemporaneously reported drastically different income and revenue figures with the SEC and the Chinese Administration of Industry and Commerce, and investigators visited the defendant's facilities and found no employees working); *In re Scottish Re Grp.*, 524 F. Supp. 2d at 394 (strong inference of scienter where plaintiffs cited "contemporaneous circumstances . . . of which the [defendants] were aware, and which made their failure to take an earlier valuation allowance tantamount to conscious misbehavior"). As

such, the Amended Complaint fails to sufficiently allege scienter. *See Jun*, 2021 WL 4260644, at *1-2 (in similar circumstances, concluding that plaintiffs failed to adequately allege scienter).

### 4.  Loss Causation

To adequately state a claim for securities fraud, a plaintiff must plead both transaction causation and loss causation. *ATSI*, 493 F.3d at 106. Transaction causation is similar to reliance and requires a showing that, "but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005). Loss causation "is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff," and a plaintiff must claim that "the loss be foreseeable *and* that the loss be caused by the materialization of the concealed risk." *Id.* at 172-73 (emphasis in original). To establish loss causation, a plaintiff must allege "that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security. Otherwise, the loss in question was not foreseeable." *Id.* at 173 (emphasis in original).

Because Plaintiff has not identified actionable misstatements or omissions or adequately alleged scienter as to the few actionable misstatements, the court need not reach the issue of loss causation. *See, e.g., Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 184 (E.D.N.Y. 2017) ("Since the plaintiffs have not identified any actionable misstatements or adequately alleged scienter, there is no basis upon which they may plead reliance or loss causation."); *In re Neurotrope, Inc. Sec. Litig.*, 315 F. Supp. 3d 721, 730 (S.D.N.Y. 2018) ("Because the Complaint fails to allege a material misrepresentation or omission, and scienter, the loss causation issue is not addressed.").

In sum, because the Amended Complaint does not sufficiently allege a material misrepresentation or omission or scienter, Plaintiff fails to state a claim under Section 10(b) and Rule 10b-5(b).

### B.  Scheme Liability: Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c)

Count II of the Amended Complaint alleges violations of subsections (a) and (c) of Rule 10b-5, which prohibit, respectively, "employ[ing] any device, scheme, or artifice to defraud," and "engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit." 17 C.F.R. § 240.10b–5(a), (c). "Unlike the better-known subsection (b), these subsections do not require the defendant to make a misstatement or omission; they require only deceptive conduct." *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021). To state a claim for scheme liability, Plaintiff must plausibly allege: "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *Id.* Importantly, "the deceptive or fraudulent scheme or activity must have occurred *in connection with the purchase or sale of a security.*" *Id.* (emphasis added). "To maintain a 10b–5(a) or (c) claim, a plaintiff must specify what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue." *Id.*

"[T]he three subsections of Rule 10b–5 are distinct, and courts must scrutinize pleadings to ensure that misrepresentation or omission claims do not proceed under the scheme liability rubric." *In re Smith Barney*, 884 F. Supp. at 161. As such, "where the core misconduct alleged is in fact a misstatement, it is improper to impose [] liability by designating the alleged fraud a manipulative device rather than a misstatement." *Id.* Put another

way, "scheme liability under subsections (a) and (c) of Rule 10b-5 hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement." *Id.*

Plaintiff fails to meet the heightened pleading standard applicable to its scheme liability claim. The Amended Complaint describes numerous improper business practices mandated, and sometimes personally carried out by, Fouerti. (Am. Compl. ¶¶ 38-84.) But aside from a single conclusory statement that Fouerti engaged in "a course of business that operated as a fraud or deceit . . . in connection with [the purchase of Polished stock]," the Amended Complaint does not actually describe a scheme *in connection with the purchase or sale of securities*. (*Id.* ¶ 181.) At no point does Plaintiff "articulate with precision the contours of an alleged scheme to defraud investors, or which specific acts were conducted in furtherance of it." *Plumber & Steamfitters Loc.*, 11 F.4th at 105. Instead, Plaintiff's claim "rests upon the incorporation of the previous [65] pages of the pleading paired with the conclusory assertion that Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to deceive the investing public." *Id.* But these purported acts of fraud—committed against Polished, customers, and credit card companies—do not establish a deceptive scheme to defraud *investors*. *See id.* (allegations of money laundering insufficient to plead a scheme to defraud investors); *Fogel v. Wal-Mart de Mexico SAB de CV*, No. 13-CV-2282 (KPF), 2017 WL 751155, at *18 (S.D.N.Y. Feb. 27, 2017) (allegations of bribery scheme insufficient to plead scheme to defraud investors). As such, the Amended Complaint fails to state a claim for scheme liability.

### C. Control Person Liability: Section 20(a) of the Exchange Act

Count III of the Amended Complaint alleges violations of Section 20(a) against the Individual Defendants. To state a claim for control person liability under Section 20(a), Plaintiff must plausibly

allege: "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI*, 493 F.3d at 108; *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 457 n.1 (2d Cir. 2019) (explaining that a violation of Section 20(a) "depends on there first being a primary violation of Section 10(b)"). For the reasons stated above, the Amended Complaint fails to allege a primary violation of the securities laws. Consequently, it cannot sufficiently allege a violation of Section 20(a). *See ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 206-07 (2d Cir. 2009) (concluding that the "control person liability claim pursuant to . . . section 20 of the Exchange Act must also fail for want of a primary violation").

## V.  LEAVE TO AMEND

In a footnote on the final page of its opposition, Plaintiff states: "If the Court dismisses the Complaint, Plaintiff respectfully requests leave to amend." (Pl.'s MTD Opp. at 31 n.19.) The Individual Defendants do not specifically oppose this request, although they ask the court to dismiss the Amended Complaint with prejudice. (*See* Defs.' MTD at 30; *see also* Defs.' Reply at 10.)

Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that a court "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). "District courts typically grant plaintiffs at least one opportunity to plead fraud with greater specificity when they dismiss under Rule 9(b)." *ATSI*, 493 F.3d at 108. Ultimately, "[t]he decision to grant or deny leave to amend rests within the discretion of the trial court." *N. Assurance Co. of Am. v. Square D Co.*, 201 F.3d 84, 87 (2d Cir. 2000).

Although the court is unsure whether Plaintiff can remedy the flaws in the Amended Complaint, the court will allow Plaintiff to amend its pleading. Even where Plaintiffs "have not specified

how they would amend their pleading if granted leave to do so, the Second Circuit has admonished district courts that 'complaints dismissed under Rule 9(b) are almost always dismissed with leave to amend.'" *Schiro*, 396 F. Supp. 3d at 309 (quoting *Pasternack v. Shrader*, 863 F.3d 162, 175 (2d Cir. 2017)). Because Plaintiff has not yet had an opportunity to amend its complaint in response to a court order pointing out the deficiencies in its pleading, the court will afford Plaintiff an opportunity to do so. *See id.* (adopting same approach); *Ulbricht v. Ternium S.A.*, No. 18-CV-6801 (PKC) (RLM), 2020 WL 5517313, at *12 (E.D.N.Y. Sept. 14 2020) (adopting same approach).

Plaintiff is warned that the court will not grant further leave to amend "unless [Plaintiff] provide[s] a detailed indication of what facts [it] would add to cure the pleading's defects . . . with an explanation of why the amendment would not be futile." *Schiro*, 396 F. Supp. 3d at 309; *see also F5 Cap. v. Pappas*, 856 F.3d 61, 90 (2d Cir. 2017) (denial of leave to amend appropriate where plaintiff failed to "explain how it proposed to amend the complaint to cure its defects"); *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (leave to amend properly denied "where the request gives no clue as to how the complaint's defects would be cured").

## VI. CONCLUSION

For foregoing reasons, the Individual Defendants' motion for consideration and/or judicial notice is GRANTED in part and DENIED in part, the Individual Defendants' motion to dismiss is GRANTED, and Plaintiff's request for leave to file a second amended complaint is GRANTED. Plaintiff shall file its second amended complaint within 30 days of the issuance of this opinion. Failure to file a second amended complaint within the specified time period will result in the court entering an order dismissing this case with prejudice.

SO ORDERED.


Dated:    Brooklyn, New York
          January 23, 2025

                                          s/Nicholas G. Garaufis
                                          NICHOLAS G. GARAUFIS
                                          United States District Judge