# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RYAN MASCHHOFF, Individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>     v.<br><br>POLISHED.COM INC. F/K/A 1847 GOEDEKER INC., DOUGLAS T. MOORE, ROBERT D. BARRY, ALBERT FOUERTI, MARIA JOHNSON, ELLERY W. ROBERTS, THINKEQUITY, A DIVISION OF FORDHAM FINANCIAL MANAGEMENT, INC., AEGIS CAPITAL CORP., and SPARTAN CAPITAL SECURITIES, LLC,<br><br>     Defendants. | Case No. 1:22-cv-06606-NGG-VMS<br><br>SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED<br><br>CLASS ACTION |

# TABLE OF CONTENTS

I.      Nature of the Case ............................................................................................. 1

II.     Jurisdiction and Venue ...................................................................................... 3

III.    Parties ................................................................................................................ 4

IV.     Substantive Allegations .................................................................................... 9

        A.      Background ............................................................................................. 9

                1.      Goedeker Television Co. ............................................................. 9

                2.      The 1847 Goedeker Inc. SPAC process, and the SPAC's acquisition of Goedeker Television Co. ...................................... 9

                3.      Appliances Connection ............................................................. 10

                4.      Polished and Appliances Connection Merge ............................ 10

        B.      According to Former Employees, AC and the ACI Engaged in Manipulative and Deceptive Business Practices that Impacted Both Its and Polished's Financial Results ............................................................ 12

                1.      Defendants Committed Fraud with Respect to Inventory and Published False Inventory Numbers ........................................... 14

                2.      Defendants Forged and Falsified Documents as a Routine Business Practice, Cheating Customers, Vendors, and Credit Card Companies ..... 19

                3.      Defendants Employed Undocumented Workers Who Did Not Have Work Permits or Social Security Numbers ..................... 23

                4.      The Audit Committee Finds that Albert Fouerti Stole from Polished ...... 24

                5.      Polished Fired FE1 After FE1 Revealed Fraudulent Business Practices to Polished's C-Suite ............................................... 24

        C.      POLISHED'S GAAP VIOLATIONS ................................................... 28

                1.      GAAP Generally ...................................................................... 28

                2.      Polished Violated GAAP, Improperly Accounting for Revenue ............... 30

                3.      Polished Violated GAAP in Accounting for Costs of Goods Sold .......... 33

                4.      Material Weakness in Internal Controls ................................... 35

i

V.     FALSE AND MISLEADING STATEMENTS AND OMISSIONS .................................... 39

VI.    THE TRUTH EMERGES ................................................................................................... 55

VII.   PLAINTIFF'S CLASS ACTION ALLEGATIONS ........................................................... 60

VIII.  COUNTS .............................................................................................................................. 63

IX.    PRAYER FOR RELIEF ...................................................................................................... 69

X.     JURY TRIAL DEMANDED ............................................................................................... 70

I.     Nature of the Case ................................................................................................................. 1

II.    Jurisdiction and Venue .......................................................................................................... 5

III.   Parties .................................................................................................................................... 6

IV.    Substantive Allegations ....................................................................................................... 11

       A.     Background ............................................................................................................... 11

              1.     Goedeker Television Co. ............................................................................... 11

              2.     The 1847 Goedeker Inc. SPAC process, and the SPAC's acquisition of
                     Goedeker Television Co. ............................................................................... 11

              3.     Connection ..................................................................................................... 12

              4.     Polished and Connection Merge Based on Falsely Inflated Financial
                     Statements ...................................................................................................... 12

       B.     Former Employees Who Alleged Manipulative and Deceptive Business Practices
              that Impacted Financial Results Both Before the Acquisition at Connection and
              After the Acquisition at ACI ..................................................................................... 14

       C.     Motive ....................................................................................................................... 16

       D.     Former Employees Detail Defendants' Knowledge or Reckless Disregard of
              Improper Business Practices That Caused the Financial Statements of Connections
              and then Polished to be Materially False .................................................................. 17

              1.     A High Level Former Employee Informed Defendants Directly of ACI's
                     Fraudulent Inventory Practices Before Polished Issued its 2Q 2021
                     Financial Statements ...................................................................................... 18

              2.     Other Former Employees Corroborate FE1's Statements on False Inventory
                     Numbers in ACI's Financials that Materially Differed from Actual
                     Inventory ........................................................................................................ 22

3.    FE1 Saw and Reported on Other Fraudulent Practices that Directly Rendered Polished's Class Period Financial Statements Materially False ... 27

4.    Defendants Routinely Forged and Falsified Documents, Cheating Customers, Vendors, and Credit Card Companies ..................................... 30

5.    Defendants Employed Undocumented Workers Who Did Not Have Work Permits or Social Security Numbers ......................................................... 34

E.    The Audit Committee Finds that Albert Fouerti Stole from Polished ................. 35

F.    Polished's Violations of Generally Accepted Accounting Principles ("GAAP") . 36

1.    GAAP ................................................................................................................. 39

2.    Polished Improperly Accounted for Revenue ............................................. 41

3.    Polished Improperly Accounted for Costs of Goods Sold ......................... 45

4.    Material Weakness in Internal Controls ...................................................... 46

V.    FALSE AND MISLEADING STATEMENTS AND OMISSIONS ................................ 50

VI.    THE TRUTH EMERGES ........................................................................................... 67

VII.    PLAINTIFF'S CLASS ACTION ALLEGATIONS ..................................................... 74

VIII.    COUNTS ..................................................................................................................... 77

IX.    PRAYER FOR RELIEF .............................................................................................. 84

X.    JURY TRIAL DEMANDED ....................................................................................... 84

1.      Lead Plaintiff Eden Alpha CI LP ("Plaintiff"), individually and on behalf of all persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's Second Amended Complaint against Defendants Polished.com f/k/a 1847 Goedeker Inc. ("Polished" or "Company"), Douglas T. Moore, Albert Fouerti, and Maria Johnson, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through ~~his~~its attorneys, which included, among other things, a review of the Defendants' public documents, announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Polished, witness interviews, emails, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.[1]

I.      **NATURE OF THE CASE**

2.      ~~Between August and December of 2022, Polished, an online appliance company, closed an investigation into its financial statements, terminated its C-Suite, announcing that its former CEO stole $800,000 from the company, and announced that its largest subsidiary, purchased from the fired CEO and which accounted for the large majority of Polished's sales, illegally employed undocumented workers with no valid paperwork. Further, its inventory system was flawed. In fact, months earlier Polished was warned about fraudulent practices at the subsidiary by its VP of Logistics, and rather than act Polished fired its VP of Logistics. Because of these developments, on July 31, 2023, Polished restated financials for fiscal year 2021 and for the first quarter of 2022, harming investors.~~

---

[1] Attached as Exhibit 1 hereto is a Compare Write version of the Second Amended Complaint and the Amended Complaint.

1

3.2.    This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Polished common stock between August 12, 2021 and July 31, 2023, inclusive ("Class Period"), seeking to recover compensable damages caused by Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5(b), and Rules 10-b5(a) and (c), promulgated thereunder.

3.    Polished.com committed fraud as a regular business practice, and the fraud directly resulted in the restatement of its financial statements for fiscal year 2021 and for 1Q2022. Through a series of schemes including inflating recorded inventory, forging documents, and employing undocumented workers, Defendant Albert Fouerti first induced Polished to purchase Appliances Connection ("Connection"). Fouerti personally reaped a concrete benefit of $180 million, in cash, from Polished's purchase of Connection. Then, once at Polished, and later installed as CEO of Polished, Fouerti and the other Individual Defendants deceived investors, issuing materially false financial statements. When news of this wrongdoing emerged, forcing an audit committee investigation, Polished fired Defendants Albert Fouerti and Maria Johnson, and forced Fouerti to repay the company $800k in amounts he stole from the Company for his personal expenses and $2.9 million for the costs of the investigation, and, ultimately, filed for protection under chapter 7 of the bankruptcy code. In direct response, Polished's stock price plunged, causing damages to Plaintiffs and members of the Class.

4.    Among the fraudulent numbers that Defendants filed in their financial statements with the SEC were Polished's inventory at its Appliances Connection, Inc. ("ACI") subsidiary, which accounted for the vast majority of Polished's income. In fact, Polished's Vice President of Logistics, Former Employee 1 ("FE1"), repeatedly told Individual Defendants Fouerti, Johnson, and Moore, in person and during calls, and before each signed quarterly and annual financial

statements, that the inventory computer system listed upwards of 1,200 appliances that did not actually exist in inventory. The Individual Defendants did nothing to correct the Company's inventory control and counting problems, resulting in its publication of materially false financial statements. Defendants' recklessness harmed investors when the restatement revealed the truth.

5.      Defendants' fraud was not limited to the counting of inventory for inclusion in false financials. Multiple former employees, including FE1, detailed how, well before and continuing after its acquisition by Polished, Connection committed fraud daily. The Company's management, including Defendant Albert Fouerti, routinely ordered employees to forge documents, including invoices, bills of lading, and proofs of delivery. Connection sold refurbished appliances as new, shipped damaged appliances and forged documents to make it appear they were undamaged, and lied every day to customers, vendors, and credit card companies. The Company flouted employment law, employing large numbers of undocumented workers. Lastly, Connection's CEO, Albert Fouerti, who later became Polished's CEO, was a thief both before and after Polished's acquisition of Connection, including stealing $800,000 from the Company.

4.6.   The Company first began trading publicly in 2019. In January 2019, a Special Purpose Acquisition Company ("SPAC") named 1847 Goedeker was created to purchase Goedeker Television, an online seller of appliances and furniture, which it did in April 2019, taking the Company public. In August 2019, 1847 Goedeker began negotiating to purchase ~~Appliances~~ Connection, an online appliance seller privately owned by Albert and Elie Fouerti. ~~Appliance~~ Connection's sales dwarfed 1847 Goedeker's sales. On June 2, 2021, the acquisition was complete, and the Appliances Connection assets were placed into 1847 Goedeker's wholly owned subsidiary, Appliances Connection Inc. ("ACI"). 1847 Goedeker was later renamed Polished.com.

5.    Multiple former employees, including Polished's vice president of logistics, detailed how, well before and continuing after its acquisition, Appliances Connection ("AC") committed fraud routinely and daily, as a business practice. Employees were routinely ordered to forge documents, including invoices, bills of lading, and proofs of delivery. Inventory never matched its online listings, and at one point at least 9,000 items, listed for sale online, were missing from the warehouse. AC sold refurbished appliances as new, shipped damaged appliances and forged documents to make it appear they were undamaged, and lied every day to customers, vendors, and credit card customers. Lastly, AC's CEO, Albert Fouerti, who later became Polished's CEO, was a thief both before and after Polished's acquisition of AC.

7.    ~~After the AC~~After the Connection purchase, Polished, which was not profitable, announced that ACI was, and therefore the post-combination Company would be profitable. But ~~for the fraud, however, AC~~Connection, and later ACI, were not profitable~~ Nevertheless,~~ but for Defendants' fraud. In fact, as described by FE11, Fouerti directed the fraudulent inventory practices even before Connection was purchased by Polished. By making Connection seem profitable when it was not, Fouerti induced Polished to purchase Connection, and Fouerti negotiated a magnificent deal for himself personally, getting $180 million in cash in the transaction.

~~6.~~8.    Defendants falsely touted ~~its~~the post-combination Company's profitability, including in materially false and misleading quarterly statements for the second and third quarters of 2021. ~~Even worse,~~Polished would later announce that its quarterly financial statements for fiscal year 2021 and for the first quarter of 2022 were materially false and misleading, in violation of multiple GAAP provisions, and ~~had~~was forced to restate them. As Polished's CEO, Defendant

Fouerti repeatedly certified to the absence of fraud at Polished; even as many former employees recalled that he demanded fraud be committed every day.

~~7.~~9.    On December 27, 2022, Polished filed a Form 8-K with the SEC. The Form 8-K stated that on December 20, 2022, ~~it~~the Company had received a letter from its independent registered public accounting firm, Friedman LLP ("Friedman"), announcing its immediate resignation as Polished's auditor. Not only did Friedman resign, but it announced that it was withdrawing its fiscal year 2021 audit, and that it was disassociating itself from Polished's quarterly financial statements for Q2 2021, Q3 2021, Q4 2021, and Q1 2022.

~~8.~~10.    Due to the Company's fraud, and the resulting investigation, Polished did not timely file its quarterly statements for the last three quarters of 2022 and the first quarter of 2023, or its annual statement for fiscal year 2022. After a partial corrective disclosure first harmed investors, on July 31, 2023, Polished announced the restatements, and its stock price nosedived 68%, harming investors again.

## II.    JURISDICTION AND VENUE

~~9.~~11.    The claims alleged herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

~~10.~~12.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

~~11.~~13.    Polished's principal executive office is located at 1870 Bath Avenue, Brooklyn, New York 11214, within this District.

~~12.~~14.    In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the

facilities of a national securities exchange. Defendants disseminated the statements alleged to be false and misleading herein into this District, and Defendants solicited purchasers of Polished common stock in this District.

## III.    PARTIES

13.15.  Plaintiff Eden Alpha CI LP, as set forth in the certification attached as an exhibit to its Lead Plaintiff Motion (Dkt. No. 10-2), incorporated by reference herein, purchased Polished common stock at artificially inflated prices during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14.16.  Defendant Polished purports to ~~sell~~be a content-driven technology-enabled shopping destination selling appliances for builder and business clients, as well as individuals, as well as selling furniture, fitness equipment, plumbing fixtures, televisions, outdoor appliances, and patio furniture, ~~as well as commercial appliances for builder and business clients as a content-driven and technology-enabled shopping destination for appliances, furniture and home goods.~~. Polished purports to have warehouse fulfillment centers in the Northeast and Midwest, as well as showrooms in Brooklyn, New York, St. Louis, Missouri and Largo, Florida, and to offer one-stop shopping for national and global brands.

15.17.  Defendant Polished is a Delaware corporation with principal executive offices located at 1870 Bath Avenue, Brooklyn, New York 11214. On July 20, 2022, the Company changed its name from "1847 Goedeker Inc." to "Polished.com, Inc." In connection with the name change, the Company's common stock ceased trading under the ticker symbol "GOED" and began trading under the ticker symbol "POL." Polished's common stock trades in an efficient market on the NYSE American.

16.18.  Defendant Douglas T. Moore ("Moore") served as the Chief Executive Officer ("CEO") of the Company from August 2019 until August 31, 2021, and as a Director of the Company from April 2020 until September 2021.

17.19.  Defendant Albert Fouerti ("Fouerti") served as the CEO of the Company from September 1, 2021 until October 14, 2022. Defendant Fouerti served as a Director of the Company from September 1, 2021, until December 2022. Defendant Fouerti served as President of ACI since June 2, 2021, and from 2015 through June 1, 2021 as CEO of privately held ACConnection.

18.20.  Defendant Maria Johnson ("Johnson") served as the Company's CFO from July 2021 until October 14, 2022.

19.21.  Defendants Moore, Fouerti, and Johnson are referred to herein as the "Individual Defendants."

20.22.  Defendants Moore and Johnson signed and certified Polished's quarterly report on Form 10-Q for the period ending June 30, 2021 ("Q2 2021 10-Q"). Defendants Fouerti and Johnson signed and certified Polished's quarterly reports on Form 10-Q for the periods ending September 30, 2021 ("Q3 2021 10-Q"), and Polished's Annual Report on Form 10-K for the period ended December 31, 2021 ("2021 10-K"), as well as Polished's quarterly report on Form 10-Q for the period ending March 31, 2023 ("Q1 2022 10-Q"). All certifications were pursuant to Section 302 of the Sarbanes-Oxley Act of 2022.

21.23.  For each Certification described in the previous paragraph, the named Defendants certifying each filing certified that:

    a.  I have reviewed this [Quarterly Report on Form 10-Q/Annual Report on Form 10-K] for the period ended _____;

b.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

c.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

d.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   i.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   ii.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   iii.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the

effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

iv. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

e. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

i. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting, which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

ii. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

22.24. For each periodic report during the Class Period, Defendants also certified that "pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002," the quarterly and annual filings "fully compl[y] with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934," and that the "information

contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Polished."

23.25.  Each of the Individual Defendants, because of their positions with Polished, possessed the power and authority to control the contents of Polished's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of Polished's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

24.26.  Polished is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

25.27.  The scienter of the Individual Defendants and other employees and agents of Polished is similarly imputed to the Company under *respondeat superior* and agency principles.

26.28.  For the entire Class Period, Albert Fouerti's scienter is imputed to Polished.

27.29.  The Company and Individual Defendants are referred to herein, collectively, as "Defendants."

IV.    **SUBSTANTIVE ALLEGATIONS**

A.    **Background**

1.    **Goedeker Television Co.**

28.30.  Goedeker Television Co. was founded as a privately-held company in 1951 in St.
Louis, Missouri. The Company expanded over the next four decades, adding showrooms and
expanded to sell all appliances, as well as furniture. In 2008 Goedeker opened its ecommerce
website, "Number1Direct.com." The company. In 2012, Goedeker converted almost all its
showroom space into warehouse and office space, changing the website name to goedekers.com.

29.31.  In its quarterly report for the period ended June 30, 2020 ("Q2 2020 10-Q"), filed
with the SEC on August 20, 2020, Goedeker described itself as a "one-stop e-commerce
destination for home furnishings, including appliances, furniture, home goods and related
products." Goedeker continued that "we have evolved from a local brick and mortar operation
serving the St. Louis metro area to a large nationwide omnichannel retailer that offers one-stop
shopping for the leading brands." Goedeker further stated that "over 95% of our sales are placed
through our website at www.goedekers.com."

2.    **The 1847 Goedeker Inc. SPAC process, and the SPAC's acquisition of
Goedeker Television Co.**

30.32.  On January 10, 2019, Polished was incorporated in the State of Delaware as a
Special Purpose Acquisition Company ("SPAC"), with the intention of trading on the New York
Stock Exchange American under the ticker symbol "GOED." Upon formation, the SPAC had no
operations other than those relating to its incorporation and organization. Polished was created for
the sole purpose of acquiring substantially all of the assets of Goedeker Television Co. Upon
formation, the SPAC had no operations other than those relating to its incorporation and
organization. On April 5, 2019, Polished completed the acquisition of Goedeker Television.

11

Thereafter, Polished (at the time still called 1847 Goedeker) traded on the NYSE American under the ticker symbol "GOED."

### 3.    ~~Appliances~~ Connection

~~31.~~33.  Albert Fouerti and his brother Elie Fouerti founded the privately held ~~Appliances~~ Connection ~~("AC")~~ in 2015 as an online seller of appliances. Albert Fouerti was ~~AC's~~ Connection's CEO. According to Polished ~~stated that AC,~~ Connection was one of the leading retailers of household appliances in the U.S. Though ~~AC~~Connection had a showroom in its Brooklyn, New York, headquarters, the vast majority of its business was as an online seller of household appliances, serving retail customers, builders, architects, interior designers, restaurants, schools, and other large corporations. ~~AC shipped~~Connection claimed to ship to all 48 states in the Continental U.S., offering over 51,000 appliance products. Albert and Elie Fouerti also owned other ~~privately-held~~, related companies~~.~~ Specifically, the Fouertis owned (a) YF Logistics LLC ("YF Logistics"), ~~which operated~~operating a 200,000 square foot warehouse in Hamilton, New Jersey, from which ~~AC~~Connection received products from ~~sellers~~vendors and sold and shipped products to consumers; (b) 1 Stop Electronics Center, Inc.; (c) Gold Coast Appliances, Inc.; (d) Superior Deals, Inc.; and (e) Joe's Appliance LLC.[2]

### 4.    Polished and ~~Appliances~~ Connection Merge Based on Falsely Inflated Financial Statements

~~32.~~34.  On August 12, 2020, Ellery Roberts, Polished's Board President, began negotiating with Albert and Elie Fouerti a merger of ~~AC~~Connection into Polished. On October 20, 2020, Polished's Board of Directors approved the acquisition of ~~AC~~Connection. The parties executed the

---

[2] ~~This Amended Complaint uses "AC"~~"Connection" refers to ~~refer not only to the privately-held~~ Appliances Connection~~, but also~~ and to the other five related companies ~~owned by~~ Albert Fouerti ~~and Elie Fouerti~~owned before the merger with Polished. "ACI" refers to the entities after their purchase by Polished.

purchase agreement that same day, later approving amendments to the purchase agreement on December 20, 2020, and on April 6, 2021.

33.35. On August 31, 2020, Polished and ACConnection executed a letter of intent and each side began its due diligence of the other. As part of its due diligence, Polished's CEO, Defendant Moore, visited AC'sConnection's warehouse in Hamilton, New Jersey, and AC's Brooklyn headquarters.

36. Polished's due diligence did not reveal, however, that Connection had falsified its financial statements, causing Polished to materially overpay to purchase Connection.

34.37. In anticipation of the acquisition, Polished formed a wholly owned subsidiary called Appliances Connection, Inc. ("ACI"), for purchasing the AC assets.[3] Upon the closing of the acquisition, the AC assets became part of ACI, and Albert Fouerti became President of ACI before quickly ascending to CEO of Polished..

35.38. Though Polished was purchasing AC, ACConnection, Connection was by far the larger company, its sales dwarfing Polished's sales. In the . For example, for the second quarter of 2021 Q2 10-Q, Polished reported approximately, the quarter in which the merger closed, of Polished's $64 million in net sales for the three months ending June 30, 2021. Of that $64 million, approximately, $47.8 million comprised ACIwere Connections sales, even as ACI sales contributed to Polished covered only 29 days of the three months, starting on June 2, 2021, when the ACConnection acquisition was completedclosed.

36.39. On June 2, 2021, Polished's acquisition of ACConnection closed. Upon the closing of the acquisition, Connection became part of ACI owned AC, and its assets. The purchase price

---

[3] This Amended Complaint will use "AC" to refer to Albert Fouerti's Appliances Connection entities *before* the purchase was completed on June 2, 2021. "ACI" will refer to those same assets after their purchase by the publicly-traded Polished.

was approximately $222 million, with approximately $180 million of that total paid in cash to Albert Fouerti. Albert Fouerti became President of ACI (before eventually ascending to replace Moore as CEO of Polished). He also joined Polished's Board of Directors.

40.    Of the $222 million purchase price that Polished paid, Albert Fouerti personally received a concrete benefit of $180 million, in cash.

37.41.  In July 2022, 1847 Goedeker, Inc. was renamedbecame "Polished.com Inc.," andchanging its ticker symbol was changed to "POL."

**B.    According to Former Employees, AC and the ACI Engaged in Who Alleged Manipulative and Deceptive Business Practices that Impacted Both Its and Polished's Financial Results Both Before the Acquisition at Connection and After the Acquisition at ACI**

38.42.  In October 2020, Polished hired FE1 as Polished's Vice President of Logistics. FE1 worked at that position until Albert Fouerti, himself, fired FE1 in Novemberon September 21, 2021. FE1 reported directly to the CEO, first to CEO Douglas Moore, and then to CEO Albert Fouerti.

39.43.  Former Employee 2 ("FE2") worked for Goedeker, and then Polished, from October 2015 to December 2021. FE2 started in customer service, but then worked as the Reverse Logistics Manager, including processing returned goods. FE2 reported directly to FE1, then to FE1's replacement Mike Durrick.

40.44.  Former Employee 3 ("FE3") started working at ACConnection in September 2019, and continuedcontinuing at Polished until July 2023. FE3 worked as a Dispute Analyst, handling disputes and chargebacks. FE3 reported to Chargeback Department Manager Wellington Chen, who reported to Albert Fouerti. When Chen left, FE3 reported to Chen's replacement, "Miriam." FE3 sat two desks away from Albert Fouerti in the open Brooklyn office.

41.45.  Former Employee 4 ("FE4") began working at Goedeker and then Polished as a Customer Finance Warranty and Dispute Supervisor in January 2017, reporting to Mike Goedeker, Goedeker's CEO and the son of its founder. In June 2017 FE4 was transferred to the Accounting Department, and in January 2018 became the company's Chargeback Specialist, responsible for credit card disputes, a job that was still in the Accounting Department. FE4 was the only employee handling credit card disputes. FE4 reported to Robert Barry, who during the Class Period was Interim CFO until July 1, 2021, then Chief Accounting Officer from July 1, 2021, and then Interim CFO again after Defendant Johnson was fired in 2022. FE4 left Polished in March 2022.

42.46.  Former Employee 5 ("FE5") worked for YF Logistics from June 2022 to August 2023 as a "Manifest Manager." YF Logistics was ACI's main warehouse, in Hamilton, NJ. FE5 handled returns and closed out manifests, marking deliveries as completed or rescheduled. FE5 reported to Danny Jean, one of two YF Logistics warehouse managers.

43.47.  Former Employee 6 ("FE6") worked at YF Logistics as an IT support specialist from February 2022 to December 2022. He reported to a supervisor who reported to John Winters, an IT Manager who reported to Albert Fouerti.

44.48.  Former Employee 7 ("FE7") was Inventory Control Manager at YF Logistics from January 2021 to December 2022. FE7 reported to Warehouse Manager Danny Jean, and to a woman named Sophia, the HR Manager.

45.49.  Former Employee 8 ("FE8") worked in the Customer Service Department at YF Logistics' second warehouse in Somerset, NJ, which FE8 helped open. FE8 worked for YF Logistics from November 2021 to October 2022. FE8 reported to a person named Luigi.

46.50.  Former Employee 9 ("FE9") started at Goedeker's as a Customer Service Supervisor in March 2018, and left Polished in March 2022.

47.51.  Former Employee 10 ("FE10") started at Goedeker's in 2015, became a Damage Resolution Supervisor at Polished in February 2020, and a Customer Service Supervisor in September 2020. FE10 left Polished in March 2022.

48.52.  Former Employee 11 ("FE11") worked as Inventory Control Manager at YF Logistics from October 2020 to March 2021. FE11 reported to Office Manager Kimberly Hoffman.

**C.    Motive**

53.    Albert Fouerti directed fraudulent inventory practices, and other fraud described herein, well before Polished acquired Connection. Fouerti leveraged these deceptive practices and financials into a personal $180 million concrete personal benefit, a cash payout as part of the price Polished paid for Connection, a merger he induced by false financials showing Connection to be profitable when it was not.

54.    By providing false financials, Albert Fouerti was able to negotiate $180 million in cash for himself from Connection's acquisition by Polished as a concrete personal benefit. It was Albert Fouerti's direction of Connection's false profitability that induced Polished to enter into the acquisition. Thus, even as he had engaged in fraudulent business practices for years, the merger allowed Albert Fouerti to immediately capture tremendous concrete personal benefit. It created a powerful motive for him to deceive.

55.    Albert Fouerti also used the Company as a personal piggy bank, both before and after the merger. He directly stole $800,000 from Polished for fake expenses, additionally collected commissions paid to a fictitious salesperson, and paid his father a $104,000 salary for a fictitious job at YF Logistics. His continuing, persistent theft created motive for him to present a fraudulent portrait of Polished to investors: that of a profitable company with effective internal controls, working fulfillment and logistics systems, and every expectation of continuing as a going concern.

16

56.     Even though FE1 alerted Moore about the fraud taking place at the Company during the summer of 2021, including specifically that the inventory count in ACI's inventory computer system was approximately 1,200 appliances higher than the actual inventory count, Moore did nothing to remedy the problems. Instead, he took a lifeboat off Polished's sinking ship. According to a September 3, 2021 8-K, on August 30, 2021, Moore resigned as CEO of Polished, in favor of Albert Fouerti, signing a Separation and Release Agreement. Moore negotiated for himself a severance payment equal to one year of his base salary, $650,000, less applicable statutory deductions and authorized withholdings, payable in equal installments on the Company's regular payroll dates during the period commencing on September 1, 2021 and ending on August 31, 2022. Moore's original employment agreement, dated August 15, 2019, entitled him to only six months severance, so Moore, with knowledge of wrongdoing at the company he was leaving, negotiated a substantial extra payment for himself. In other words, after learning about Albert Fouerti's illegal and fraudulent business practices from the Company's vice president of logistics, Moore quickly resigned and negotiated a substantial severance, leaving Polished's stockholders to eventually hold the bag.

**D.     Former Employees Detail Defendants' Knowledge or Reckless Disregard of Improper Business Practices That Caused the Financial Statements of Connections and then Polished to be Materially False**

57.     Even before Polished closed its purchase of ~~AC~~Connection on June 2, 2021, Albert Fouerti and ~~AC~~Connection engaged in ~~act~~acts, practices, and courses of business they intended to deceive investors, for the benefit first of ~~AC~~Connection and then later Polished. The fraud was not a bug, but a feature, constituting Albert Fouerti's intentional, routine course of business ~~practices~~. Both before and ~~continuing~~ after the June 2, 2021, ~~AC~~closing, Connection, and then ACI, recorded significantly false inventory numbers in financial reports, forged documents, cheated customers, cheated vendors from whom they bought appliances, ~~published significantly false inventory~~

17

~~numbers in financial reports,~~ and hired undocumented workers at the YF Logistics warehouse. The financial statements upon which Albert Fouerti induced Goedeker's to purchase Connection were materially false directly as a result of these illegal business practices.

~~49.~~58.  In addition, Albert Fouerti simply stole $800,000 from Polished~~,~~ and paid his father a $104,000 salary for a fictitious job at YF Logistics. ~~Further,~~When former employees discovered and revealed Albert Fouerti's fraudulent business practices to Polished's executives, ~~who fired~~the executives did nothing except fire the complaining employees.

### 1.    A High Level Former Employee Informed Defendants Directly of ACI's Fraudulent Inventory Practices Before Polished Issued its 2Q 2021 Financial Statements

59.    During the Class Period, inventory was delivered to Polished's YF Logistics' warehouse in Hamilton, New Jersey, and then shipped to customers from that warehouse.

60.    Upon the June 2, 2021, closing of Polished's purchase of Connection, at the behest of Defendants Moore, FE1, Polished's VP of Logistics, began visiting ACI's facilities, talking with its leaders and employees, and looking at its internal documents. FE1 needed to see how ACI was run in order to successfully merge its systems and practices with Polished's systems and practices. ~~The~~FE1 was in daily contact with Defendant Doug Moore, and with Robert Barry, Polished's CFO until July 1, 2021 and thereafter Polished's Chief Accounting Officer ("CAO"). FE1 was also in contact with Maria Johnson, Polished's CFO starting in July 2021, and with other Polished executives. FE1 was also in regular contact with Albert Fouerti and other ACI executives, exchanging many emails with Albert Fouerti.[4]

---

[4] During a November 16, 2020, earnings conference call, Defendant Moore lauded FE1's hiring, noting that FE1's "contribution has been immediate and it's a key part of our path to profitability and scalability."

61.     FE1 immediately focused on inventory issues at YF Logistics. Connection provided him with the inventory from their "home-grown" inventory management system.[5] FE1 conducted two separate hand counts of inventory comparing those counts with Connection's ledger. Both counts confirmed that the ledger and, in turn, Connection's balance sheet were materially false, overstating inventory by approximately 1,200 pieces. Based on what he found, FE1 considered fixing the inventory issues to be his highest priority, after safety.

62.     In June and July of 2021, when Defendant Fouerti was still running ACI, FE1 directly told Defendant Moore and CAO Barry about all of the inventory problems and the 1,200 missing appliances, on multiple occasions. In addition, FE1 told Defendant Johnson, Polished's new CFO, about the missing inventory after she started as CFO on July 1, 2021. Moore told FE1 to work with Johnson and Barry on the inventory issues, and to continue to dig into the problems and then report their findings. While Johnson told FE1 that she would work with him, FE1 reports that Johnson did not actually take any action, and that she included the false inventory numbers in Polished's subsequent financial statements starting with the 2Q2021 financial statements.

50.63.  Indeed, the conditions at YF Logistics were known to Polished's CEO nine months before the AC purchase was completedobvious for all relevant periods. In a Schedule 14C filed by Polished with the SEC on April 22, 2021, Polished stated that its CEO, Defendant Moore, visited YF Logistic'sLogistics' warehouse in Hamilton, New Jersey, and AC'sConnection's headquarters in Brooklyn, On September 9, 2020, meeting at each location with Albert and Elie Fouerti. The Schedule 14C was signed by Defendant Moore on behalf of Polished and ACI, and by Albert Fouerti on behalf of ACConnection.

---

[5] FE1 entered into an engagement letter with a company called Korber that provides outside warehouse management systems. Albert Fouerti cancelled all contact with Korber after he became CEO on September 1, 2021.

64.     In early August 2021, FE1 visited ACI's Brooklyn office.[6] During this visit FE1 told Albert Fouerti directly that inventory was missing and materially overstated on the balance sheet, and further discussed how inventory was tracked, how damages were reported, and how the claims process worked.

65.     FE1 had a second discussion with Albert Fouerti about the facts that inventory was missing and materially overstated on the balance sheet later in August 2021.

66.     When Albert Fouerti became CEO on September 1, 2021, FE1 began having daily phone calls with him. FE1 discussed everything he had been working on under Moore. FE1 specifically raised directly with Albert Fouerti, again, that inventory was missing and materially overstated on the balance sheet. One of those conversations was on Tuesday, September 7, 2021, where FE1 laid out the inventory issues with Albert Fouerti. Albert Fouerti never acknowledged that inventory was missing and materially overstated on the balance sheet he provided or expressed concern. Indeed, according to FE1, Albert Fouerti refused to change anything about the inventory system. In the days after September 7, 2021, and before Albert Fouerti fired FE1 on September 21, 2021, FE1 again raised the inventory issue, among others, with Albert Fouerti. Further, Johnson participated in those calls, herself, hearing FE1 speak about the inventory issues, including that inventory listed on the ledger, and subsequently sent up to be included in false financial statements, did not exist in the YF Logistics warehouse.

67.     On September 21, 2021, FE1 participated in a phone call with Albert Fouerti, Johnson, and Barry, during which Albert Fouerti, after approximately 30 minutes of discussion about the very inventory issues that caused Connection and then Polished to issue false financials,

---

[6] The Brooklyn facility was an open office. Fouerti sat in the open area, without an office of his own.

screamed and cursed at FE1 and fired FE1. Before the screaming started, FE1 was able to raise most of the issues FE1 wanted to discuss. FE1 specifically raised the false inventory numbers in ACI's financials that materially differed from actual inventory, and inventory control issues. FE1 mentioned that personnel, at Albert Fouerti's direction, deliberately altered dates on invoices and other documents, shifting responsibility and costs to consumers and vendors. FE1 mentioned the prospective Korber contract. Albert Fouerti reacted in an outburst of anger, stating that FE1 did not understand the entire ordering process and maybe was not capable of understanding it. When FE1 began talking about returns and claims, Albert Fouerti became louder and even more hostile, then began attacking FE1 on a personal level and cursing at FE1. Albert Fouerti then yelled that FE1 was "incompetent." FE1 tried to talk about Polished's Code of Ethics and Business Conduct, but Albert Fouerti would not let FE1 continue, stating "I am finished with you, you are done."

68.    FE1 subsequently called Defendant Johnson, who confirmed that Albert Fouerti terminated FE1 during that phone meeting.

69.    The foregoing allegations relate directly to the materially false financial statements about its profitability Polished issued during the Class Period, based on the historic and current profitability of AC, and then ACI, were false restated on July 31, 2023, as but for follows:

a.    For fiscal year 2021, Polished understated Cost of Goods Sold ("COGS") by $1.4 million on the fraudulent business practices, ACI was not profitable. income statement, and overstated inventory by $1.4 million on the balance sheet due to an "error in inventory cutoff."

b.    Defendants Committed Fraud with Respect to Inventory and Published For Q1 2022, Polished overstated inventory by "$6.7 million, net from changes to sales returns allowance and revenue cutoff adjustments."

### 1.2.   Other Former Employees Corroborate FE1's Statements on **False Inventory Numbers** in ACI's Financials that Materially Differed from Actual Inventory

70.   ~~During the Class Period, inventory was delivered to Polished's YF Logistics' warehouse in Hamilton, New Jersey, and then shipped to customers from that warehouse.~~ Multiple other FEs corroborate FE1's description of deceptive inventory practices. Both pre- and post-merger, the entity that Albert Fouerti controlled booked inventory that was materially higher than the inventory actually on hand. Connections knowingly used false inventory figures to induce its acquisition by Polished. Defendants continued using ACI's materially inflated inventory numbers in financials Polished publicly reported.

~~51.~~71.  According to FE5, YF Logistics never had an accurate count of its inventory, and Polished's reported inventory numbers were not even close to actual inventory. According to FE5, when the warehouse would be shut down to do a physical count of inventory, which happened on multiple occasions, no products would be shipped out and arriving appliances would be placed in a separate, roped-off area. ~~There would always be~~Each time the warehouse carried out a physical count, there were material inconsistencies between the inventory listed on paper, and the much smaller actual count. The count would be repeated several times during the week. By close of work on Friday, the numbers were still significantly off. When Monday morning arrived, warehouse manager Danny Jean would just remove the rope and tell everyone to get back to work as if the discrepancy in the numbers had been solved, which it had not. When FE5 started working, there were over 9,000 pieces missing from inventory. FE6 confirmed that the physical count was never correct. The foregoing allegations relate directly to ~~Polished's~~the materially false financial statements Polished issued during the Class Period and restated on July 31, 2023 ~~restatement of Polished's fiscal year 2021 and first quarter 2022 financial results,~~ as follows:

a.  For fiscal year 2021, Polished understated Cost of Goods Sold ("COGS") by $1.4 million on the income statement, and overstated inventory by $1.4 million on the balance sheet due to an "error in inventory cutoff."

b.  For Q1 2022, Polished overstated inventory by "$6.7 million, net from changes to sales returns allowance and revenue cutoff adjustments."

52.72.  FE7, an inventory control manager, first at Connection and then later at ACI, further confirms that YF Logistics' inventory count was never correct. Every day, employees searched, fruitlessly, for at least 10 items that were missing from the warehouse. FE7 recalls that a manager named Luigi would let employees buy appliances from the "scrap" pile for cash, for enormous discounts, and then pocket the cash. Though called "scrap," most of the "scrap" items had minimal damage, and some only needed to be re-boxed. FE6 confirmed that employees stole many appliances from YF Logistics' warehouse. The foregoing allegations relate directly to Polished'sthe materially false financial statements Polished issued during the Class Period and restated on July 31, 2023 restatement of Polished's fiscal year 2021 and first quarter 2022 financial results, as follows:

a.  For fiscal year 2021, Polished understated Cost of Goods Sold ("COGS") by $1.4 million on the income statement, and overstated inventory by $1.4 million on the balance sheet due to an "error in inventory cutoff."

b.  For Q1 2022, Polished overstated inventory by "$6.7 million, net from changes to sales returns allowance and revenue cutoff adjustments."

53.73.  FE11 also worked as an inventory control manager, in the period before Polished acquired ACConnection. FE11 made multiple suggestions to Elie Fouerti on ways to improve inventory practices, including specifically using a better warehouse management computer system.

23

Elie Fouerti rejected every suggestion. Elie Fouerti also ordered FE11 to scavenge parts from damaged products and use them to create or perfect other products that the company would then market on its website as "brand new." ~~The foregoing allegations relate directly to Polished's July 31, 2023 restatement of Polished's fiscal year 2021 and first quarter 2022 financial results~~Each morning FE11 compared orders for delivery with the actual existence of the appliance in the warehouse. Appliances would commonly, almost daily, not be present in the warehouse, and FE11 was ordered to send a different product, or an already damaged product, that was in the YF Logistics warehouse. When FE11 would bring the issue to Elie Fouerti, with whom he had frequent conversations, Elie would take the paperwork from FE11 and tell FE11 Elie would handle it. FE11 never heard of the issue again. On one occasion a refrigerator was not in the warehouse, and Elie ordered workers to repair and re-box a refrigerator in the salvage pile, and send it out as "new." FE11 left Connection the very next day. The foregoing allegations relate directly to the materially false financial statements Polished issued during the Class Period and restated on July 31, 2023, as follows:

    a.  For fiscal year 2021, Polished overstated sales on the income statement by $7.4 million, and understated accounts payable and accrued expenses by $7.4 million on the balance sheet due to under accrual of "allowance for sales returns."

    b.  For Q1 2022, Polished overstated Q1 2022 sales by $4.1 million on the income statement, and overstated inventory on the balance sheet "by $6.7 million, net from changes to sales returns allowance and revenue cutoff adjustments."

~~54.~~74.  FE3 heard Albert Fouerti state during a meeting that every piece of inventory must be carried as available for sale, even if it was damaged. FE3 dealt with the chargeback documents, and got at least 10 complaints per day from unhappy customers who had received these damaged

items. FE3 also personally saw that many of the warehoused items available for sale were actually damaged. According to FE3, all of the damaged items were carried as saleable. Further, according to FE3, ACConnection, and then later ACI, sold refurbished items that were advertised as brand new. The foregoing allegations relate directly to Polished'sthe materially false financial statements Polished issued during the Class Period and restated on July 31, 2023 restatement of Polished's fiscal year 2021 and first quarter 2022 financial results, as follows:

   a. For fiscal year 2021, Polished overstated sales on the income statement by $7.4 million, and understated accounts payable and accrued expenses by $7.4 million on the balance sheet due to under accrual of "allowance for sales returns."

   b. For Q1 2022, Polished overstated Q1 2022 sales by $4.1 million on the income statement "because of an understatement of a returns allowance and revenue cutoff issues."

   c. For Q1 2022, Polished overstated inventory on the balance sheet "by $6.7 million, net from changes to sales returns allowance and revenue cutoff adjustments."

   55.75.    FE3 also knowscorroborated that Albert Fouerti forged AC'sConnection's, and then later ACI's, inventory numbers. FE3 heard Albert Fouerti state that even if an item was not in stock, that ACConnection would sell it, charge the customers the second the order was placed, and then keep the money. The foregoing allegations relate directly to Polished'sthe materially false financial statements Polished issued during the Class Period and restated on July 31, 2023 restatement of Polished's fiscal year 2021 and first quarter 2022 financial results, as follows:

   a. For fiscal year 2021, Polished overstated sales on the income statement by $7.4 million, and understated accounts payable and accrued expenses by $7.4 million on the balance sheet due to under accrual of "allowance for sales returns."

b.  For fiscal year 2021, Polished improperly recognized revenue on $8.1 million of customer's deposits in 2021 on the income statement.

c.  For Q1 2022, Polished overstated sales on the income statement by $4.1 million overstatement of Q1 2022 sales "because of an understatement of a returns allowance and revenue cutoff issues."

56.76.  FE2 observed during the summer of 2021 that the inventory and ordering computer systems simply did not work correctly. FE2 saw that an order might be fulfilled multiple times, sometimes three or more times, and that items were getting lost. FE2 raised these issues with management at ACI, but management did not make any changes. The foregoing allegations relate directly to Polished'sthe materially false financial statements Polished issued during the Class Period and restated on July 31, 2023 restatement of Polished's fiscal year 2021 and first quarter 2022 financial results, as follows:

a.  For fiscal year 2021, Polished understated inventory on the balance sheet by "$7.7 million, resulting from the reduction in cost of goods sold attributable to the allowance for sales returns, revenue cutoff, and inventory cutoff, offset by a reduction in showroom inventory of $1.0 million that was reclassified as property and equipment."

b.  For Q1 2022, Polished recognized a decline in inventory on the balance sheet of $6.7 million, net from changes to sales returns allowance and revenue cutoff adjustments.

57.77.  According to FE3, FE5, FE6, and FE7, Polished's publicly reported inventory numbers were materially false. The foregoing allegations relate directly to Polished'sthe materially

false financial statements Polished issued during the Class Period and restated on July 31, 2023 restatement of Polished's fiscal year 2021 and first quarter 2022 financial results, as follows:

    a. For fiscal year 2021, Polished understated inventory on the balance sheet by "$7.7 million, resulting from the reduction in cost of goods sold attributable to the allowance for sales returns, revenue cutoff, and inventory cutoff, offset by a reduction in showroom inventory of $1.0 million that was reclassified as property and equipment."

    b. For Q1 2022, Polished recognized a decline in inventory on the balance sheet of $6.7 million, net from changes to sales returns allowance and revenue cutoff adjustments.

### 3. FE1 Saw and Reported on Other Fraudulent Practices that Directly Rendered Polished's Class Period Financial Statements Materially False

78. From what FE1 observed on visits to YF Logistics and to ACI's Brooklyn offices, FE1 knew that Albert Fouerti was requiring illegal and unethical fraudulent practices, resulting in serious systemic and operational issues at ACI. On September 9, 2021, FE1 sent an email to Robert Barry, Polished's CAO, to Thomas Sean Harcum, Polished's Chief Marketing Officer and Chief Technology Officer, and to Michael Hargrave, Polished's Chief Merchandising Officer.[7] The email laid out specific concerns, including that FE1 knew of at least 15 people working for ACI who were not legally allowed to do so. Some of the 15 had openly admitted to FE1 that they were not authorized to be working in the U.S. FE1 further noted that Albert Fouerti refused to let anyone look at the list of people paid on Forms 1099.

---

[7] In a November 2020 Investor Presentation, Polished devoted a slide entitled "Senior Staff" to touting Harcum, Hargrave, and FE1.

79.    FE1's email further discussed, in detail, unethical, fraudulent practices at ACI. FE1 wrote that even if damage was the fault of workers at YF Logistics, the damage team was required to file a claim with the vendor, and 100% of all claims are filed as "concealed damages," meaning it was not ACI's fault. The foregoing allegations relate directly to the materially false financial statements Polished issued during the Class Period and restated on July 31, 2023, as follows:

    a.   For fiscal year 2021, Polished understated COGS on the income statement by $0.4 million, and overstated gross profit by $0.4 million on the income statement due to an over accrual of rebates from vendors.

    b.   For fiscal year 2021, Polished overstated accounts receivable on the balance sheet by $0.5 million due to an "over accrual of vendor rebates."

    c.   For Q1 2022, Polished overstated accounts receivable on the balance sheet by $3.8 million due to an "over accrual of vendor rebates."

80.    Further, FE1 documented that if an item was purchased from a third-party vendor who had purchased it from the manufacturer, and it was too late to file a claim against the manufacturer, Albert Fouerti directed the returns team to change the invoice date so that it appeared that ACI had purchased the item form the third-party vendor earlier than it actually had. The manufacturer had no idea when the item had been purchased from the third-party vendor, so was forced to accept the date from ACI, and pay ACI for the damaged item. Even more egregiously, if photos of the damage were unavailable, Albert Fouerti directed ACI's returns team to use old photos from other products to prove to the manufacturer and third-party vendor that the damage existed. The foregoing allegations relate directly to the materially false financial statements Polished issued during the Class Period and restated on July 31, 2023, as follows:

a.   For fiscal year 2021, Polished understated COGS on the income statement by $0.4 million, and overstated gross profit by $0.4 million on the income statement due to an over accrual of rebates from vendors.

b.   For fiscal year 2021, Polished overstated accounts receivable on the balance sheet by $0.5 million due to an "over accrual of vendor rebates."

c.   For Q1 2022, Polished overstated accounts receivable on the balance sheet by $3.8 million due to an "over accrual of vendor rebates."

81.   FE1's email noted obvious OSHA violations. Further, if a YF Logistics driver was at fault for an accident, Albert Fouerti required the driver to tell the other driver involved in the accident to call Chuck Prusakowski, a YF Logistics warehouse manager, and let Prusakowki try to resolve the issue without formal reports to any entity.

82.   Finally, FE1's email stated that Yousef Fouerti was being paid $104,000 per year for a fake job.

83.   In the email, FE1 mentioned an earlier discussion with CEO Doug Moore and others. In fact, FE1 had previously emailed Robert Barry about Yousef Fouerti's fake "job" on August 17, 2021.

84.   Following FE's September 9, 2021 email, Robert Barry told FE1 that he should discuss these issues with Defendant Albert Fouerti, who had just been appointed Polished's new CEO,[8] and with Defendant Johnson, Polished's CFO. A series of emails were exchanged between FE1, Fouerti, and others, and in a September 20, 2021 email Fouerti asked FE1 to meet with him and Johnson at 2:30 p.m. on September 21, 2021. During the September 21, 2021 phone call, FE1

_____

[8] At the same time as Albert Fouerti was appointed CEO, Elie Fouerti was appointed Polished's Chief Operating Officer.

raised all of these issues, except as to Yousef Fouerti's no-show job, before he was screamed at and fired.

### 2.4.    Defendants Routinely Forged and Falsified Documents as a Routine Business Practice, Cheating Customers, Vendors, and Credit Card Companies

58.85. Multiple FEs observed that Albert and Elie Fouerti repeatedly ordered thatemployees to forge documents be forged, and mandated that employees performcarry out unethical and illegal business practices.

59.86.  According to FE2, who observed fraudulent practices with her own eyes when she was present in Brooklyn during the summer of 2021, Albert and Elie Fouerti ordered an employee in Brooklyn named Ketevan "Keti" Talakvadze, who worked for Albert Fouerti, to repeatedly forge documents. For example if a product was returned after 35 days, outside the window to return it to a manufacturer, the Fouertis ordered Talakvadze to alter the document so that it appeared the appliance had been returned within the time limit so it could be returned to the manufacturer. Talakvadze told FE2 that she was required to copy Albert and Elie Fouerti on every single email she sent, which FE2 also personally observed on every email they watched Talakvadze create, and on older emails FE2 saw. FE2 also saw Talakvadze change delivery dates on bills of lading to circumvent damage claims. Talakvadze toldrelates that FE2 stated that she did not want to forge these documents, but that Albert and Elie Fouerti ordered her to do it. The foregoing allegations relate directly to Polished'sthe materially false financial statements Polished issued during the Class Period and restated on July 31, 2023 restatement of Polished's fiscal year 2021 and first quarter 2022 financial results, as follows:

> a.  For fiscal year 2021, Polished overstated gross profit on the income statement by an additional $3.3 million due to under accrual of vendor purchases ($1.5 million),

an error in inventory cutoff ($1.4 million), and an over accrual of rebates due from vendors ($0.4 million).

b. For fiscal year 2021, Polished overstated accounts receivable on the balance sheet by $0.5 million due to "an over accrual of vendor rebates."

c. For Q1 2022, Polished overstated accounts receivable on the balance sheet were overstated by $3.8 million due to an excess over accrual of vendor rebates.

60.87. According to FE2, ACI employees not only forged documents and lied to customers, vendors, and credit card companies at the command of Albert and Elie Fouerti, but they bragged about doing so. For example, FE2 spoke to an ACI Customer Service Manager named Vito while in ACI's Brooklyn showroom in the summer of 2021. Vito showed FE2 paperwork showing that a customer had returned a damaged product, and ACI had charged the customer for the return freight. ACI then collected from the shipper for the damaged product, even though the product was damaged before it left YF Logistics. Then, ACI returned the product to the manufacturer and recouped even more money. FE2 also saw in emails from Talakvadze to Albert and Elie Fouerti that Talakvadze also carried out this exact triple dipping scheme.

61.88. FE3 confirmed that ACConnection and later ACI forged customer signatures, delivery signatures, and lied to convince credit card companies that products had been delivered with no damage when they were actually damaged when delivered, gaining a material advantage with respect to chargeback resolutions. If a customer contacted a credit card company to dispute a charge either because an item was damaged or never arrived, when the credit card company contacted ACI to investigate, ACI employees, at the direction of Albert and Elie Fouerti, routinely forged signatures and proof of deliveries, and would forge a document showing that the item was in pristine condition when delivered. FE3 saw Wellington Chen and Miriam forge documents on a

daily basis. FE3 secretly reported these fraudulent practices to American Express, but does not know what if any actions American Express took.

62.89.  FE10 confirmed the understandings of the other FEs, recalling that it was a routine business practice at ACI to forge and change invoices and other documents to win chargeback disputes. FE9, a customer service supervisor, further recalls that ACI employees routinely changed dates on invoices so that valid warranty claims would be outside the warranty period. FE9 also saw signatures forged on delivery orders when appliances had not been delivered, including forged driver's signatures on Proof of Delivery documents. When the customer complained, ACI employees would tell them that the item was delivered, and that ACI had a document proving it.

63.90.  According to FE8, a customer service employee, Albert and Elie Fouerti ordered employees to blame any damage to products on the carrier, even when ACI had actually shipped an already-damaged product. FE8 further recalls seeing that ACI's website showed that products were available that were actually not available. FE8 was instructed to lie and tell customers that the order was backlogged and to wait when in fact ACI did not have the product in stock. Sometimes, ACI would ship a substitute product (for example, a Kenmore when the customer ordered a Whirlpool) without customer permission. When the customer complained, YF Logistics refused to take the product back unless the customer threatened to sue. The foregoing allegations relate directly to Polished'sthe materially false financial statements Polished issued during the Class Period and restated on July 31, 2023 restatement of Polished's fiscal year 2021 and first quarter 2022 financial results, as follows:

  a. For fiscal year 2021, Polished overstated gross profit on the income statement by an additional $3.3 million due to under accrual of vendor purchases ($1.5 million),

an error in inventory cutoff ($1.4 million), and an over accrual of rebates due from vendors ($0.4 million).

b.  For fiscal year 2021, Polished overstated accounts receivable on the balance sheet by $0.5 million due to "an over accrual of vendor rebates."

c.  For Q1 2022, Polished overstated accounts receivable on the balance sheet were overstated by $3.8 million due to an excess over accrual of vendor rebates.

64.91.  Finally, FE4 was in charge of handling credit card disputes at Polished. FE4 went into the computer chargeback system to look at documents about a specific dispute where the customer stated the item had never been delivered. FE4 immediately saw that the delivery address was different from the billing address, which according to FE4 is an immediate red flag. In fact, the order was an instance of identity theft, committed by a third party, and the appliance had been shipped to the identity thief. FE4 saw that documents they had signed earlier had been altered. FE4's signature was still on the document, but the "ship to" address had been forged to read that a delivery had been made to the billing address. FE4 further saw that the Bill of Lading had been altered. FE4 then continued looking for different contested purchases, and quickly found two other instances of forged paperwork. By forging and altering the documents, ACI forced the defrauded customer and the credit card company to fight over who would pay what amount to whom, while ACI kept the entire purchase price. After July 1, 2021, FE4 told Robert Barry, who had been Interim CFO and was now Polished's Chief Accounting Officer, what they had found. Barry told FE4 to stop looking into forgeries. Eventually disgusted with the unethical practices, FE4 quit in March 2022. The foregoing allegations relate directly to Polished'sthe materially false financial statements Polished issued during the Class Period and restated on July 31, 2023 restatement of Polished's fiscal year 2021 and first quarter 2022 financial results, as follows:

a.  For fiscal year 2021, bad debt expense was understated on the income statement by $0.6 million, and accounts receivable was overstated on the balance sheet by $0.6 million.

### ~~3.~~**5.**  Defendants Employed Undocumented Workers Who Did Not Have Work Permits or Social Security Numbers

~~65.~~92.  Multiple FEs state that Polished knowingly employed large numbers of undocumented workers, who had no paperwork or social security numbers, and who were paid in cash or under the table.

~~66.~~93.  FE1, Polished's VP of Logistics, reported that there were many undocumented workers, and in FE1's first attempt counted at least 15. FE11 ~~reported that there were~~, who spoke Spanish and conversed with many ~~undocumented~~of the non-English-speaking workers at YF Logistics, said that 30-40% of the warehouse workers did not have documentation, and 30% did not speak English. FE5 concurred that many workers at YF Logistics had no paperwork.

~~67.~~94.  FE6 stated that numerous workers at YF Logistics openly told FE6 that they were undocumented, were hired under an alias, with no supporting paperwork, and were paid in cash.

~~68.~~95.  FE3 stated that undocumented workers worked as warehousemen, delivery drivers, installers, and customer service agents. FE3 further stated that Sami Bazzi, who was head of Human Resources for Polished from January 2021 to July 2021, found that 60% of the workers at YF Logistics had no social security numbers and were not authorized to work in the U.S. According to FE3, when they brought these numbers to Albert Fouerti, FE3 was fired. Further, according to FE3 Albert Fouerti was friendly with a woman named Natasha and her husband, who owned an employment agency named DNL Power. Fouerti and the couple attended the same religious institution. Fouerti would cut a check to DNL Power to cover wages for all of the

undocumented workers. DNL Power would then take a cut of the money, and pay the undocumented workers in cash.

69.96.  When the purchase of ~~AC~~Connection was being finalized, so close to but before June 2, 2021, Polished sent FE2 to see ~~AC's~~Connection's Brooklyn headquarters and YF Logistics warehouse. FE2 spent time with Keti Talakvadze, and watched her collect information from multiple new employees in a single session. All of the new hires were foreigners, and none had proper employment paperwork. This process was repeated multiple times during the week. In one instance it took 20 minutes just to learn a new worker's birthday. FE2 reported this to FE1, their direct report. FE1 told FE2 that they witnessed this too.

70.97.  Perhaps even worse, FE10 observed an undocumented worker get seriously injured at an ACI warehouse in Brooklyn. Rather than take the worker immediately to the hospital, other employees had the worker wait in a janitorial closet while they discussed what to do with him. FE2 also observed an employee get hurt, and saw YF Logistics management try to convince the employee to accept cash instead of taking him to the hospital.

71.98.  On September 9, 2021, Felicia Pirkle, an Administrative Services Manager at Polished, sent FE1 an email containing a list she had compiled of 82 ACI employees for whom neither Polished nor ACI had social security numbers.

### ~~C.~~E.    The Audit Committee Finds that Albert Fouerti Stole from Polished

72.99.  Polished's audit committee concluded, and published in a press release dated December 22, 2022, that Albert Fouerti stole $800,000 from Polished. Further, Albert Fouerti was forced to repay the $2.9 million cost of the investigation.

73.100.         This was not, however, the only known ~~example~~instance of Albert Fouerti ~~stealing~~committing outright theft. According to FE3, Albert Fouerti created a fake salesperson named "Ibrahim." He then assigned about half of all online orders to Ibrahim, who then received

35

commissions on every order. The money actually went straight to Albert Fouerti. FE3 knew all of the approximately 10 salespersons, and none of them was named "Ibrahim." FE3's manager, Wellington Chen, told him that "Ibrahim" was a fake salesperson that Albert Fouerti created.

### 1.    ~~Polished Fired FE1 After FE1 Revealed Fraudulent Business Practices to~~ Polished's ~~C-~~Suite

74.    ~~Upon the June 2, 2021, closing~~Violations of ~~Polished's purchase of AC, FE1, Polished's VP of Logistics, began visiting ACI's facilities, talking with its leaders and employees, and looking at its internal documents. FE1 needed to see how ACI was run in order to successfully merge its systems and practices with Polished's systems and practices. FE1 was in regular contact with Doug Moore, Polished's CEO, with Robert Barry, Polished's CFO until July 2021, with Maria Johnson, Polished's CFO starting in July 2021, and with other Polished executives. FE1 was also in regular contact with Albert Fouerti and other ACI executives, and many emails were exchanged between FE1 and Albert Fouerti.[9]~~

~~75.~~1.    ~~From these visits, FE1 concluded that Albert Fouerti was requiring illegal and unethical~~ fraudulent practices, resulting in serious systemic and operational issues at ACI. ~~On September 9, 2021, FE1 sent an email to Robert Barry, to~~ Thomas Sean Harcum, Polished's Chief Marketing Officer and Chief Technology Officer, and to Michael Hargrave, Polished's Chief Merchandising Officer.[10] ~~The email laid out specific concerns, including that FE1 knew of at least 15 people working for ACI who were not legally allowed to do so. Some of the 15 had openly~~

---

[9] ~~During a November 16, 2020, earnings conference call, Defendant Moore lauded FE1's hiring, noting that FE1's "contribution has been immediate and it's a key part of our path to profitability and scalability."~~

[10] ~~In a November 2020 Investor Presentation, Polished devoted a slide entitled "Senior Staff" to touting Harcum, Hargrave, and FE1.~~

admitted to FE1 that they were not authorized to be working in the U.S. FE1 further noted that Albert Fouerti refused to let anyone look at the list of people paid on Forms 1099.

76.    FE1's email further discussed, in detail, unethical, fraudulent practices at ACI. FE1 wrote that even if damage was the fault of workers at YF Logistics, the damage team was required to file a claim with the vendor, and 100% of all claims are filed as "concealed damages," meaning it was not ACI's fault. The foregoing allegations relate directly to Polished's July 31, 2023 restatement of Polished's fiscal year 2021 and first quarter 2022 financial results as follows:

   a.    For fiscal year 2021, Polished understated COGS on the income statement by $0.4 million, and overstated gross profit by $0.4 million on the income statement due to an over accrual of rebates from vendors.

   b.a. For fiscal year 2021, Polished overstated accounts receivable on the balance sheet by $0.5 million due to an "over accrual of vendor rebates."

   c.a. For Q1 2022, Polished overstated accounts receivable on the balance sheet by $3.8 million due to an "over accrual of vendor rebates."

77.    Further, FE1 documented that if an item was purchased from a third-party vendor who had purchased it from the manufacturer, and it was too late to file a claim against the manufacturer, Albert Fouerti directed the returns team was ordered to change the invoice date so that it appeared that ACI had purchased the item form the third-party vendor earlier than it actually had. The manufacturer had no idea when the item had been purchased from the third-party vendor, so was forced to accept the date from ACI, and pay ACI for the damaged item. Even more egregiously, if photos of the damage were unavailable, Albert Fouerti directed ACI's returns team to use old photos from other products to prove to the manufacturer and third-party vendor that the

damage existed. The foregoing allegations relate directly to Polished's July 31, 2023 restatement of Polished's fiscal year 2021 and first quarter 2022 financial results as follows:

      a.  For fiscal year 2021, Polished understated COGS on the income statement by $0.4 million, and overstated gross profit by $0.4 million on the income statement due to an over accrual of rebates from vendors.

      b.a.For fiscal year 2021, Polished overstated accounts receivable on the balance sheet by $0.5 million due to an "over accrual of vendor rebates."

      c.a.For Q1 2022, Polished overstated accounts receivable on the balance sheet by $3.8 million due to an "over accrual of vendor rebates."

78.    FE1's email noted obvious OSHA violations. Further, if a YF Logistics driver was at fault for an accident, Albert Fouerti required the driver to tell the other driver involved in the accident to call Chuck Prusakowski, a YF Logistics warehouse manager, and let Prusakowki try to resolve the issue without formal repots to any entity.

79.1.  Finally, FE1's email stated that Youssef Fouerti was being paid $104,000 per year for a fake job.

80.    In the email, FE1 mentioned an earlier discussion with CEO Doug Moore and others. In fact, FE1 had previously emailed Robert Barry about Youssef Fouerti's fake "job" on August 17, 2021.

81.    Following FE's September 9, 2021 email, Robert Barry told FE1 that he should discuss these issues with Defendant Albert Fouerti, who had just been appointed Polished's new CEO,[11] and with Defendant Johnson, Polished's CFO. A series of emails were exchanged between

---

[11] At the same time as Albert Fouerti was appointed CEO, Elie Fouerti was appointed Polished's Chief Operating Officer.

FE1, Fouerti, and others, and in a September 20, 2021 email Fouerti asked FE1 to meet with him and Johnson at 2:30 p.m. on September 21, 2021.

82.     On September 21, 2021, FE1 participated in a virtual meeting with Albert Fouerti and Johnson. During the meeting, FE1 attempted to discuss the concerns and fraudulent practices he had raised in his September 9, 2021 email. As the meeting continued, FE1 recalled, Albert Fouerti became openly hostile. Within 30 minutes, Fouerti was interrupting FE1 constantly, stating that FE1 did not understand the entire ordering process and maybe was not capable of understanding it. When FE1 began talking about returns and claims, Fouerti became louder and even more hostile, then began attacking FE1 on a personal level and cursing at FE1. Albert Fouerti then yelled that FE1 was "incompetent." FE1 tried to talk about Polished's Code of Ethics and Business Conduct, but Fouerti would not let FE1 continue, stating "I am finished with you, you are done."

83.     FE1 later called Defendant Johnson, who confirmed that FE1 had been terminated during the virtual meeting.

### D.F.   POLISHED'S   Generally Accepted Accounting Principles ("GAAP VIOLATIONS")

#### 1.     GAAP Generally

84.101.        GAAP refers to the framework of guidelines for financial accounting used to prepare financial statements. The SEC has the statutory authority to set accounting standards and has delegated that authority to the Financial Standards Accounting Board ("FASB").

85.102.        The FASB accounting standards codification ("ASC") and the SEC rules and interpretive releases are sources of authoritative GAAP for SEC registrants. SEC Staff also issues Staff Accounting Bulletins ("SABs") which represent practices followed by the SEC staff in administering SEC disclosure requirements. ASC 105-10-05-1.

86.103.     SEC rules and regulations require that publicly traded companies include GAAP-compliant financial statements in their annual and quarterly reports filed with the SEC. *See* Section 13 of the Exchange Act; SEC Rule 10-01(d) of Regulation S-X ("Reg. S-X"). SEC Rule 4-01(a) of Reg. S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).

87.104.     According to the FASB Statement of Financial Accounting Concepts ("CON") No. 8, "[t]he omission or misstatement of an item in a financial report is material if, in light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item." CON 8 ¶ QC11. According to SAB 99, evaluating materiality requires viewing the facts in the context of surrounding circumstances or as a "total mix," considering both quantitative and qualitative factors. SAB 99 recognizes that a 5% threshold in relation to individual line-item amounts, subtotals, or totals in the financial statements is often used as a "rule of thumb" in assessing materiality but cautions that such evaluation should be only the beginning of a materiality assessment and "cannot appropriately be used as a substitute for a full analysis of all relevant considerations." Misstatements of financial statements which are less than 5% "could well be material. Qualitative factors may cause misstatements of quantitatively small amounts to be material." *Id.* According to the SEC staff, "[t]he materiality of a misstatement may turn on where it appears in the financial statements" and "whether the misstatement masks a change in earnings or other trends … [or] concealment of an unlawful transaction." *Id.*

88.105.     The Public Company Accounting Oversight Board ("PCAOB"), a nonprofit corporation established by Congress to oversee the audits of public companies, established

auditing standards that provide that "[t]he financial statements are management's responsibility … Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements." PCAOB Auditing Standard ("AS") 1001.03. Further, an "entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management ... Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility." *Id*.

> **2.    Polished** ~~Violated GAAP,~~ **Improperly** ~~Accounting~~Accounted **for Revenue**

~~89.~~106.        Accounting Standards Codification ("ASC") topic 606, *Revenue from Contracts with Customers*, is the authoritative standard governing revenue recognition. The core principle of ASC 606's guidance is that revenue recognized by an entity should depict the transfer of promised goods or services to customers in an amount that reflects the consideration (*i.e.*, the selling price) to which the entity expects to be entitled in exchange for those goods or services. ASC 606-10-05-3. Revenue is recognized in accordance with this core principle by applying the following five steps:

a. Step 1: Identify the contract(s) with a customer. A contract is an agreement between two or more parties that creates enforceable rights and obligations.

b. Step 2: Identify the performance obligations in the contract, such as promises to transfer goods or services to a customer.

c. Step 3: Determine the transaction price, which is the amount of consideration in a contract to which an entity expects to be entitled in exchange for transferring

41

promised goods or services to a customer. Transaction price can include fixed and variable consideration. If the consideration is variable, an entity estimates the amount of consideration to which it will be entitled in exchange for the promised goods or services. The estimated amount of variable consideration will be included in the transaction price only to the extent that it is <u>probable</u> that a significant <u>reversal</u> in the amount of cumulative revenue recognized <u>will ;</u>

d.  <u>not occur</u> when the uncertainty associated with the variable consideration is subsequently resolved.

e.  Step 4: Allocate the transaction price to the performance obligations in the contract. An entity typically allocates the transaction price to each performance obligation on the basis of the relative standalone selling prices of each distinct good or service promised in the contract.

f.  Step 5: Recognize revenue when (or as) the entity satisfies a performance obligation. An entity recognizes revenue when (or as) it satisfies a performance obligation by transferring a promised good or service to a customer (<u>which is when the customer obtains control of that good or service</u>). The amount of revenue recognized is the amount allocated to the satisfied performance obligation. ASC 606-10-05-4.

<s>90.</s>107.      The following are some indicators that an entity should consider in determining when the customer obtained control. The customer has:

a.  a present obligation to pay;

b.  legal title;

c.  physical possession;

42

    d.  risks and rewards or ownership; and

    e.  accepted the asset. ASC 606-10-25-30.

91.108.       With respect to determining the transaction price, GAAP contains the following requirements:

> An entity shall consider the terms of the contract and its customary business practices to determine the transaction price. The transaction price is the amount of consideration to which an entity expects to be entitled in exchange for transferring promised goods or services to a customer, <u>excluding amounts collected on behalf of third parties (for example, some sales taxes)</u>." ASC 606-10-32-2 "An entity may make an accounting policy election to exclude from the measurement of the transaction price all taxes assessed by a governmental authority that are both imposed on and concurrent with a specific revenue-producing transaction and collected by the entity from a customer (for example, sales, use, value added, and some excise taxes)." ASC 606-10-32-2A.

92.109.       The amount of consideration included in the transaction price may vary when products are sold with a right of return or because of discounts, rebates, refunds, credits, price concessions, incentives, performance bonuses, penalties, or other similar items. ASC 606-10-32-6.

93.110. GAAP prohibits recognizing revenue for any products expected to be returned. ASC 606-10-55-23. "For any amounts received (or receivable) for which an entity does not expect to be entitled, the entity should not recognize revenue when it transfers products to customers but should recognize those amounts received (or receivable) as a refund liability. Subsequently, at the end of each reporting period, the entity should update its assessment of amounts for which it expects to be entitled in exchange for the transferred products and make a corresponding change to the transaction price and, therefore, in the amount of revenue recognized." ASC 606-10-55-25. "An entity should update the measurement of the refund liability at the end of each reporting period

for changes in expectations about the amount of refunds. An entity should recognize corresponding adjustments as revenue (or reductions of revenue)." ASC 606-10-55-26

94.111. In its 2021 Form 10-K, the Company disclosed that it followed ASC 606:

> The Company records revenue in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic 606, "Revenue from Contracts with Customers". Revenue is recognized to depict the transfer of goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. …
>
> Substantially all the Company's sales are to individual retail consumers (homeowners), builders and designers. The Company's performance obligation is to deliver the customer's order. Each customer order generally contains only one performance obligation based on the merchandise sale to be delivered, at which time revenue is recognized. …
>
> Any sales tax, value added tax, and other tax the Company collects concurrently with revenue-producing activities are excluded from revenue. …
>
> Sales returns are estimated based on historical return levels and our expectation of future returns. We also recognize a return asset, and corresponding adjustment to cost of sales, for our right to recover the goods returned by the customer, measured at the former carrying amount of the goods, less any expected recovery cost. At each financial reporting date, we assess our estimates of expected returns, refund liabilities, and return assets.
>
> Customer deposits – Includes amounts collected from customers when an order is placed. The deposits are transferred to revenue when the order ships to the customer or returned to the Company if the order is subsequently cancelled. [2021 Form 10-K, page F-8].

95.112. In the annual report for the period ended December 31, 2022, filed with the SEC on July 31, 2023, Polished restated its financials for fiscal year 2021 and for the first fiscal quarter of 2022. Defendants admitted that the originally filed financial reports were materially false and

misleading, and that Polished had violated GAAP for accounting for revenues in each of the reporting periods.

3.    **Polished ~~Violated GAAP in Accounting~~Improperly Accounted for Costs of Goods Sold**

~~96.~~113. Regulation S-X requires companies to disclose in their financial statements the costs and expenses applicable to sales and revenues, including cost of tangible goods sold (i.e., inventory sold), cost of services, and expenses applicable to other revenues. 17 CFR § 210.5-03.

~~97.~~114. A major objective of accounting for inventories is the proper determination of income through the process of matching appropriate costs against revenues. ASC 330-10-10-1. Inventory includes items held for sale in the ordinary course of business. ASC 330-10-20. The primary basis of accounting for inventories is cost, which has been defined generally as the price paid or consideration given to acquire an asset. Inventory costs include the sum of all expenditures and charges incurred in bringing an article to its existing condition and location. ASC 330-10-30-1. When inventory costs are understated, the resulting profit from sales of such goods is overstated by the same amount.

~~98.~~115. GAAP requires vendor rebates to be recognized as a reduction in the cost of sales, based on a systematic and rational allocation, when such rebates can be reasonably estimated and their receipt is probable. When a rebate is not probable and cannot be reasonably estimated, it should be recognized as a reduction of the cost of goods sold as the milestones for earning the rebate are achieved. ASC 705-20-25-10.

~~99.~~116. Polished disclosed the following in its 2021 Form 10-K with respect to its accounting for cost of sales:

> Cost of revenue - Includes the cost of purchased merchandise plus the cost of shipping merchandise and where applicable installation, net of promotional rebates and other incentives received from vendors. Vendor allowances primarily consist of volume rebates that

45

are earned as a result of attaining certain purchase levels and advertising allowances for the promotion of vendors' products that are typically based on guaranteed minimum amounts with additional amounts being earned for attaining certain purchase levels. These vendor allowances are accrued as earned, with those allowances received as a result of attaining certain purchase levels accrued over the incentive period based on estimates of purchases. Volume rebates and certain advertising allowances reduce the carrying cost of inventory and are recognized in cost of sales when earned. [Page F-8].

100.117.    In the annual report for the period ended December 31, 2022, filed with the SEC on July 31, 2023, Polished restated its financials for fiscal year 2021 and for the first fiscal quarter of 2022. Defendants admitted that the originally filed financial reports were materially false and misleading, and that Polished had violated GAAP in accounting for costs of goods sold in each of the reporting periods.

### 4.    Material Weakness in Internal Controls

101.118.    The Committee of Sponsoring Organizations of the Treadway Commission (COSO) Internal Control—Integrated Framework ("Framework") was originally issued in 1992 and refreshed in 2013. The Framework was developed as guidance to help improve confidence in all types of data and information.

102.119.    The Framework sets forth three categories of objectives, which allow organizations to focus on separate aspects of internal control:

- *Operations Objectives*—These pertain to effectiveness and efficiency of the entity's operations, including operational and financial performance goals, and safeguarding assets against loss.

- *Reporting Objectives*—These pertain to internal and external financial and non-financial reporting and may encompass reliability, timeliness, transparency, or other terms as set forth by regulators, standard setters, or the entity's policies.

- *Compliance Objectives*—These pertain to adherence to laws and regulations to which the entity is subject.

103.120.    Management, with board oversight, sets entity-level objectives that align with the entity's mission, vision, and strategies. Management and the board of directors establish goals and targets toward the achievement of objectives that by their nature create pressures within the organization. Excessive pressures are most commonly associated with:

- Unrealistic performance targets, particularly for short-term results

- Conflicting objectives of different stakeholders

- Imbalance between rewards for short-term financial performance and those for long-tern focused shareholders, such as corporate sustainability goals

For example, pressure to generate sales levels that are not commensurate with market opportunities can lead sales managers to falsify numbers or engage in bribery or other illicit acts.

104.121.    Setting objectives is a prerequisite to internal control and a key part of the management process relating to strategic planning.

105.122.    COSO defines internal control as "a process, effected by an entity's board of directors, management, and other personnel, designed to provide reasonable assurance regarding the achievement of objectives relating to operations, reporting, and compliance."

106.123.    Internal control is not one event or circumstance, but a dynamic and iterative process— actions that permeate an entity's activities and that are inherent in the way management runs the entity. Embedded within this process are controls consisting of policies and procedures. These policies reflect management or board statements of what should be done to effect internal control. Such statements may be documented, explicitly stated in other management communications, or implied through management actions and decisions. Procedures consist of actions that implement a policy.

107.124.    Internal control is effected by the board of directors, management, and other personnel. It is accomplished by the people of an organization, by what they do and say. The board

and senior management establish the tone for the organization concerning the importance of internal control and the expected standards of conduct across the entity. The board of directors and senior management establish the tone at the top regarding the importance of internal control including expected standards of conduct. Management reinforces expectations at the various levels of the organization. The resulting control environment has a pervasive impact on the overall system of internal control.

108.125.    Tone is impacted by the operating style and personal conduct of management and the board of directors, attitudes toward risk, and positions, which may be conservative or aggressive (e.g., position on estimates, policy choices), and degree of formality (e.g., in a smaller family business, controls may be more informal), all of which sends a message to the organization. Personal indiscretions, lack of receptiveness to bad news, or unfairly balanced compensation practices could impact the culture and ultimately provide an incentive for inappropriate conduct. In contrast, a history of ethical and responsible behavior by management and the board of directors and demonstrated commitment to addressing misconduct send strong messages in support of integrity. Employees are likely to develop the same attitudes about right and wrong—and about risks and controls—as those shown by management. Individual behavior is often influenced by the knowledge that the chief executive officer has behaved ethically when faced with a tough business-based or personal decision, and that all managers have taken timely action to address misconduct.

109.126.    Tone at the top and throughout the organization is fundamental to the functioning of an internal control system. Without a strong tone at the top to support a strong culture of internal control, awareness of risk can be undermined, responses to risks may be inappropriate, control activities may be ill defined or not followed, information and

communication may falter, and feedback from monitoring activities may not be heard or acted upon.

110.127.     The board of directors ultimately holds the chief executive officer accountable for understanding the risks faced by the entity and establishing the requisite system of internal control to support the achievement of the entity's objectives. The chief executive officer and senior management, in turn, are responsible for designing, implementing, conducting, and periodically assessing the structures, authorities, and responsibilities needed to establish accountability for internal control at all levels of the organization.

111.128.     In its 2021 Form 10-K filed on March 31, 2022, the Company disclosed that it evaluated the effectiveness of its internal its control over financial reporting in accordance with the COSO Framework and concluded that the Company did not maintain effective internal control over financial reporting as of December 31, 2021, due to the following material weaknesses:

> *Material Weaknesses in Internal Control over Financial Reporting*
>
> Management has determined that the Company's ineffective internal control over financial reporting and resulting material weaknesses, stem primarily from management's inability to maintain appropriately designed controls, which impacts the control environment, risk assessment procedures and ability to detect or prevent material misstatements to the financial statements. The material weaknesses were attributed to:
>
> - Lack of structure and responsibility, insufficient number of qualified resources and inadequate oversight and accountability over the performance of controls;
>
> - Ineffective assessment and identification of changes in risk impacting internal control over financial reporting;
>
> - Inadequate selection and development of effective control activities, general controls over technology and effective policies and procedures; and
>
> - Ineffective evaluation and determination as to whether the

49

components of internal control were present and functioning.

112.129.      The Company disclosed that management had excluded Appliances Connection from its assessment of the effectiveness of the Company's internal control over financial reporting because the acquisition was completed in June 2021.

113.130.      The Company disclosed the same material weakness in its Q1 2022 Form 10-Q filed on May 16, 2022.

114.131.      The 2022 Form 10-K filed on July 31, 2023, also disclosed the same material weaknesses but added one more: "the lack of an accounting system that is required for a company or our size."

## V.      FALSE AND MISLEADING STATEMENTS AND OMISSIONS

115.132.      On August 12, 2021, Polished filed its Q2 2021 10-Q with the SEC, signed by Defendants Moore and Johnson. In the MD&A, in a section entitled "Going Concern Assessment," Polished stated that "Management believes that based on relevant conditions and events that are known and reasonably knowable that its forecasts, for one year from the date of the filing of these unaudited condensed consolidated financial statements, indicate improved operations and the Company's ability to continue operations as a going concern." Polished further based its going concern statement on AC'sConnection's profitability, stating that "For the six months ended June 30, 2021, the Company incurred operating losses of approximately $4,543,516 and negative cash flow from operations of $6,985,302, but had working capital of $15,530,879," continuing "On June 2, 2021, the Company closed on the acquisition of Appliances Connection. **Appliances Connection has historically been profitable**." Finally, Polished stated that "Additionally, only one month of operations for **Appliances Connection, which has operated profitably**, are included in the results of operations for the six months ended June 30, 2021."

116.133.    The foregoing statements about "going concern," in the context of the statement of ~~AC's~~Connection 's historic and present profitability, are materially false and misleading. In fact, but for the fraud, as Polished admitted at the end of the Class Period, Polished was not profitable. Polished and Albert Fouerti knew or recklessly disregarded that at no point in 2021 was the consolidated entity Polished profitable. In Polished's restated 2021 financial statements, filed with the SEC on July 31, 2023, Polished restated its previously announced $7.7 million 2021 income into a $7.6 million **loss**. Further, in the context of praising ~~AC~~Connection and discussing profitability and going concern, Defendants were duty-bound to disclose that Albert Fouerti was and continued to be a thief and mandated fraudulent business practices, as described in detail above. Defendants' stated opinion that Polished would be able to continue as a going concern rested on the false supporting fact of ~~AC's~~Connection's profitability, and was therefore materially false, as were the statement of ~~AC's~~Connection's profitability. In addition, no reasonable investor would have believed Defendants' statements in light of Albert, Defendants' stated opinion that Polished would be able to continue as a going concern rested on the false supporting fact of ~~AC's~~Connection's profitability, and was therefore materially false, as are the statements of ~~AC's~~Connection's profitability. Fouerti and ~~AC's~~Connection's wrongdoing.[12]

117.134.    Also in the Q2 2021 10-Q, discussing taxes, Polished announce that it recognized an income tax benefit of $8,048,478 in Q2 2021, which "arose from the elimination of the allowance for the deferred tax asset." Polished based its elimination of the allowance for the deferred tax asset" on ~~AC's~~Connection 's profitability, stating that "The acquisition of AC on June 2, 2021 makes it more likely than not that the Company will be profitable, and will be able to

---

[12] As President of ACI, and a member of Polished's Board of Directors, Plaintiff imputes Albert Fouerti's scienter, including his knowledge of the fraud and his stealing from ACI, to Polished.

utilize previously derived net operating losses." Polished further stated that "***Appliances Connection has a history of profitable operations***," and that Polished "determined that it was more likely than not that it would have profitable operations in the future and therefore be able to realize the deferred tax assets and accordingly reversed the allowance for deferred tax assets at June 30, 2021." As a result of realizing the $8,048,478 in deferred tax assets in Q2 2021, Polished announced income in Q2 2021 instead of a loss.

118.135.    The foregoing statement about Polished's "elimination of the allowance for the deferred tax asset," in the context of the statement of AC's Connection's historic and present profitability, is materially false and misleading. In fact, but for the fraud, as Polished admitted at the end of the Class Period, Polished was not profitable. Polished and Albert Fouerti knew or recklessly disregarded that at no point in 2021 was the consolidated entity Polished profitable. In Polished's restated 2021 financial statements, filed with the SEC on July 31, 2023, Polished restated its previously announced $7.7 million 2021 income into a $7.6 million ***loss***. Further, in the context of praising AC Connection and discussing profitability and going concern, Defendants were duty-bound to disclose that Albert Fouerti was and continued to be a thief and mandated fraudulent business practices, as described in detail above. Defendants' stated opinion that Polished would be able to continue as a going concern rested on the false supporting fact of AC's Connection's profitability, and was therefore materially false. In addition, no reasonable investor would have believed Defendants' statements in light of Albert Fouerti and AC's Connection's wrongdoing.

119.136.    About internal controls, the Q2 2021 10-Q stated, "There were no changes in the Company's internal control over financial reporting or in any other factors that could significantly affect these controls during the three months ended June 30, 2021 that have materially

affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting." Further, the Q2 2021 10-Q included certifications from Defendants Moore and Johnson, stating:

> 5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
> b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

120.137.    The foregoing statements about internal controls were materially false and misleading because they rendered Polished duty-bound to disclose then-existing material weaknesses, of which Polished and Albert Fouerti knew of or recklessly disregarded. For Q2 2021, material weaknesses existed as Polished disclosed in the 2021 10-K, including: "Lack of structure and responsibility, insufficient number of qualified resources and inadequate oversight and accountability over the performance of controls"; b) "Ineffective assessment and identification of changes in risk impacting internal control over financial reporting"; c) "Inadequate selection and development of effective control activities, general controls over technology and effective policies and procedures"; and d) "Ineffective evaluation and determination as to whether the components of internal control were present and functioning."

121.138.    On November 15, 2021, Polished held an earnings conference call to discuss the results of Q3 2021 ("Q3 2021 Call"). Defendants Fouerti, who was by this point Polished's

CEO, and Defendant Johnson, as well as Robert Barry appeared on behalf of Polished. During the Q3 2021 Call, Defendant Fouerti stated that "The backbone of our success will be our fulfillment and logistics systems as well as the other technologies in our supply chain."

122.139.    The foregoing statement concerning its fulfilment and logistics systems serving as the backbone for Polished's was materially false and misleading. By mentioning fulfillment and logistics, Defendants were duty bound to disclose, but omitted that, Defendant Albert Fouerti ordered employees to forge documents, lying about damages, returns, and credit card disputes as a matter of course and as a business practice. Inventory at YF Logistics never came close to matching the declared inventory, with as many 9,000 items missing fromFE1 repeatedly told Defendants Moore, Johnson, and Fouerti. FE1 told each of the Individual Defendants that 1,200 appliances were included in the inventory. As computer system, but did not actually exist in inventory. In fact, as a matter of course, Polished counted damaged and missing items as "new" and "available" on first AC'sConnection's and then Polished's, inventory. Former employees state that Albert Fouerti was stealing commissions, and Polished would later announce that albert Fouerti was stealing large amounts of money from Polished. When FE1 tried to raise issues with both the fulfillment and logistics systems, including that inventory was missing and materially overstated on the balance sheet , Albert Fouerti fired FE1. Finally, Robert Barry was told about the logistics and fulfillment issues by FE1 in FE1's September 9, 2021, email, and Defendant Johnson attended the September 21, 2021, virtual meeting where Albert Fouerti screamed and cursed at FE1 and then fired FE1.

123.140.    Also during the Q3 2021 Call, in colloquy with analyst Steve Emerson from Emerson Investment Group, misleading about Polished's return policies and their impact on its balance sheet, Albert Fouerti stated, "So right now, we take it back. It's just a regular return

process. If you take the product, it gets returned back to us. We process it exchange or we process a refund to the customer. And," Albert Fouerti continued, "it depends if their manufacturer takes it back and our factories just gets allowance each manufacturer has a different process in place to take back and address these type of returns."

124.141.    The foregoing comment about Polished's return policies was materially false and misleading. In fact, Polished's return process involved fraud as a business practice, as described in detail above, including forging documents, shipping damaged products and forging documents stating that the products were delivered without damage, forging invoices and bills of lading, refusing to accept returns from customers based on forged paperwork, and lying to credit card companies and producing forged documents. Defendants knew and/or recklessly disregarded the fraudulent practices in Polished's return process. Indeed, Albert Fouerti personally directed these fraudulent practices at ACI and Polished, and his scienter is imputed to Polished, on whose behalf he spoke as CEO. Moreover, FE1 informed Defendant Defendants Moore and Johnson, and Chief Accounting Officer Robert Barry, about these practices.

125.142.    On November 15, 2021, Polished filed its Q3 2021 10-Q with the SEC, signed by Defendants Fouerti and Johnson. In the MD&A, in a section entitled "Going Concern Assessment," Polished stated that "Management believes that based on relevant conditions and events that are known and reasonably knowable that its forecasts, for one year from the date of the filing of these unaudited condensed consolidated financial statements, indicate improved operations and the Company's ability to continue operations as a going concern." Polished based its going concern statement on AC's Connection's profitability, stating that "[f]or the nine months ended September 30, 2021, the Company had operating profit of $2.0 million, $18.3 million of cash flow used in operations, and working capital of $20.0 million. Additionally, the Company had

$27.2 million of unrestricted cash at September 30, 2021. Polished continued, "On June 2, 2021, the Company closed on the acquisition of Appliances Connection. ***Appliances Connection has historically been profitable***." Finally, Polished stated that "Additionally, less than 4 months of their operations are included in the results of operations for the nine months ended September 30, 2021."

126.143.    The foregoing statements about "going concern," in the context of the statement of ~~AC's~~Connection's historic profitability, are materially false and misleading. In fact, but for the fraud, as Polished admitted at the end of the Class Period, Polished was not profitable. Polished and Albert Fouerti knew or recklessly disregarded that at no point in 2021 was the consolidated entity Polished profitable. In Polished's restated 2021 financial statements, filed with the SEC on July 31, 2023, Polished restated its previously announced $7.7 million 2021 income into a $7.6 million ***loss***. Further, in the context of praising ~~AC~~Connection and discussing profitability and going concern, Defendants were duty-bound to disclose that Albert Fouerti was and continued to be a thief and mandated fraudulent business practices, as described in detail above. Defendants' stated opinion that Polished would be able to continue as a going concern rested on the false supporting fact of ~~AC's~~Connection's profitability, and was therefore materially false, as are the statements of ~~AC's~~Connection's profitability. In addition, no reasonable investor would have believed Defendants' statements in light of Albert Fouerti and ~~AC's~~Connection's wrongdoing.

127.144.    In the Q3 2021 10-Q, Polished further stated that "In the second quarter of 2021, the Company acquired Appliances Connection. ***Appliances Connection has a history of profitable operations***," continuing, "as such, the Company determined that it was more likely than not that it would have profitable operations in the future and therefore be able to realize the

deferred tax assets and accordingly reversed the allowance for deferred tax assets at June 30, 2021."

128.145.    The foregoing statement about Polished's "elimination of the allowance for the deferred tax asset," in the context of the statement of AC'sConnection's historic and present profitability, is materially false and misleading. In fact, but for the fraud, as Polished admitted at the end of the Class Period, Polished was not profitable. Polished and Albert Fouerti knew or recklessly disregarded that at no point in 2021 was the consolidated entity Polished profitable. In Polished's restated 2021 financial statements, filed with the SEC on July 31, 2023, Polished restated its previously announced $7.7 million 2021 income into a $7.6 million **loss**. Further, in the context of praising ACConnection and discussing profitability and going concern, Defendants were duty-bound to disclose that Albert Fouerti was and continued to be a thief and mandated fraudulent business practices, as described in detail above. Defendants' stated opinion that Polished would be able to continue as a going concern rested on the false supporting fact of AC'sConnection's profitability, and was therefore materially false. In addition, no reasonable investor would have believed Defendants' statements in light of Albert Fouerti and AC'sConnection's wrongdoing.

129.146.    About internal controls, the Q3 2021 10-Q stated, "During the three months ended September 30, 2021, the Company hired a new Chief Executive Officer and a new Chief Financial Officer," continuing "There were no other changes in the Company's internal control over financial reporting or in any other factors that could significantly affect these controls during the three months ended September 30, 2021 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting." Albert Fouerti, who certified the Q3 2021 10-Q, certified, in part, that:

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

~~130.~~147.    The foregoing statements about internal controls were materially false and misleading because they rendered Polished duty-bound to disclose then-existing material weaknesses, which Polished and Albert Fouerti knew of or recklessly disregarded. For Q3 2021, material weaknesses existed as Polished disclosed in the 2021 10-K, including: "Lack of structure and responsibility, insufficient number of qualified resources and inadequate oversight and accountability over the performance of controls"; b) "Ineffective assessment and identification of

changes in risk impacting internal control over financial reporting"; c) "Inadequate selection and development of effective control activities, general controls over technology and effective policies and procedures"; and d) "Ineffective evaluation and determination as to whether the components of internal control were present and functioning."

131.148.        Defendant Albert Fouerti certified the Q3 2021 10-Q. That certification stated, in part:

> 5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
>     a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
>     b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

132.149.        The foregoing Albert Fouerti certification was materially false and misleading because Albert Fouerti knew, but knowingly or recklessly failed to disclose, that business practices at ACI that were both improper or illegal, and as described in detail above, that Albert Fouerti mandated fraud at ACI as a business practice. Albert Fouerti and Polished, to whom Albert Fouerti's scienter is imputed, were duty-bound to disclose that Fouerti was already stealing directly from Polished in an amount Polished would later reveal was $800,000, that ACI was defrauding customers, vendors, and credit card companies, published false inventory numbers, as FE1 repeatedly told Defendant Fouerti starting in early August 2021, that Albert Fouerti enriched himself by stealing money from fake commissions, as well as about the fraudulent lying about

59

ACI's and Polished's inventory numbers, forging and falsifying documents as a business practice, cheating customers, vendors, and credit card companies, employing many undocumented workers for whom ~~AC~~Connection did not have the required paperwork, and paying Albert Fouerti's father $104,000 annually for a fake job at YF Logistics.

~~133.~~150.    On March 31, 2022, Polished filed its 2021 10-K with the SEC, reporting 2021 revenues of $362.3 million, gross profit of $79.7 million, income from operations of $8.3 million, net income of $7.7 million, and net income per share of $0.10.

~~134.~~151.    These reported results were false and misleading because, in violation of GAAP:

a.  As disclosed in the restated 2021 10-K, filed with the SEC on July 31, 2023, Polished overstated its 2021 revenue by $16.6 million, consisting of: i) under-accrued allowance for sales returns by $7.4 million in violation of ASC 606-10-05-4, ASC 606-10-55-23 – 26 and its own revenue recognition accounting policy; ii) improperly recognized revenue on $8.1 million of customer's deposits in 2021 before it had satisfied its performance obligations rather than in the future (when sales would actually occur) in violation of ASC 606-10-05-4, ASC 606-10-25-30 and its own revenue recognition accounting policy; and iii) improperly including $1.1 million of sales taxes it collected from customers in reported revenue, rather than recording these sales taxes as a liability on the balance sheet, in violation of ASC 606-10-05-4, ASC 606-10-32-2-2A and its own revenue recognition accounting policy.

b.  As disclosed in the restated 2021 10-K, Polished overstated its 2021 gross profit by $9.9 million in total due to (a) the $6.6 million net impact of the above revenue

overstatements and (b) an additional $3.3 million due to under accrual of vendor purchases ($1.5 million), an error in inventory cutoff ($1.4 million), and an over accrual of rebates due from vendors ($0.4 million) in violation of ASC 330 and its own accounting policy with respect to accounting for cost of sales.

c.   As disclosed in the restated 2021 10-K, Polished understated its 2021 operating expenses by $918,000 in total due to (a) $619,000 understatement of bad debt expense in violation of ASC 310-10-35-8 and (b) recording $299,000 excess accrual for sales tax receivable.

d.   As a result of the above misstatements, Polished overstated it 2021 sales by $16.6 million (or 4.8%) and overstated its gross profit by $9.9 million (or 14.2%). Polished understated its 2021 operating loss by $10.8 million, which resulted in the Company reporting $8.3 million <u>income</u> from operations rather than a $2.5 million <u>loss</u> from operations. Polished understated its 2021 net loss and loss per share by $15.3 million and $0.22, respectively, which resulted in the Company reporting <u>income</u> and net <u>income</u> per share of $7.7 million and $0.10, respectively, rather than a net <u>loss</u> and net <u>loss</u> per share of $7.6 million and $0.12, respectively.

~~135.~~152.   Defendant Albert Fouerti certified the 2021 10-K. That certification stated, in part:

> 5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
>      a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's

ability to record, process, summarize and report financial information; and

      b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

~~136.~~153.    The foregoing Albert Fouerti certification was materially false and misleading because Albert Fouerti knew, but knowingly or recklessly failed to disclose, business practices at ACI that were both improper or illegal, and as described in detail above, that Albert Fouerti mandated fraud at ACI as a business practice. Albert Fouerti and Polished, to whom Albert Fouerti's scienter is imputed, were duty-bound to disclose that Fouerti was already stealing directly from Polished in an amount Polished would later reveal was $800,000, that ACI was defrauding customers, vendors, and credit card companies, published false inventory numbers, as FE1 repeatedly told Defendant Fouerti starting in early August 2021, that Albert Fouerti enriched himself by stealing money from fake commissions, as well as about the fraudulent lying about ACI's and Polished's inventory numbers, forging and falsifying documents as a business practice, cheating customers, vendors, and credit card companies, employing many undocumented workers for whom ~~AC~~Connection did not have the required paperwork, and paying Albert Fouerti's father $104,000 annually for a fake job at YF Logistics.

~~137.~~154.    In the 2021 10-K, in the MD&A, in a section entitled "Going Concern Assessment," Polished stated that "Management believes that based on relevant conditions and events that are known and reasonably knowable that its forecasts, for one year from the date of the filing of these unaudited condensed consolidated financial statements, indicate improved operations and the Company's ability to continue operations as a going concern." In that same section, Polished based its going concern statement on ~~AC's~~Connection's profitability, stating that "On June 2, 2021, the Company closed on the acquisition of Appliances Connection. ***Appliances***

***Connection has historically been profitable***." Polished disclosed that net income for fiscal year 2021 was positive, at $7.7 million, and that the Company had operating income of $8.3 million, $18.3 million of cash flow used in operations, and working capital of $16.0 million. Additionally, the Company had $27.2 million of unrestricted cash at September 30, 2021. Polished continued, Finally, Polished stated that "Additionally, less than 7 months of [ACI's] operations are included in the results of operations for the year ended December 31, 2021."

138.155.      The foregoing statements about "going concern," in the context of the statement of AC's Connection's historic profitability, are materially false and misleading. In fact, but for the fraud, as Polished admitted at the end of the Class Period, Polished was not profitable. Polished and Albert Fouerti knew or recklessly disregarded that at no point in 2021 was the consolidated entity Polished profitable. In Polished's restated 2021 financial statements, filed with the SEC on July 31, 2023, Polished restated its previously announced $7.7 million 2021 income into a $7.6 million ***loss***. Further, in the context of praising AC ACI and discussing profitability and going concern, Defendants were duty-bound to disclose that Albert Fouerti, Polished's CEO, was and continued to be a thief and mandated fraudulent business practices, as described in detail above. Defendants' stated opinion that Polished would be able to continue as a going concern rested on the false supporting fact of AC's Connection's profitability, and was therefore materially false, as are the statements of AC's Connection's profitability. In addition, no reasonable investor would have believed Defendants' statements in light of Albert Fouerti and AC's Connection's wrongdoing.

139.156.      In the 2021 10-K, under the heading "Logistics," Polished stated:

> In our fulfillment of large durable goods, we have created an infrastructure that allows us to deliver products in most states. We want to scale this infrastructure by continuing to improve execution, fulfillment center locations, and delivery timing. ***This proprietary***

> *logistic process enables us to provide our customers' products quickly and to provide a better shipping and delivery experience than they might otherwise experience. Additionally, we believe this logistics network will help us reduce expenses, touchpoints, damages and returns.*

140.157.    The foregoing statements about "logistics" were materially false and misleading, because Polished and Albert Fouerti knew or recklessly disregarded that the logistics process and returns process at ACI, and thus at Polished, involved fraud as a business practice, as described in detail above, including forging documents, shipping damaged products and forging documents stating that the products were delivered without damage, forging invoices and bills of lading, refusing to accept returns from customers based on forged paperwork, and lying to credit card companies and producing forged documents. Indeed, Albert Fouerti personally directed these fraudulent practices at ACI and Polished, and his scienter is imputed to Polished, on whose behalf he spoke as CEO.

141.158.    In the 2021 10-K, Polished included the following risk warning:

> *Our continued revenue growth will depend upon, among other factors, our ability to acquire more customers, build our brands and launch new brands, introduce new products or offerings and improve existing product.*
>
> Maintaining and enhancing our brands is critical to acquiring and expanding our base of customers and suppliers. Our ability to maintain and enhance our brands *depends largely on our ability to maintain customer confidence in our product and customer service offerings, including by delivering products on time and without damage*. If customers do not have a satisfactory shopping experience, they may seek out alternative offerings from our competitors and may not return to our sites as often in the future, or at all.
>
> ****
>
> *Customer complaints* or negative publicity about our sites, products, delivery times, customer data handling and security practices or customer support, especially on blogs, social media websites and our sites, could rapidly and severely diminish

consumer use of our sites and consumer and supplier confidence in
us and result in harm to our brands.

142.159.    The foregoing risk warning was false and misleading because the risk

warned of as hypothetical had materialized. Polished, as described in detail by the former

employees, was shipping damaged goods or shipping appliances to the wrong addresses, or not

shipping appliances to customers at all, but charging customers in every such case. and then

denying the aggrieved customers satisfaction, refusing to refund money as a course of practice.

Albert Fouerti knew or recklessly disregarded that the logistics process and returns process at ACI,

and thus at Polished, involved fraud as a business practice, as described in detail above, including

forging documents, shipping damaged products and forging documents stating that the products

were delivered without damage, lying to customers and denying their claims, forging invoices and

bills of lading, refusing to accept returns from customers based on forged paperwork, and lying to

credit card companies and producing forged documents. Indeed, Albert Fouerti personally directed

these fraudulent practices at ACI and Polished, and his scienter is imputed to Polished, on whose

behalf he spoke as CEO.

143.160.    On May 16, 2022, Polished filed its Q1 2022 10-Q with the SEC, reporting

Q1 2022 revenues of $152.8 million, gross profit of $35.9 million, income from operations of

$10.1 million, net income of $5.9 million, and net income per share of $0.06.

144.161.    These reported results were false and misleading because, in violation of

GAAP:

a.    As disclosed in the restated 2022 Q1 10-Q, filed with the SEC on July 31, 2023,

Polished's Q1 2022 revenues were overstated by $4.1 million due to "an

understatement of a returns allowance and revenue cutoff issues" in violation of

ASC 606-10-05-4, ASC 606-10-25-30, ASC 606-10-55-23 – 26, and its own revenue recognition accounting policy;

b.  As disclosed in the restated 2022 Q1 10-Q, Polished also understated its Q1 2022 cost of goods sold, and consequently overstated its gross profit, by an additional $1.9 million due to improperly recording cost of goods sold within its operating expenses.

c.  As disclosed in the restated 2022 Q1 10-Q, Polished understated its Q1 2022 other income (expense) by $0.2 million as a result of "various miscellaneous adjustments."

d.  As a result of the above misstatements, Polished's Q1 2022 sales were overstated by $4.1 million (or 2.8%), gross profit was overstated by $5.1 million (or 16.6%), operating income was overstated by $3.2 million (or 46.4%), net income was overstated by $103,000 (or 1.7%), and net income per share was overstated by $0.01 (or 20.0%).

145.162.    Defendant Albert Fouerti certified the Q1 2022 10-Q. That certification stated, in part:

> 5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
>     a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

146.163.     The foregoing Albert Fouerti certification was materially false and misleading because Albert Fouerti knew, but knowingly or recklessly failed to disclose, business practices at ACI that were both improper or illegal, and as described in detail above, that Albert Fouerti mandated fraud at ACI as a business practice. Albert Fouerti and Polished, to whom Albert Fouerti's scienter is imputed, were duty-bound to disclose that Fouerti was already stealing directly from Polished in an amount Polished would later reveal was $800,000, that ACI was defrauding customers, vendors, and credit card companies, published false inventory numbers, as FE1 repeatedly told Defendant Fouerti starting in early August 2021, that Albert Fouerti enriched himself by stealing money from fake commissions, as well as about the fraudulent lying about ACI's and Polished's inventory numbers, forging and falsifying documents as a business practice, cheating customers, vendors, and credit card companies, employing many undocumented workers for whom ACConnection, then later ACI, did not have the required paperwork, and paying Albert Fouerti's father $104,000 annually for a fake job at YF Logistics.

## VI.    THE TRUTH EMERGES

147.164.     On August 15, 2022, after market close, Polished filed a Form 12b-25 ("Notification of Late Filing") with the SEC. Polished announced that it was unable to file its quarterly report on Form 10-Q for the period ended June 30, 2022 "because it requires additional time to complete the investigation described below," stating:

> The Audit Committee of the Company's Board of Directors ("Audit Committee") ***recently began an independent investigation regarding certain allegations made by certain former employees related to the Company's business operations***. The investigation is ongoing, and the Audit Committee continues to work diligently with independent counsel and consultants to complete the investigation as soon as possible. The Company cannot predict the duration of the

investigation, eventual scope, its outcome, or its impact on the Company's financial results. As a result of the additional time required to complete the investigation, the Company has not finalized its financial statements for the period ended June 30, 2022. The Company expects that it will finalize its financial statements and file the related Second Quarter 10-Q as soon as practicable after the conclusion of the investigation, but does not anticipate that it will be in a position to file the Second Quarter 10-Q on or before the fifth calendar date following the required filing date as prescribed in Rule 12b-25.

(Emphasis added.)

148.165.    On this news, Polished's stock price fell 35.7%, from $75.50 at the close on August 15, 2022, to $48.50 at the close on August 16, 2022, harmingdamaging investors.[13]

149.166.    On August 25, 2022, after close of market, Polished issued a press release announcing "the engagement of a leading strategic consulting firm with retail and ecommerce operations expertise to augment its existing management, identify opportunities to accelerate long-term profitable growth and, separately, to potentially expedite the Audit Committee of the Board of Directors' ongoing investigation."

150.167.    On October 14, 2022, after close of market, Polished issued a press release announcing that "it has accepted the resignations of Albert Fouerti, Maria Johnson and Elie Fouerti, effective immediately." The press release repeated that "the Board's Audit Committee, with the assistance of independent legal counsel and consultants, is carrying out an internal investigation regarding certain allegations made by certain former employees related to the Company's business operations."

151.168.    On November 2, 2022, after close of market, Polished issued a press release discussing the ongoing investigation, disclosing:

---

[13] Stock prices have been adjusted to account for Polished's 1:50 stock split on October 20, 2023.

> **Focus of Previously Disclosed Internal Investigation:** The investigation being carried out by the Audit Committee of the Board of Directors ***is focused on employment and inventory management practices. The investigation, which is supported by independent legal counsel and consultants, is focused on the time period of 2021 through the present***. The Audit Committee intends to complete its accelerated, yet extensive, investigation by the end of this calendar year. If the investigation's scope or timeline materially changes, Polished will provide a subsequent update.

(Emphasis added.)

152.169.       On November 14, 2022, Polished filed a Form 12b-25 ("Notification of Late Filing") with the SEC. Polished announced that it was unable to file its quarterly report on Form 10-Q for the period ended September 30, 2022 "because it requires additional time to complete the investigation described below," stating:

> The Audit Committee of the Company's Board of Directors ("Audit Committee") ***is carrying out an internal investigation regarding certain allegations made by certain former employees related to the Company's business operations***. The investigation is ongoing, and the Audit Committee continues to work diligently with independent counsel and consultants to complete the investigation as soon as possible. The Company cannot predict the duration of the investigation, eventual scope, its outcome, or its impact on the Company's financial results. As a result of the additional time required to complete the investigation, the Company has not finalized its financial statements for the period ended September 30, 2022. The Company expects that it will finalize its financial statements and file the related Third Quarter 10-Q as soon as practicable after the conclusion of the investigation, but does not anticipate that it will be in a position to file the Third Quarter 10-Q on or before the fifth calendar date following the required filing date as prescribed in Rule 12b-25.

(Emphasis added.)

69

153.170.    On December 22, 2022, Polished issued a press release disclosing the results of the Audit Committee's internal investigation:[14]

---

[14] Polished filed a Form 8-K with the SEC, attaching the December 22, 2022 press release, on December 27, 2022.

### *Internal Investigation Results*

The Company's Board of Directors (the "Board") has completed its assessment of the results of the Audit Committee's previously disclosed internal investigation. The investigation, which was supported by independent legal counsel and advisors, produced the following key findings pertaining to the Company's business operations under former management during the 2021-2022 period:

- The Company was charged by its former Chief Executive Officer approximately $800,000 for expenses unrelated to the Company and its operations.[15]

- ***The Company appears to not have had in place all the necessary documentation for all of its employees and, in turn, may have failed to comply with certain legal requirements***. As elaborated on below, the Company has subsequently put in place enhanced controls to remedy any labor issues and believes it is now in full compliance with legal requirements.

- ***The Company's controls, software and procedures for managing and tracking inventory, including damaged inventory, were insufficient***. As elaborated on below, the Company has subsequently put in place enhanced controls to remedy such issues.

(Emphasis added.)

~~154.~~171.      On December 27, 2022, Polished filed a Form 8-K with the SEC. The Form 8-K itself stated that on December 20, 2022, it had received a letter from its independent registered public accounting firm, Friedman LLP ("Friedman"), announcing its immediate resignation as Polished's auditor. Not only did Friedman resign, but it announced that it was withdrawing its fiscal year 2021 audit, and that it was disassociating itself from Polished's quarterly financial

---

[15] In the December 21, 2022 Settlement Agreement between Albert Fouerti and Polished, filed as an exhibit to the December 27, 2022 Form 8-K, Albert Fouerti agreed to reimburse $3.7 million to Polished to pay back the $800,000 he stole and to pay for the cost of Polished's investigation.

statements for Q2 2021, Q3 2021, Q4 2021, and Q1 2022. The 8-K, including the text of the letter

read:

> On December 20, 2022, Polished.com Inc. (the "Company")
> received a letter (the "Letter") from the Company's independent
> registered public accounting firm, Friedman LLP ("Friedman"),
> informing the Company of its decision to resign effective December
> 20, 2022 as the auditors of the Company.
>
> In the Letter, Friedman advised the Company that based on the
> results of the Company's Board of Directors (the "Board") internal
> investigation as reported to Friedman, it appears there may be
> material adjustments and/or disclosures necessary to previously
> reported financial information. Additionally, the Board's internal
> investigation has identified facts, that if further investigated by
> Friedman, might cause Friedman to no longer to be able to rely on
> the representations of (i) management that was in place at the time
> Friedman issued its audit report for the year ended December 31,
> 2021, or (ii) management that was in place at the time of Friedman's
> association with the quarterly financial statements for the periods
> ended June 30, 2021, September 30, 2021 and March 31, 2022. Prior
> to the Letter, in the past two years, the Company had not received
> from Friedman an adverse opinion or a disclaimer of opinion, and
> their opinion was not qualified or modified as to uncertainty, audit
> scope, or accounting principles. The resignation by Friedman was
> neither recommended nor approved by the audit committee of the
> Board (the "Audit Committee") or the Board and there were no
> disagreements with management and Friedman. Friedman had
> previously reported a material weakness to the Audit Committee,
> which was included on the Company's Form 10-K for the year
> ended December 31, 2021, filed on March 31, 2022, regarding the
> ineffectiveness of the Company's internal controls over financial
> reporting.
>
> In connection with the Letter, Friedman advised us that it is
> withdrawing its previously issued audit opinion on our December
> 31, 2021 consolidated financial statements, issued on March 31,
> 2022, and declined to be associated with the quarterly financial
> statements for the periods ended June 30, 2021, September 30, 2021,
> and March 31, 2022, filed on August 8, 2021, November 16, 2021
> and May 12, 2022, respectively.
>
> The Company has provided Friedman with a copy of the disclosures
> in this Current Report on Form 8-K prior to filing with the SEC. A
> copy of Friedman's letter, stating it agrees with the statements as set

forth above, is filed as Exhibit 16.1 to this Current Report on Form 8-K.

155.172.        On July 31, 2023, after close of market, Polished issued a press release announcing that it was filing all restated and/or delayed financial statements for Fiscal Year 2021 and Fiscal Year 2022 and is filing its results for the first quarter of Fiscal Year 2023. The press release further stated that it was issuing a restatement of the fiscal year 2021 and first quarter of fiscal year 2022 results. That same date, after close of market, Polished filed its delayed 2022 10-K, restating the financial results for fiscal year 2021 and Q1 2022.

156.173.        On this news, Polished's stock price fell 68%, from $31.55 at the close on July 31, 2023, to $10.00 at the close on August 1, 2023, harming investors.

174.    On February 13, 2024, Polished announced an SEC investigation of the restatement and the findings of Polished's audit investigation, including the issues raised in this Complaint. *See In the Matter of Polished.com Inc.* (NY-10653).

175.    The Department of Justice is also conducting a parallel investigation into the same issues the SEC is investigating.

176.    On March 7, 2024, Polished and affiliated entities filed voluntary petitions for relief under Chapter 7 of the Bankruptcy Code, intending to liquidate. Having received $180 million in cash for his stake in Connections, Defendant Fouerti continues to profit from Polished's demise.

177.    Polished disclosed in the 2021 10-K, it was "a member and 5% equity interest holder of Dynamic Marketing, Inc. ("DMI"), a 60-member appliance purchasing cooperative. DMI purchases consumer electronics and appliances at wholesale prices from various vendors, and then makes such products available to its members, who sell such products to end consumers." Polished continued that "[f]or the years ended December 31, 2021, and 2020, the Company purchased a substantial portion of finished goods from DMI, representing 72.1% and 22.1% of purchases,

respectively." In addition, Polished stated that "Albert Fouerti, is on the board of directors of DMI."

178.    On June 27, 2024, DMI purchased the assets of Polished, including ACI from the Chapter 7 trustee. On information and belief, Defendant Albert Fouerti continues as a board member of DMI.

## VII.    PLAINTIFF'S CLASS ACTION ALLEGATIONS

~~157.~~179.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Polished common stock publicly traded on the NYSE American during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Polished, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

~~158.~~180.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Polished common stock were actively traded on the NYSE American. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands, of members in the proposed Class.

~~159.~~181.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

~~160.~~182.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

161. 183.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of Polished;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused Polished to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of Polished common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

162. 184.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

163.185.    In addition, common issues of fact and law predominate over individual issues. In particular, to avoid individual proof of reliance, Plaintiff invokes, in part, the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Polished securities met the requirements for listing, and were listed and actively traded on the NYSE American, an efficient market;

- As a public issuer, Polished filed public reports;

- Polished regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- Polished's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- Polished was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

164.186.    Based on the foregoing, the market for Polished common stock promptly digested current information regarding Polished from all publicly available sources and reflected such information in the prices of the common units, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

165.187.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of*

*Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## VIII.  COUNTS

### COUNT I

### Violations of Section 10(b) And Rule 10b-5(b) Promulgated Thereunder

### Against Defendants Polished, Fouerti, Moore, and Johnson

166.188.      Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

167.189.      Plaintiff asserts this claim against Defendants Polished, Fouerti, and Johnson basing the claim upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder by the SEC.

168.190.      For the false statements alleged in the Q2 2021 10-Q, the maker of the false statements is Defendant Polished, and Albert Fouerti's Douglas Moore's scienter is imputed to Polished.

169.191.      For the false statements alleged in the Q3 2021 10-Q, the makers of the false statements are Defendants Polished, Albert Fouerti, and Johnson, and Albert Fouerti's and Johnson's scienter are imputed to Polished.

170.192.      For the false statements alleged during the Q3 2021 Call, the makers of the false statements are Defendants Albert Fouerti and Polished, and Fouerti's scienter is imputed to Polished.

171.193.      For the false statements alleged in the 2021 10-K, the makers of the false statements are Defendants Polished, Albert Fouerti, and Johnson, and Albert Fouerti's and Johnson's scienter is imputed to Polished.

172.194.    For the false statements alleged in the Q1 2022 10-Q, the makers of the false statements are Defendants Albert Fouerti and Polished, and Fouerti's scienter is imputed to Polished.

173.195.    During the Class Period, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b), Defendant Polished, by and through its officers, disseminated materially false and misleading statements, based upon information Defendants Fouerti, Moore, and Johnson, and other senior Polished officers and employees furnished knowingly or deliberately disregarding that the information contained misrepresentations, omitted material facts, and failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

174.196.    Defendants Albert Fouerti, Moore, and Johnson, and through their knowledge or reckless disregard, Polished, acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Polished were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of Polished, their control over, and/or receipt and/or modification of Polished allegedly materially misleading statements, and/or their associations with Polished which made them privy to confidential proprietary information concerning Polished, participated in the fraudulent scheme alleged herein.

175.197.    As a result of the foregoing, the market price of Polished common stock was artificially inflated during the Class Period.

176.198.    In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the integrity of the market price of Polished common stock during the Class Period in purchasing Polished common stock at prices that were artificially inflated as a result of Defendants' false and misleading statements.

177.199.    Had Plaintiff and the other members of the Class been aware that the market price of Polished common stock had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Polished common stock at the artificially inflated prices that they did, or at all. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

178.200.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5(b) promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Polished common stock during the Class Period. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5(b) promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Polished common stock during the Class Period.

## COUNT II

**Violations of Section 10(b) And Rule 10b-5(a) and (c) Promulgated Thereunder**

**Against Defendants Polished and Fouerti**

179.201.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

180.202.     Defendants Polished and Fouerti, by and through Fouerti and other senior Polished officers and employees, violated §10(b) of the 1934 Act and Rule 10b-5(a) and (c) in that they employed devices, schemes and artifices to defraud and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Polished's common stock and directly impacted the price of Polished common stock during the Class Period.

181.203.     Defendant Fouerti, who was a senior executive of ACI and then CEO of Polished, and a member of Polished's Board of Directors, formulated and directed the schemes to defraud described above, by defrauding customers, vendors, and credit card companies, publish false inventory numbers, and enrich himself by stealing money from fake commissions, fraudulently lying about ACI's and Polished's inventory numbers, forging and falsifying documents as a business practice, cheating customers, vendors, and credit card companies, employing many undocumented workers for whom ACConnection, and then ACI, did not have the required paperwork, and paying Albert Fouerti's father $104,000 annually for a fake job at YF Logistics.

182.204.     Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Polished were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of Polished, their control over, and/or receipt and/or modification of Polished allegedly materially misleading

statements, and/or their associations with Polished which made them privy to confidential proprietary information concerning Polished, participated in the fraudulent scheme alleged herein.

~~183.~~205.        Albert Fouerti was a senior executive and director of Polished, and had actual knowledge of the alleged scheme to defraud.

~~184.~~206.        Defendant Fouerti had actual knowledge of the fraudulent scheme set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth. As a result of the fraudulent scheme, the market price of Polished common stock was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Polished common stock during the Class Period in purchasing Polished common stock at prices that were artificially inflated as a result of Defendants' false and misleading statements. Had Plaintiff and the other members of the Class been aware that the market price of Polished common stock had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Polished common stock at the artificially inflated prices that they did, or at all. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Polished common stock during the Class Period. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to

the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Polished common stock during the Class Period.

## COUNT III

### Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

~~185.~~209.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

~~186.~~208.    During the Class Period, the Individual Defendants participated in the operation and management of Polished, and conducted and participated, directly and indirectly, in the conduct of Polished business affairs. Because of their senior positions, they knew the adverse non-public information about Polished's misstatement of revenue and profit and false financial statements.

~~187.~~209.    As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Polished financial condition and results of operations, and to correct promptly any public statements issued by Polished which had become materially false or misleading.

~~188.~~210.    Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Polished disseminated in the marketplace during the Class Period concerning Polished results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Polished to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Polished within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Polished common stock.

83

189.211.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Polished.

## IX.    PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of themselves and the Class, pray for judgment and relief as follows:

(a)    declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)    awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)    awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## X.    JURY TRIAL DEMANDED

190.212.    Plaintiff hereby demands a trial by jury.

Dated: October 31, 2023February 24, 2025                Respectfully submitted,

THE ROSEN LAW FIRM, P.A.

*/s/ Jacob A. Goldberg*
Jacob A. Goldberg
Gonen Haklay
Leah Heifetz-Li
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Fax: (212) 202-3827
Email: jgoldberg@rosenlegal.com

Email: ghaklay@rosenlegal.com
Email: lheifetz@rosenlegal.com

Phillip Kim
Laurence M. Rosen
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com

*Lead Counsel for Plaintiff and the Class*