UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Eden Alpha CI LLP, Individually and on behalf of all others similarly situated,

Plaintiff,

-against-

POLISHED.COM INC. F/K/A 1847 GOEDEKER INC., DOUGLAS T. MOORE, ALBERT FOUERTI, and MARIA JOHNSON,

Defendants.

**MEMORANDUM & ORDER**
**22-CV-6606 (NGG) (VMS)**

NICHOLAS G. GARAUFIS, United States District Judge.

Lead Plaintiff Eden Alpha CI LLP ("Plaintiff") brings this putative class action against Polished.com Inc. ("Polished"), Douglas Moore, Albert Fouerti, and Maria Johnson (collectively, "Defendants"), alleging violations of the federal securities laws. (Second Am. Compl. ("SAC") (Dkt. 53).) Pending before the court are Defendants Moore, Fouerti, and Johnson's (the "Individual Defendants") motion for judicial notice of certain documents and motion to dismiss the SAC. (Mot. for Jud. Not. ("Defs.' Mot. for Not.") (Dkt. 56-2); Mot. to Dismiss ("MTD") (Dkt. 56-1).) For the reasons that follow, the motion for judicial notice is GRANTED IN PART and DENIED IN PART, and the motion to dismiss is GRANTED.

## I. BACKGROUND

### A. Facts

The court assumes familiarity with the background facts of the case and references its fact section in its last Memorandum and Order ("M&O") dismissing the First Amended Complaint ("FAC") (Dkt. 34) with leave to amend. (M&O (Dkt. 51) at 2-12.)

1

## B.  Procedural History

On October 21, 2022, Plaintiff filed suit against Polished, the Individual Defendants, and several others, alleging violations of the Securities Exchange Act of 1934 (the "Exchange Act"). (Compl. (Dkt. 1).) In September 2023, Judge Scanlon appointed Eden Alpha CI LLP as a lead plaintiff and The Rosen Law Firm, P.A. as lead counsel. (Mem. and Order Appointing Lead Plaintiff (Dkt. 30) at 2.)

On October 31, 2023, on consent of the parties and by order of the court, Plaintiff filed the FAC, alleging: (Count I) violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5(b) against Polished, Fouerti, and Johnson; (Count II) violations of Section 10(b) and Rule 10b-5(a) and (c) against Polished and Fouerti; and (Count III) violations of Section 20(a) of the Exchange Act against the Individual Defendants. (Stipulation and Order (Dkt. 33); FAC ¶¶ 167-190.) Count I alleges that several statements in Polished's Q2 2021 Form 10-Q, Q3 2021 Form 10-Q, Q3 2021 earnings call with investors, 2021 Form 10-K, and Q1 2022 Form 10-Q were false or materially misleading, as evidenced by the allegations of Former Employees ("FEs") and the July Restatement. (FAC ¶¶ 167-173.) Building upon these alleged misrepresentations, Count II claims scheme liability as to Polished and Fouerti, and Count III claims control person liability as to the Individual Defendants. (*Id.* ¶¶ 180-190.)

On March 7, 2024, Polished filed for Chapter 7 bankruptcy in the United States Bankruptcy Court for the District of Delaware, triggering an automatic stay of the proceedings in this court pursuant to 11 U.S.C. § 362(a). (Notice of Bankruptcy dated 3/7/2024 (Dkt. 42).) *See In re Polished.com Inc., et al.,* No. 24-BK-10353 (Bankr. D. Del.). However, as automatic stays generally do not apply to non-bankrupt codefendants, the proceedings

2

continued against the Individual Defendants.[1] (*See* Pl.'s Letter Dated 3/11/2024 (Dkt. 43).)

On June 21, 2024, the Individual Defendants filed their fully briefed motion to dismiss the FAC under Federal Rules of Civil Procedure 12(b)(6) and 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4. (Defs.' First MTD (Dkt. 48-1); Pl.'s First MTD Opp'n (Dkt. 48-20); Defs.' Reply in Supp. of First MTD (Dkt. 48-22).) At the same time, the Individual Defendants filed a fully briefed motion requesting that the court consider or take judicial notice of certain documents. (*See* Defs.' First Mot. for Not. (Dkt. 48-2); Pl.'s Opp'n to First Mot. for Not. (Dkt. 48-21); Defs.' Reply in Supp. of First Mot. for Not. (Dkt. 48-23).)

On January 24, 2025, the court issued its M&O granting in part and denying in part the Individual Defendants' motion for consideration and/or judicial notice, granting the Individual Defendants' motion to dismiss, and granting Plaintiff's request for leave to file a SAC. (M&O at 67.) The court made three central findings. First, it found that it "could not credit the [former employee] accounts, as currently pleaded, for purposes of establishing" the false or misleading nature of the alleged representations or omissions, or scienter. (M&O at 23, 23-29.) Second, the court categorized the challenged statements as falling into

---

[1] "It is well-established that stays pursuant to § 362(a) are limited to debtors and do not encompass non-bankrupt co-defendants." *Tchrs. Ins. And Annuity Ass'n of Am. v. Butler*, 803 F.2d 61, 65 (2d Cir. 1986). After Polished filed for bankruptcy, Plaintiff informed the court that it intended to dismiss Polished from the case without prejudice and pursue its claims solely against the Individual Defendants. (Pl.'s Letter Dated 3/11/2024 at 1.) After the issuance of the M&O and before the filing of the SAC, Plaintiff informed the court that it would "describe Polished as a non-party defendant" and that "Polished is no longer a party to this action." (Pl.'s Letter 1/28/25 (Dkt. 52).) It has not followed through on the promises made in either letter, (*see* SAC ¶ 1), and thus Polished formally remains a named Defendant in this action.

four categories—of these, the court only found that the FAC successfully pleaded false and misleading statements with respect to restated financial metrics, specifically Polished's 2021 10-K and 1Q2022 10-Q, as a result of the July Restatement. (*Id.* at 30-54.) Third, the court found that the FAC failed to sufficiently raise a strong inference of scienter. (*Id.* at 57.) The court described Plaintiff as relying on "four sets of facts to establish circumstantial evidence of conscious misbehavior or recklessness," which included the FE accounts, the resignations of Fouerti and Johnson, the resignation of Polished's independent accounting firm, Friedman, and alleged GAAP violations. (*Id.* at 56.) After dismissing the sufficiency of FE1's account, the court found that a holistic analysis of the remaining three bases was also insufficient to establish a strong inference of scienter. (*Id.* at 56-62.) Separately, the court declined to reach the issue of loss causation because Plaintiff had not "identified actionable misstatements or omissions or adequately alleged scienter." (*Id.* at 62 (citing *Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 184 (E.D.N.Y. 2017) ("Since the plaintiffs have not identified any actionable misstatements or adequately alleged scienter, there is no basis upon which they may plead reliance or loss causation.")).)[2]

On February 24, 2025 Plaintiff filed its SAC. (Dkt. 53.) It alleges the same three counts but adds Douglas Moore, Polished's former CEO from August 2019 to August 31, 2021, as a defendant under Count I. (SAC ¶¶ 190, 195-96.)

On June 9, 2025, the Individual Defendants filed their fully briefed motion to dismiss the SAC under Federal Rules of Civil Procedure 12(b)(6) and 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4. (MTD; Pl.'s Opp'n to MTD ("Opp'n") (Dkt 56-17); Defs.' Reply in Supp. of MTD ("Defs.' Reply") (Dkt. 56-19).) At the same time, the Individual

---

[2] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

Defendants filed a fully briefed motion requesting that the court take judicial notice of certain documents. (*See* Defs.' Mot. for Not. (Dkt. 56-2); Pl.'s Opp'n to Mot. for Not. (Dkt. 56-18); Defs.' Reply in Supp. of Mot. for Not. (Dkt. 56-20).)

## II. LEGAL STANDARDS

In considering a motion to dismiss, the court accepts as true all factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor. *See Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008). To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Complaints alleging securities fraud are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA. *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 166-67 (2d Cir. 2021) ("*Synchrony*"). Rule 9(b) requires that "a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To satisfy this standard, a plaintiff must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Synchrony*, 988 F.3d at 167. "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI Comms., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) ("*ATSI*").

The PSLRA expands on the Rule 9(b) standard, requiring securities fraud complaints to "specify each misleading statement; . . . set forth the facts on which a belief that a statement is misleading was formed; and . . . state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d

98, 108 (2d Cir. 2012); *see also* 15 U.S.C. § 78u–4(b)(1), (2). "The requisite state of mind in a Rule 10b-5 action is 'an intent to deceive, manipulate or defraud.'" *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168 (2d Cir. 2000) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)). Such an intent may be established "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99.

The court makes all new findings in reviewing this motion to dismiss the SAC. *Arce v. Walker*, 139 F.3d 329, 332 n.4 (2d Cir. 1998) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect.") (quoting *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977)). Plaintiff's assertion that there is any "law of the case" is incorrect, and the court will rule on the SAC as though it is the first complaint it has considered. (Opp'n at 21.) However, the court at various times refers to and incorporates its findings from the prior M&O into this opinion to the extent they concern the allegations asserted in the SAC.

## III. MOTION FOR JUDICIAL NOTICE

In ruling on a motion to dismiss, the court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI*, 493 F.3d 98. "A document is incorporated by reference if the complaint makes[] a clear, definite and substantial reference to the document." *Stinnett v. Delta Air Lines, Inc.*, 278 F. Supp. 3d 599, 608 (E.D.N.Y. 2017). Where a document is not incorporated by reference, the court may nevertheless consider it if "the complaint relies heavily upon [the document's] terms and effect, thereby rendering the

6

document integral to the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

The court "may also consider matters of which judicial notice may be taken under Fed. R. Evid. 201." *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991). A court may take judicial notice of a fact that is "not subject to reasonable dispute" either because it is "generally known within the trial court's territorial jurisdiction" or because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). It is well-established that courts may take judicial notice of "public disclosure documents required by law to be filed, and actually filed, with the SEC." *Kramer*, 937 F.2d at 774.

Here, Individual Defendants request that the court take judicial notice of thirteen (13) documents and four Financial Accounting Standards Board ("FASB") standards. (Defs.' Mot. for Not. at 3-7.) The documents include financial forms filed by Polished with the SEC, press releases, and a transcript of its November 15, 2021 earnings call. (*Id.* at 3-4.) The Individual Defendants argue that these documents are "incorporated by reference into the [SAC] and/or [are] a proper subject of judicial notice." (*Id.* at 1.) Plaintiff opposes this request. (Pl.'s Opp'n to Mot. for Not. at 1.)

The court declines to take judicial notice of any documents but agrees with the Individual Defendants that it may consider Exhibits 1-13 because they are incorporated by reference in the SAC. The court will also consider the FASB standards just as it would any other source of regulatory authority. (*See* M&O at 18); *Ganino*, 228 F.3d at 159 n.4 ("The SEC treats the FASB's standards as authoritative.").

### A. Exhibits 1-13

Exhibits 1-13 include four press releases (contained within Exhibits 8, 9, 10, and 11), a transcript of Polished's Q3 2021

7

earnings call held on November 15, 2021, (Exhibit 3), and eleven documents filed by Polished with the SEC, (Exhibits 1, 2, 4-13). (Defs.' Mot. for Not. at 3-4.) The SAC quotes from and makes substantial reference to each of these documents. (Defs.' Mot. for Not. at 3-4. (citing the SAC).) These "clear, definite and substantial reference[s]" to each of the Exhibits incorporates them by reference so that they are part of the SAC. *Stinnett*, 278 F. Supp. 3d at 608; *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007).

### B. FASB Standards

Individual Defendants request that the court consider four FASB standards (also referred to as Accounting Standards Codification or "ASC") cited in the SAC. (Defs.' Mot. for Not. at 6-7.)

Plaintiff alleges that the Individual Defendants, in making certain financial disclosures, violated Generally Accepted Accounting Principles ("GAAP"). (SAC ¶¶ 101-131.) "The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the [FASB] and the American Institute of Certified Public Accountants." *In re Bear Stearns Cos., Inc. Sec., Derivative, and ERISA Litig.*, 763 F. Supp. 2d 423, 467 (S.D.N.Y. 2011). The FASB is "the designated organization in the private sector for establishing standards of financial accounting and reporting." *In re WorldCom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 478 n.3 (S.D.N.Y. 2005). These standards "have been recognized by the SEC as authoritative." *Id.* SEC Regulation S–X provides that financial statements filed with the SEC that are not presented in conformity with GAAP are presumed to be misleading. 17 C.F.R. § 210.4–01(a)(1). Ultimately, however, "[a]llegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim." *Stevelman v. Alias Rsch. Inc.*, 174 F.3d 79, 84 (2d Cir. 1999).

Plaintiff alleges that the Individual Defendants violated four FASB standards: ASC 606, ASC 330, ASC 705, and ASC 310.

8

(SAC ¶ 151.) The SAC relies significantly on alleged violations of FASB standards in attempting to state a securities fraud claim. (*Id.* ¶¶ 101-17, 150-51, 160-61.) Plaintiff presumably wants the court to refer to those standards in adjudicating the motion to dismiss. As such, the court will consider the FASB standards, particularly the standards cited in the SAC, just as it would any other source of regulatory authority. *Cf. In re Avon Sec. Litig.*, No. 19-CV-1420 (CM), 2019 WL 6115349, at *21 (S.D.N.Y. Nov. 18, 2019) (crediting alleged GAAP violations as support for scienter allegations).

In sum, the Individual Defendants' request that the court consider Exhibits 1-13 and the FASB standards is GRANTED, and their request that the court take judicial notice of these Exhibits is DENIED.

## IV. MOTION TO DISMISS

### A. Primary Liability

The SAC fails to rectify the shortcomings of the FAC as to primary liability for the reasons that follow.

#### 1. Class Period

In a footnote in its opposition, Plaintiff writes that "the Court may, if it chooses, shorten the Class Period to start on March 31, 2022, to reflect its different rulings on the falsity of the 2Q21 and 3Q21 financial statements versus the fiscal year 2021 and 1Q22 financial statements." (Opp'n at 21 n.19.) By this, Plaintiff refers to this court's prior ruling, as described above, where it found credible misstatements in the 2021 10-K and 1Q22 10-Q because of the July Restatement,[3] but that also found the 2Q21 and 3Q21 financial statements not to contain false statements. Individual

---

[3] As summarized in the M&O, the July Restatement refers to Polished's filing of its delayed 2022 Form 10-K with the SEC, where it restated financial results from fiscal year 2021 and 1Q22. (*See* M&O at 10-11.)

Defendants characterize "these concessions" as constituting waiver of Plaintiff's claims as to statements contained in these documents, (Defs.' Reply at 5), while Plaintiff "reserves all rights regarding these statements," (Opp'n at 21). While the court has the power to "alter or modify the class" as it sees fit, *In re Sumitomo Copper Litig.*, 262 F.3d 134, 139 (2d Cir. 2001), no class has yet been certified, and thus Plaintiff's allegations control. To adjudicate this motion, and in accordance with the court's findings below, *see infra* Section IV.A.4, the court adopts Plaintiff's proposed class period as beginning on March 31, 2022, and ending on July 31, 2023. (Opp'n at 21 n.19; SAC ¶¶ 2, 10.)

Accordingly, as Individual Defendants point out, the claims against Moore are dismissed, as Moore stepped down as CEO on August 31, 2021, and stepped down as a director of Polished in September 2021, half a year before the new class period began. (SAC ¶ 18; Defs.' Reply at 6.) There are no allegations that he helped prepare, sign, or certify any financial statements containing a challenged statement during the class period. (*See, e.g.,* SAC ¶ 22.)

### 2. Additional FE Allegations

The FAC and the SAC utilized anonymous witness accounts to attempt to prove both material falsity and scienter. (FAC ¶¶ 38-84; SAC ¶¶ 42-100.) The first M&O explained that anonymous witness accounts, like the ones pleaded in the FAC and the SAC, are discredited in four circumstances:

> "First, courts generally do not credit the statements of anonymous witnesses "who are insufficiently described or whose descriptions do not suggest that they [were] in [a] position to know the facts attributed to them." *Miao v. Fanhua, Inc.,* 442 F. Supp. 3d 774, 799 (S.D.N.Y. 2020) (collecting cases). Second, statements "that cannot situate in time relevant occurrences are sometimes

> disregarded because they cannot establish that the challenged statements were knowingly false when made." *Id.* (collecting cases). Third, allegations by anonymous witnesses that are insufficiently particular are often discounted or disregarded. *Id.* at 800 (collecting cases). Fourth, courts tend not to credit uncorroborated statements of anonymous witnesses that are sourced secondhand from individuals "with whom plaintiffs' counsel have not themselves interacted." *Id.* (collecting cases).

(M&O at 23-24.) In the FAC, each of the eleven anonymous FEs suffered from at least one of these deficiencies. (*See* M&O at 24.) The SAC attempts to rectify Plaintiff's pleading by marshaling additional allegations for FEs 1, 2, 4, and 11. However, as no new material allegations are presented regarding FEs 3, 5, and 6-10, the court reiterates the deficiencies identified in the First M&O as to these individuals. (*Id.* at 24-29.) Its analysis of the new allegations likewise reveals their deficiencies and finds that they cannot support Plaintiff's claims.

### a. FE2, FE4, and FE11

The SAC fails to establish any of these accounts as credible for purposes of supporting its claims.

FE2 was a "reverse logistics manager" and FE4 was a "chargeback specialist" in the company's accounting department. (SAC ¶¶ 43, 45.) The SAC attempts to moor their allegations in time. (*See* SAC ¶¶ 45, 86, 87, 91, 96.) While this new information helps to understand more precisely when different events allegedly occurred, these accounts still suffer from fatal defects.

FE2's account still fails to describe their access to Fouerti and recites conclusory allegations that they "rais[ed] these issues with management at [ACI]." (SAC ¶ 76.) These are not specific enough to find that Fouerti or others were on notice of FE2's complaints. (M&O at 28; citing Loc. No. 38, *Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447,

11

*Workers Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010) (discounting CW allegations where there was no indication that the sources had any contact with the individual defendants).) FE2's account is further undermined by its heavy reliance on secondhand reports. (*See, e.g.*, SAC ¶ 86 (describing what an employee of Fouerti's is alleged to have told FE2 about being forced to forge documents) and ¶ 87 (same, with another employee named Vito).) Such secondhand accounts are not credited by courts. *See Miao*, 442 F. Supp. 3d at 799.

FE4's allegations, meanwhile, relate to a party not in the lawsuit, and the court cannot impute knowledge to other defendants based on what may have been raised to the then-Chief Accounting Officer, Robert Barry. (SAC ¶ 91); *see In re Am. Express Co. Sec. Litig.*, No. 02-CV-5533 (WHP), 2008 WL 4501928, at *36 (S.D.N.Y. Sept. 26, 2008), *aff'd sub nom. Slayton v. Am. Exp. Co.*, 604 F.3d 758 (2d Cir.2010) (finding no inference of scienter where "Plaintiffs have also failed to allege any facts showing that the confidential source[] . . . had any contact with the Individual Defendants or would have knowledge of what they knew or should have known during the Class Period"). Accordingly, because FE4 is not alleged to have "met the Individual Defendants, reported any concerns, received any instructions, or made any personal contact with them during the Class Period," this employee's allegations cannot support any inference of scienter. *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 352 (S.D.N.Y. 2011). The M&O correctly rejected this level of interaction as too attenuated. (*See* M&O at 25.)

The SAC also adds allegations to FE11's account. FE11 was an "inventory control manager" before Polished acquired Appliances Connection ("AC").[4] (SAC ¶ 73.) FE11 now alleges that in

---

[4] For simplicity, the court will refer to Appliances Connection, the pre-acquisition company, as "AC," and Appliances Connection Inc. as "ACI," the

comparing orders for delivery with the existence of the appliances in the warehouse, "[a]ppliances would commonly, almost daily, not be present in the warehouse" and that FE11 "was ordered to send a different product, or an already damaged product, that was in the YF Logistics[5] warehouse." (*Id.*) FE11 would bring such issues to Fouerti "with whom he had frequent conversations" but Fouerti would "handle" the issues and FE11 "never heard of the issue[s] again." (*Id.*)

These allegations likewise cannot sustain Plaintiff's claim. First, FE11 did not work in Polished's warehouse, but YF logistics, a subsidiary. (SAC ¶ 52.) Accordingly, FE11 would not have sufficient insight into how the company operated as a whole to know if these alleged discrepancies had a material impact on Polished's financial statements. *See, e.g., Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 223 (S.D.N.Y. 2018) (disregarding the statements of five former employees because they "worked mainly within a single [company] unit, so they had no insight on how other [company] units, let alone other [company] divisions, projected aftermarket sales"); *In re China Mobile Games & Ent. Grp., Ltd Sec. Litig.*, No. 14-CV-4471 (KMW), 2016 WL 922711, at *4 (S.D.N.Y. Mar. 7, 2016) (disregarding allegations of confidential witness ("CW") who worked at a subsidiary, not the parent company, as such testimony "could describe the anomalies of a rogue fiefdom rather than company-wide practices"). These new allegations also do nothing to rectify an additional issue raised in the first M&O: FE11 left YF logistics in March of 2021, "months before the start of the class period"—

_____

post-transaction name for the Goedeker wholly owned subsidiary of the AC assets. (SAC ¶ 6.)

[5] AC owned YF Logistics, a 200,000 square foot subsidiary warehouse in Hamilton, New Jersey, along with four other subsidiaries called 1 Stop Electronics Center, Inc., Gold Coast Appliances, Inc., Superior Deals, Inc., and Joe's Appliance LLC. (SAC ¶ 33.) The SAC elsewhere refers to YF Logistics as "ACI's main warehouse." (*Id.* ¶ 46.)

now a year before the new class period. (M&O at 27.) As described below, even though pre-class period allegations can be considered by the court, FE11's do not fall within even the twelve months covered by the 2021 Form 10-K. (SAC ¶¶ 52.) The court resists crediting these attenuated allegations, far from "contemporaneous" with the statements made at the beginning of the class period. *See Glickman v. Alexander & Alexander Servs., Inc.,* No. 93-CV-7594 (LAP), 1996 WL 88570, at *11 n.6 (S.D.N.Y. Feb. 29, 1996) ("[A] stronger inference of fraud may be raised when the fraudulent acts occur simultaneously with, or closely precede, the realization of their purpose.").

The additional allegations in the SAC fail to move the needle as to the credibility of these accounts. Plaintiff's greatest revisions to the SAC come with the account of FE1, the former "VP of Logistics."

> ### b.    FE1

Plaintiff's main addition in the SAC is a more fleshed out series of allegations about FE1, which describe direct communication with the Individual Defendants in Polished's leadership. Although Plaintiff's SAC bolsters some of the allegations of FE1, the court declines to credit the allegations made by this anonymous account.

The SAC satisfies the M&O's critique that there were no allegations that FE1 brought the allegedly fraudulent practices to the attention of Johnson or Fouerti at the September 21, 2021 meeting. (M&O at 28.) The SAC details what FE1 allegedly shared with these Individual Defendants such that, assuming the allegations to be true, Fouerti and Johnson both "knew about the alleged improper business practices." (*Id.*) It also situates in time when the statements were made. (*See* SAC ¶¶ 59-69.) Although these alleged timeframes are not precise, for example, "[i]n early August 2021," this level of accuracy is sufficient at the pleading stage. *See Madison Maidens, Inc. v. Am. Mfrs. Mut. Ins. Co.,* No.

14

05-CV-4585 (LTS) (JCF), 2006 WL 785270 (S.D.N.Y. Mar. 27, 2006) ("[A] plaintiff need not plead dates, times and places with absolute precision, so long as the complaint gives fair and reasonable notice to defendants of the claim and the grounds upon which it is based.").

The parties dispute if this is enough. Individual Defendants argue that the SAC does not include details indicating that FE1 was "in a position to know facts attributed to him" including that "(1) there were 1,200 'missing appliances' at YF Logistics, and/or (2) that those allegedly missing appliances caused the Company's valuation of inventory to be 'materially false.'" (MTD at 8 (citing SAC ¶¶ 61, 139).) In their view, neither FE1's alleged hand counts of inventory nor access to ACI's ledger suffice to allege anything about ACI or Polished's inventory more broadly. (MTD at 8-9; *see* SAC ¶ 61.) Individual Defendants aver that no pleaded facts connect these missing appliances to FE1's personal knowledge that they "resulted in the [Polished's] financial statements being false or misleading." (*Id.* at 9.)

Plaintiff counters that FE1's allegations "directly address the weakness this Court found in the FAC" and that the SAC "adequately pleads the Individual Defendants' knowledge of the inventory and other issues, which they ignored in publishing materially false financial statements." (Opp'n at 10.) Plaintiff details a series of conversations FE1 allegedly had with each of the Individual Defendants, including a conversation with Defendant Moore in July 2021, (SAC ¶ 62), one with Defendant Johson, (*id.*), and several with Defendant Fouerti—including twice in August 2021, (*id.* ¶ 64.) In these meetings FE1 told them about "all of the inventory problems and the 1,200 missing appliances," (*Id.* ¶ 62), and told Fouerti that "inventory was missing and materially overstated on the balance sheet." (*Id.* at ¶ 64.)

Individual Defendants are right, but on narrower grounds. Throughout Individual Defendants' briefing they push the court

to disregard the FE accounts, because they concern conduct that allegedly occurred before the class period began. (MTD at 7, 9, 10; Defs.' Reply at 5-6). However, "[f]acts that fall outside the relevant period can be considered in determining whether a complaint alleges scienter" and "[a]ny information that sheds light on whether class period statements were false or materially misleading is relevant." *See City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*, 587 F. Supp. 3d 56, 95 (S.D.N.Y. 2022); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001). Indeed, a case Individual Defendants cite in both their motion and their reply with an explanatory parenthetical that "allegations relating to conduct pre-dating the class period could not support scienter" is misleading. *Fogel v. Wal-Mart de Mexico SAB de CV*, No. 13-CV-2282 (KPF), 2017 WL 751155, at *17 (S.D.N.Y. Feb. 27, 2017). That case only rules that *statements* made in the pre-class period are not actionable. *See id.* But it is silent on accounts that are brought forward before the class period and the extent to which they can be used to make inferences about falsity and scienter during the class period. And the accounts of employees no longer at the company could be relevant if they were close in time or pertinent to the full-year financial reporting for FY21, at the earliest. *See, e.g., In re Arqit Quantum Inc. Sec. Litig.*, 774 F. Supp. 3d 505, 529-30 (E.D.N.Y. 2025) (rejecting defendants' claim that the CWs could not have relevant knowledge because none were employed at the company when the challenged statements were made); *see also Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 484 (S.D.N.Y. 2018), *remanded on other grounds sub nom. Abramson v. Newlink Genetics Corp.*, 965 F.3d 165 (2d Cir. 2020) (finding a "period leading up to" the relevant event strengthened plaintiffs' allegations regarding anonymous source's role); *Emps.' Ret. Sys. v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015) ("[A]llegations concerning activity in one period can support an inference of similar circumstances in a subsequent period.").

The narrower and correct rule statement is that these examples *lose* explanatory value the further they are from the alleged misstatements, not that they should be rejected as a bright line rule. *Compare Reckitt Benckiser Grp.*, 587 F. Supp. 3d at 95 ("facts that fall outside the relevant period can be considered"), *with Glickman*, 1996 WL 88570, at *11 n.6 ("[A] stronger inference of fraud may be raised when the fraudulent acts occur simultaneously with, or closely precede, the realization of their purpose."), *and In re FuboTV Inc. Sec. Litig.*, No. 21-CV-1412 (ALC), 2023 WL 2711826, at *11 (S.D.N.Y. Mar. 30, 2023) (finding that allegations made by a CW who left the company seven months previously would be "even less likely [to] have information that could support an inference of contemporaneous falsity"). Thus, the court can still consider FE1's allegations even though they occurred outside the Class Period.

The main reason that FE1's allegations as to falsity and scienter fail is because FE1 was not in a position to know, nor had the expertise to value, the allegedly missing inventory. As to units of inventory, at some point during June of 2021, FE1 conducted "two separate hand counts" of YF Logistics warehouse. (SAC ¶ 61.) FE1 compared his hand counts of YF Logistics' inventory to ACI's ledger to come to the conclusion that "the ledger and, in turn, ACI's balance sheet were materially false." (SAC ¶ 61.) There are not sufficient allegations that lay out in detail how many units were in the warehouse at the time, what percentage of total units this number represented, if the warehouse was closed to prevent units from coming in and out and keep the numbers stable, and importantly, whether this count was ever repeated at a later point in time. *See, e.g., Ford v. Voxx Int'l Corp.*, No. 14-CV-4183 (JS) (AYS), 2016 WL 3982466, at *6-7 (E.D.N.Y. July 22, 2016) (declining to credit a single FE1 who could not quantify alleged magnitude of declining sales); *Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 411 n.10 (S.D.N.Y. 2007) (failing to credit allegations of a write-down as a CW failed

17

to "distinguish between ferry and container assets" and conclusory allegations to when certain containers were overvalued).

Without more, Plaintiff rests most of its case on numbers from a single day, which could have changed the next day or week without FE1's knowledge. *See In re Lehman Bros. Sec. & Erisa Litig.*, No. 10-CV-6637 (LAK), 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013) (disregarding CWs who "were loan level underwriters, not managers or corporate officers who could have spoken to the company's practices broadly"). Further, as ACI was a "wholly owned subsidiary" of Polished, its inventory system would not necessarily reflect the entire company's inventory, and the SAC makes no representation about how much of the entire company's inventory was on this system. (SAC ¶ 6.) Accordingly, FE1 would not have a complete picture of the entire inventory of the company's stock keeping units. *See Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010), *aff'd*, 430 F. App'x 63 (2d Cir. 2011) (discounting allegations of CWs whom the complaint did not indicate had any "access to aggregated data regarding [the company's] credit risk"); *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 367 (S.D.N.Y. 2007) (finding insufficient allegations by a former founder of a subsidiary who had no knowledge about the parent's corporate strategy). The SAC fails to represent how FE1 knew that 1,200 missing units at the subsidiary, on a single day, "materially misstated [Polished's inventory] on the balance sheet" for an entire quarter or fiscal year. (SAC ¶ 65.) The court took no position in the M&O as to whether FE1 could be so credited, and Individual Defendants persuasively argue that the SAC does not plead facts sufficient to allow the court to believe FE1's account. (*See* M&O at 27-28; MTD at 8-11.)

Regarding valuation, there are also no allegations that FE1 could accurately *value* the missing units. (MTD at 10.) Polished allegedly had 500,000 stock keeping units, or items of inventory for

18

sale, as of March 31, 2022. (Polished's 2021 Form 10-K, filed with SEC March 31, 2022 (Dkt. 56-7) at ECF p. 10.) There is no allegation that FE1 understood how to value this inventory, and the omission of the value of these missing units also undermines Plaintiff's credibility. *Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 335-36 (S.D.N.Y. 2009), *aff'd*, 371 F. App'x 212 (2d Cir. 2010) (finding that reports relied upon by a CW that contained "lease terms for less than a third of Kmart's stores" were "questionable" in valuing Kmart's entire real estate portfolio); *Caiafa*, 525 F. Supp. 2d 398 at 411 n.10 (failing to credit CW's writedown allegations that failed to "specif[y] the amount by which the containers were overvalued, and at what times"). Even assuming these 1,200 units were truly missing, the court cannot credit that this number was material without knowing anything about the valuation of these goods.

Plaintiff points to this court's decision in *Nio* to attempt to salvage its claims. (Opp'n at 10 (citing *In re Nio, Inc. Sec. Litig.*, No. 19-CV-1424 (NGG) (JRC), 2021 WL 3566300, at *7 (E.D.N.Y. Aug. 12, 2021)).) There, the court credited the accounts of three anonymous sources to deny a motion to dismiss a securities fraud claim. The accounts of three individuals—a purchasing manager in charge of factory development, a senior salesperson, and a car design engineer—supported the claim for material misrepresentation that an electric vehicle factory had been built. *Nio*, 2021 WL 3566300, at *4, 7. The court credited the allegations of the latter two through the accounts of the first, since that FE1—the purchasing manager—was directly in charge of "selecting factory sites and negotiating with factory suppliers." *Id.* at *7. Whether the company had begun building the factory was directly within both FE1s knowledge and competence to assess. Here, however, Plaintiff's FE1 did not have a complete picture of Polished's entire inventory, and the valuation of thousands of units of inventory would require specialization or familiarity with valuation methods (neither of which is alleged in the SAC). Unlike the findings

19

in *Nio*, the anonymous accounts here cannot sustain or corroborate each other because the court finds them individually unreliable.

Plaintiff levels serious allegations against Individual Defendants. However, the weakness of key FE accounts precludes this court from deeming them sufficiently credible to sustain Plaintiff's claims. *See Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000); *see also In re MRU Holdings Sec. Litig.*, 769 F. Supp. 2d 500, 515 (S.D.N.Y. 2011) ("Clearly, an inference that the defendants knew their statements to be false cannot be based on allegations which are themselves speculative.") (quoting *Wexner v. First Manhattan Co.*, 902 F.2d 169, 173 (2d Cir. 1990)). As such, the court will not credit their accounts in assessing the sufficiency of the allegations in the SAC.

### 3.    Alleged Material Misrepresentations and Omissions

Plaintiff makes nearly identical allegations in the SAC that Fouerti and Johnson made numerous material misrepresentations and omissions across four SEC filings and one earnings call. The challenged statements in the SAC generally fall into four categories: (1) financial metrics and opinions regarding Polished's future prospects (SAC ¶¶ 132, 134, 142, 144, 154); (2) restated financial metrics (*id.* ¶¶ 150, 160); (3) statements and certifications regarding Polished's internal controls (*id.* ¶¶ 136, 146, 148, 152, 162); and (4) statements concerning Polished's fulfilment, logistics, and returns processes (*id.* ¶¶ 138, 140, 156, 158).

"A material misrepresentation or omission must be both (1) false or misleading, and (2) material." *Leadersel Innotech ESG v. Teladoc Health, Inc.*, No. 23-CV-1112, 2024 WL 4274362, at *2 (2d Cir. Sept. 24, 2024) (citing *Singh v. Cigna Corp.*, 918 F.3d 57, 62-63 (2d Cir. 2019)). To adequately allege a material misrepresentation, "a plaintiff must plead facts that show that the defendant made a statement of material fact that was untrue at the time it was made." *In re Liberty Tax, Inc. Sec. Litig.*, 435 F.

20

Supp. 3d 457, 465 (E.D.N.Y. 2020). A misrepresentation or omission is material if there is a "substantial likelihood that a reasonable investor would find the misrepresentation important in making an investment decision." *United States v. Gramins*, 939 F.3d 429, 445 (2d Cir. 2019); *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186-89 (2015) (applying the same standard to omissions). A misrepresentation or omission is important to a reasonable investor "if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Gramins*, 939 F.3d at 445 (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)); *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38, 45-47 (2011).

The SAC does not make materially different claims as to the statements. As the court declines to credit the new allegations brought by the FEs, it adopts the same reasoning and conclusions for the aforementioned four groups of statements as the M&O. The statements contained in groups (1), (3), (4) fail to allege material misrepresentations and omissions. (M&O at 30-38, 41-54.) But the SAC adequately alleges that certain challenged statements in the restated financial metrics—those contained in group (2)—which include the 2021 Form 10-K and 2022 Form 10-Q, were both false and misleading when stated. (M&O at 38-41.)

The court briefly addresses two of Plaintiff's new arguments for the sake of completeness. Plaintiff argues that the 2021 10-K Risk Factor,[6] a statement in group (4), had already materialized when it was made, and that the SOX Certifications, in group (3), were false statements of fact. (Opp'n at 22-23.) Plaintiff argues that FE1's new allegations show that Fouerti knew this risk had materialized, because Polished was already shipping damaged

---

[6] Polished included a risk warning in its 2021 10-K outlining factors that could impact the company's growth. (SAC ¶ 158.)

21

products. (SAC ¶¶ 73-74, 79-80.) Plaintiff also avers that FE1's account proves that the SOX Certifications were false because FE1 directly told Fouerti about improprieties in the business. (Opp'n at 22-23.) This, Plaintiff reasons, renders his certifications false. (*Id.*)

For this Risk Factor, the pleading for FEs 1, 3, and 11, whose accounts Plaintiff cites in support of allegedly damaged products being shipped, contains no dates of when FE1, FE3, or FE11 allegedly heard Fouerti demand that employees ship and carry damaged goods for sale. (Opp'n at 22 (citing SAC ¶¶ 73-74, 79-80).) This is a fatal defect to their accounts. *See Miao*, 442 F. Supp. 3d at 799.

SOX Certifications are statements of opinion, not fact. (M&O at 44-45 (citing *New England Carpenters Guaranteed Annuity and Pension Funds v. DeCarlo*, 122 F.4th 28, 47 (2d Cir. 2023)).) Accordingly, Plaintiff must allege that "(1) the speaker does not hold the belief . . . professed; (2) the facts supplied in support of the belief professed are untrue; or (3) the speaker omits information that makes the statement misleading to a reasonable investor." *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 217 (S.D.N.Y. 2018) (quoting *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016)). FE1's accounts are not credible for the reasons laid out above. Even taken as true, no allegations here are sufficient to prove that Fouerti and Johnson disbelieved these statements, provided false facts, or omitted information making the statement misleading. *See id.* The 1,200 pieces of allegedly missing inventory from two hand-counts months earlier from a subsidiary warehouse are insufficient to prove fraud. Nor do they meet the PSLRA's heightened pleading standard. *See Synchrony*, 988 F.3d at 166-67. And as Individual Defendants point out, the SAC is impermissibly vague with respect to the alleged forgeries or hiring practices. (Defs.' Reply at

6-7.) FE1's accounts do not mention that he even brought hiring practices to Fouerti or Johnson's attention. (SAC ¶¶ 64-67.)

For these reasons, the SAC fails to plead that either the Risk Factor or the SOX Certifications were either false or misleading.

### 4.   Scienter

Plaintiff's claims, including new allegations attempting to establish Individual Defendants' motive to commit fraud, fail to raise a strong inference of scienter.

Under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." *Anschutz Corp.*, 690 F.3d at 108. "The requisite state of mind in a Rule 10b-5 action is an intent to deceive, manipulate or defraud." *Ganino*, 228 F.3d at 168. Such an intent may be established "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99. Motive and opportunity may be established by demonstrating that defendants benefitted "in a concrete and personal way" from the alleged fraud. *Novak*, 216 F.3d at 311. Conscious misbehavior means "deliberate[ly] illegal behavior, a standard met when it is clear that a scheme, viewed broadly, is necessarily going to injure." *Gould v. Winstar Comms., Inc.*, 692 F.3d 148, 158 (2d Cir. 2012). Recklessness may be established "where a defendant has engaged in conduct that was highly unreasonable, representing an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* at 158-59. This standard is met "where a defendant failed to review or check information that it had a duty to monitor, or ignored obvious signs of fraud." *Id.* at 159.

23

Importantly, there are "several important limitations on the scope of liability for securities fraud based on reckless conduct." *Novak*, 216 F.3d at 309. First, plaintiffs cannot "proceed with allegations of fraud by hindsight." *Id.* "Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them." *Id.* As such, "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Id.* Second, "as long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects." *Id.* And where a plaintiff claims that defendants had access to contrary facts, the plaintiff "must specifically identify the reports or statements containing this information." *Id.* Finally, "[a]llegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim." *Stevelman*, 174 F.3d at 84; *see also Novak*, 216 F.3d at 309.

"[I]n determining whether the pleaded facts give rise to a strong inference of scienter, the court must take into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323 (2007) ("*Tellabs*"). A complaint will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. In making this determination, the court must review "all the allegations holistically." *Id.* at 326.

The SAC adds new allegations to argue that Fouerti and Moore had the motive and the opportunity to commit fraud, and like the FAC, relies on circumstantial evidence of conscious misbehavior or recklessness to establish scienter. In addition to the original four sets of facts alleged in the FAC—(1) the FE accounts; (2) the

24

resignations of Fouerti and Johnson; (3) the resignation of Polished's independent accounting firm, Friedman; and (4) alleged GAAP violations, (SAC ¶¶ 42-131, Opp'n at 7-21)—the SAC adds (5) a section alleging that Fouerti and Moore had motives to violate the securities laws. (SAC ¶¶ 53-56.) For the reasons that follow, the court does not find that this additional allegation raises a strong inference of scienter as to any Individual Defendant.

### a.  *Motive and Opportunity*

Plaintiff's additional allegations as to motive are insufficient as a matter of law.[7] Plaintiff asserts that the SAC "pleads Fouerti's motive to concoct and carry out the fraudulent scheme, ¶¶ 53-55, and that the fraudulent scheme predated Goedeker's purchase of [AC]. ¶¶ 53-97." (Opp'n at 14.) Fouerti allegedly "directed fraudulent inventory practices, and other fraud . . . well before Polished acquired [AC]." (SAC ¶ 53.) He purportedly "leveraged the scheme to produce numbers which were clearly attractive to Goedeker, and negotiated a concrete personal benefit for himself of $180 million" upon acquisition of his company. (Opp'n at 14 (citing SAC ¶ 54).) Fouerti also allegedly stole $800,000 directly from Polished and paid his father a $104,000 salary for a fictitious job at YF Logistics. (SAC ¶ 55.) Plaintiff then alleges that Moore's motive is established by his $650,000 severance payment when he left the CEO role on August 30, 2021. (SAC ¶ 56.)

These allegations fail to bolster Plaintiff's allegations of scienter. As to Fouerti, the allegations about the fraudulent inventory practices and "false financials" before the acquisition are not pleaded with sufficient detail for this court to credit them. There are no detailed allegations of what type of fraud occurred, or why

---

[7] The parties do not contest whether the Individual Defendants had "opportunity," which generally requires access to inside corporate information. *See Stevelman v. Alias Research, Inc.,* 174 F.3d 79, 86 (2d Cir. 1999).

the financials were supposedly false. *See ATSI*, 493 F.3d at 99 ("Allegations that are conclusory or unsupported by factual assertions are insufficient."). Further, the idea that he made the numbers "attractive" to Goedeker is insufficient to show motive. Even accepting this allegation as true, schemes to defraud other shareholders do "not support the argument that [the alleged fraud] show[ed] motive to defraud a company's *own* shareholders." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.,* 553 F.3d 187, 200-201 (2d Cir. 2009) ("*ECA*"). Indeed, without further allegations, it is "at least as compelling" an inference, *Tellabs,* 551 U.S. at 326, that this alleged motive, "common to most corporate officers . . . for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation," could be legitimate. *ECA,* 552 F.3d at 198. And in any event, this motive would "not constitute 'motive' for the purposes of this inquiry." *Id.*; *see also Kalnit v. Eichler,* 264 F.3d 131, 141 (2d Cir. 2001) ("The desire to achieve the most lucrative acquisition proposal can be attributed to virtually every company seeking to be acquired.").

This alleged motive also has nothing to do with any challenged statement. Goedeker's purchase of AC is not only activity far before the class period, but also before Fouerti was an employee of Polished. *See In re Lions Gate Ent. Corp. Sec. Litig.,* 165 F. Supp. 3d 1, 23 (S.D.N.Y. 2016) (declining to find a concrete benefit to defendants in retaining control over company in a takeover battle three years before the challenged statements, and finding a lack of connection between nondisclosure of an SEC investigation and this "benefit"). This alleged scheme is not adequately connected to any class period activity or defrauding investors. As with the other scienter pleading requirements, "mere conclusory allegations connecting fraud to benefits for purposes of motive are insufficient." *Glaser v. The9, Ltd.,* 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011) (citing *Fort Worth Employers' Ret. Fund v. Biovail*

*Corp.*, 615 F. Supp. 2d 218, 225 (S.D.N.Y. 2009)). And as Defendants point out, none of Plaintiff's cited cases in its Opposition deal directly with whether motive allegations concerning a *different*, pre-class fraud can create a strong inference of scienter. (Defs.' Reply at 8 n.7.)[8]

Likewise, accepting as true the allegations that Fouerti stole $800,000 from the company, and created a fake job for his father at YF Logistics, Plaintiff has not tied these "motives" to any challenged statement or a scheme to perpetrate a fraud on the company's investors. *Glaser*, 772 F. Supp. 2d at 587; *In re Lions Gate*, 165 F. Supp. 3d at 23 ("The plaintiffs have failed to connect the motive to the allegedly materially false statements or omissions.").

Lastly, while Moore has already been dismissed from the case, considering the new pleading still ends with the same result. Moore's motive allegations fail as Moore is only connected to 2Q21 financial statements, and any contemporaneity is highly attenuated. (SAC ¶ 132); *see Glickman*, 1996 WL 88570, at *11 n.6. And as Defendants insist, Moore's severance payment is "unremarkable and cannot demonstrate motive to defraud investors." (Defs.' Reply at 8; *see also* M&O at 58-60 (citing voluminous caselaw in finding the resignations of Fouerti and Johnson failed to support a strong inference of scienter); *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510 (S.D.N.Y.), *aff'd*

---

[8] These include an out-of-circuit, unreported default judgment action that details the standard for obtaining a permanent injunction in the Ninth Circuit, not the 10b-5 scienter standard in the Second Circuit. (Opp'n at 14 (citing *Sec. & Exch. Comm'n v. McMillan*, No. 06-CV-0951 (PCT) (SMM), 2009 WL 10708627, at *3 (D. Ariz. Oct. 20, 2009)).) Another out-of-circuit, unreported SEC action does not aid the court in comparing either facts or law to the instant case, as Plaintiff merely parrots that a prior order concluded the defendant acted with scienter. (*Id.* (citing *SEC v. Yin Nan Wang*, No. 13-CV-7553 (JAK), 2016 WL 11533562, at *2, *9 (C.D. Cal. Oct. 31, 2016)).)

*sub nom. Condra v. PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009) (failing to find scienter through tenuous linkage between a negotiation of a "golden parachute" severance payment and the alleged fraud). No motive allegations are made as to Johnson, which therefore also fail.

> b.   *Circumstantial Evidence*

Plaintiff also fails to offer sufficient circumstantial evidence to successfully raise an inference that the Individual Defendants were acting with conscious misbehavior or recklessness. "[I]f a plaintiff fails to allege adequate motive, as in this case, the strength of the circumstantial allegations of conscious misbehavior or recklessness must be correspondingly greater." *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 184 (S.D.N.Y. 2012), *aff'd sub nom. Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72 (2d Cir. 2013) (summary order). As detailed above, the court does not credit the amended allegations as to the FEs. While FE1's allegations now include more information about what was allegedly discussed in their direct conversations with Fouerti and Johnson, including the September 21, 2021 meeting where FE1's employment was terminated, (SAC ¶¶ 59-69), FE1's statements are not credible because there are no allegations that they "played any direct or meaningful role in the company-wide financial forecasting or reporting process," in either fully understanding Polished's inventory or its valuation. *NECA-IBEW Health & Welfare Fund v. Pitney Bowes Inc.*, No. 09-CV-1740 (VLB), 2013 WL 1188050, at *35 (D. Conn. Mar. 23, 2013); *see also In re MRU Holdings Sec. Litig.*, 769 F. Supp. 2d at 515.

The M&O found that individually the other three factors, (1) the resignations of Fouerti and Johnson, (2) the resignation of Polished's independent accounting firm, Friedman, and (3) alleged GAAP violations were insufficient to create a "strong inference of

28

scienter." (M&O at 58 (citing *Novak*, 216 F.3d at 309 ("[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim."); *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. 2007) ("[A]lthough not sufficient in and of themselves, [resignations] add to the overall pleading of circumstantial evidence of fraud.").) And even when considering them "holistically" the court still did not find they adduced "strong circumstantial evidence of conscious misbehavior or recklessness." (M&O at 58 (citing *Tellabs*, 551 U.S. at 326); *see generally id.* 58-62 (discussing the other factors).) As the court declines to credit the allegations of FE1 and the other anonymous witnesses, (*see supra* Section IV.A.3), the court again finds that Plaintiff has failed to materially augment its FAC. There is not sufficient circumstantial evidence from which to infer conscious misbehavior or recklessness as to any Individual Defendant.

Taken holistically with the other allegations already discussed and substantially identical to those in the FAC, Plaintiff fails to raise a strong inference of scienter as to any Individual Defendant.

### 5. Loss Causation

Because the majority of the challenged statements are not actionable misstatements or omissions, and because Plaintiff has failed to adequately raise a strong inference of scienter as to the few actionable misstatements, the court declines to reach the issue of loss causation. (*See* M&O at 62); *see, e.g., Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 184 (E.D.N.Y. 2017) ("Since the plaintiffs have not identified any actionable misstatements or adequately alleged scienter, there is no basis upon which they may plead reliance or loss causation."); *In re Neurotrope, Inc. Sec. Litig.*, 315 F. Supp. 3d 721, 730 (S.D.N.Y. 2018) ("Because the Complaint fails to allege a material misrepresentation or omission, and scienter, the loss causation issue is not addressed.").

29

\*       \*       \*

In sum, the Second Amended Complaint does not sufficiently allege a material misrepresentation, omission, or scienter. *See Synchrony*, 988 F.3d at 167. Thus, Plaintiff fails to state a claim under Section 10(b) and Rule 10b-5(b).

### B.   Scheme Liability

The court previously found that Plaintiff's Count II alleging scheme liability failed because the various purportedly improper practices failed to describe a scheme "in connection with the purchase or sale of securities." (M&O at 63-64.)

Count II of the SAC fails for the same reasons.[9] As a threshold matter, scheme liability cannot be established when a complaint "only alleges misstatements and omissions." *SEC v. Rio Tinto*, 41 F.4th 47, 53 (2d Cir. 2022). Outside the allegations of the misstatements, which make up the vast majority of the ink spilled in the SAC, Plaintiff fails to "articulate with precision the contours of an alleged scheme to defraud investors, or which specific acts were conducted in furtherance of it." *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021). The purported acts of fraud against Polished, customers, and credit card companies "do not establish a deceptive scheme to defraud investors." (M&O at 64 (quoting *Plumber & Steamfitters Loc.*, 11 F.4th at 105 (holding that allegations of money

---

[9] Plaintiff incorrectly states in its briefing that the court made factual findings as to the various allegations in the FAC about improper business practices directed and carried out by Fouerti. (Opp'n at 23.) As a matter of elementary procedure, "[o]n a motion to dismiss, the court does not find facts." *United States v. Prevezon Holdings LTD.*, 122 F. Supp. 3d 57, 78 (S.D.N.Y. 2015). As described above, while the court refers to its earlier M&O to the extent certain allegations and arguments are materially identical, it reviews only the SAC as the operative complaint. Thus, there is no law of the case Plaintiff can point to here. *See supra* Section II.

laundering were insufficient to plead a scheme to defraud investors)); *Fogel v. Wal-Mart de Mexico SAB de CV*, No. 13-CV-2282 (KPF), 2017 WL 751155, at *18 (S.D.N.Y. Feb. 27, 2017) (holding that allegations of a bribery scheme were similarly insufficient).) Scienter, a necessary element of a scheme-liability claim, is likewise missing and requires dismissal. *See Plumber & Steamfitters Loc.*, 11 F.4th at 105; *Meyer v. Organogenesis Holdings Inc.*, 727 F.Supp.3d 368, 398 n.12 (E.D.N.Y. 2024) (finding that a scheme liability claim failed "in light of Plaintiffs' failure to establish scienter").[10]

### C.  Section 20(a)

The court previously found that Plaintiff failed to allege violations of Section 20(a) against Individual Defendants in its Count III, as the FAC failed to "allege a primary violation of the securities laws." (M&O at 65 (citing *ECA*, 553 F.3d at 206-07 (concluding that the "control person liability claim pursuant to . . . section 20 of the Exchange Act must also fail for want of a primary violation")).) For the reasons stated above the SAC fails to allege a primary violation of the securities laws. Consequently, Plaintiff cannot allege a violation of Section 20(a). *See ECA*, 553 F.3d at 206-07.

### V.  CONCLUSION

For foregoing reasons, the Individual Defendants' motion for judicial notice is GRANTED IN PART and DENIED IN PART. The Individual Defendants' motion to dismiss is GRANTED and the Second Amended Complaint is DISMISSED WITH PREJUDICE as

---

[10] The primary case Plaintiff discusses here is an unreported, out-of-circuit decision. (Opp'n at 24 (citing *Maverick Fund, Ltd. v. Mohawk Industries, Inc.*, 21-CV-0118 (VMC), 2023 WL 2887603, at *9 (N.D. Ga. Mar. 31, 2023)).) It is immaterial to this case that the court there found defendants to have adequately pled falsity and scienter.

to these defendants. As Plaintiff has made multiple representa-
tions that Polished is no longer in the case, the court DIRECTS it
to make an application to keep the case open as to that entity
within 30 days. If it does not, the Clerk of Court is respectfully
DIRECTED to close the case.

SO ORDERED.

Dated:   Brooklyn, New York
         March 10, 2026

                                    s/Nicholas G. Garaufis
                                    NICHOLAS G. GARAUFIS
                                    United States District Judge

32